SOVEREIGN NEWS CO., Plaintiff,

v.

Lee C. FALKE, Prosecuting Attorney for Montgomery County, Ohio, and E. R. Robinson and C. L. Dalrymple, and John T. Corrigan, Prosecuting Attorney for Cuyahoga County, Ohio, and Roy Warner, L. Thompson, John Crawford, Archie Catavolos, Kenneth White, William Poe, Richard B. Millett, John H. Devine, James Lynsky, Vincent G. Krawulski, Carl Delau, Andrew S. Vanyo, James Kennelley, Robert J. Cermak, Henry Yisha, Gregory Kunz, B. Jones, Richard McIntosh, John McNamara, Edward C. Loucas, Samuel Hennie, Charles Berkey, Robert O'Brien, and the following members of the Police Department of the City of Cleveland, Ohio, whose full names are unknown at this time: Kaminski, Banyon, McGreer (Badge No. 1583), and John Doe I, John Doe II, and John Doe III, Defendants.

No. C77–230.

United States District Court,
N. D. Ohio, E. D.

Oct. 31, 1977.

Bernard A. Berkman, Berkman, Gordon, Kancelbaum & Levy, Cleveland, Ohio, for plaintiff.

William J. Brown, Atty. Gen. of Ohio, Thomas V. Martin, Asst. Atty. Gen., Columbus, Ohio, James A. Brogan, First Asst. County Pros., Dayton, Ohio, for amicus curiae.

Jack M. Schulman, Director of Law, Bruce A. Taylor, Asst. Director of Law, Cleveland, Ohio, Herbert Creech, Asst. Pros. Atty., Dayton, Ohio, for Falke.

Smith, Warder, Arter & Hadden, Cleveland, Ohio, Timothy J. Armstrong, Asst. Pros. Atty., Cleveland, Ohio, for Robinson and Dalrymple.

## MEMORANDUM OF OPINION

## JUDGMENT ORDER

MANOS, District Judge.

## I.

## PROCEDURAL HISTORY

On March 7, 1977, the plaintiff, Sovereign News Company,[1] filed this action seeking compensatory and punitive damages, a declaratory judgment, and preliminary and permanent injunctions restraining both the Cuyahoga County, Ohio and Montgomery County, Ohio prosecutors, and all the defendant Cleveland and Dayton police officers from using evidence seized during a search of Sovereign's premises to prosecute Sovereign.[2] The search in question was

---

1. Hereinafter, Sovereign.

2. Paragraph 1 of Sovereign's Complaint states:
 "Plaintiff is a corporation doing business in Ohio and engaged in the distribution of books, magazines and films. Defendants Lee C. Falke and John T. Corrigan are respectively the duly elected and acting prosecuting attorneys for the counties of Montgomery and Cuyahoga, State of Ohio. The other de-

fendants are officers and members of the police departments of the cities of Dayton and Cleveland in the State of Ohio, as indicated in the caption of this complaint. This action seeks damages against the defendants (except the defendant prosecuting attorneys), declaratory judgment and equitable relief to redress the violation of plaintiff's rights secured under the First, Fourth and Fourteenth

conducted on February 16, 1977 pursuant to a search warrant. Sovereign's complaint alleges that the search of its premises, and the Ohio statutory provisions employed to authorize that search, violate the First, Fourth, and Fourteenth Amendments to the United States Constitution.[3]

On March 28, 1977, Sovereign moved for a preliminary injunction, and on March 29, 1977, the court convened a hearing on that motion.[4] The Cleveland policemen urged the court to dismiss Sovereign's complaint pursuant to Fed.R.Civ.P. 12(b) on the theory that the doctrine of *Younger v. Harris,*[5] 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Huffman v. Pursue,*[6] 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) compelled the court to abstain from hearing Sovereign's constitutional claims.[7]

Prior to the commencement of the March 29, 1977 hearing, counsel for defendant Falke, the Prosecuting Attorney for Montgomery County, filed a written motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), (3), (6), "for the reasons that the court lacks jurisdiction over the subject matter of the action, the venue is improper and the complaint fails to state a claim upon which

relief can be granted.[8]" Falke's motion was orally argued before the commencement of the March 29, 1977 hearing. Falke's counsel, First Assistant Montgomery County Prosecutor James Brogan, admitted that this court sustained "jurisdiction to hear the case," but urged that venue should be transferred to the Federal District Court for the Southern District of Ohio,[9] and that the court should not hear Sovereign's claims because of the doctrine of "equitable restraint" enunciated in *Louisville Area Inter-Faith Committee for United Farm Workers et al. v. Nottingham Liquors et al.,* 542 F.2d 652 (6th Cir. 1976), and *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).[10] Assistant Montgomery County Prosecutor Brogan also argued that *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) prohibits this court from issuing any injunctive order restraining state law enforcement authorities from introducing illegally obtained evidence to a state grand jury that sustains jurisdiction of investigate an alleged offense to which the illegally obtained evidence is relevant.[11]

---

Amendments of the United States Constitution."

The complaint alleges an excess of 10,000 dollars in controversy, and charges that the defendants violated Sovereign's federal civil rights while acting under color of state law. Thus paragraphs two and three of Sovereign's complaint allege original federal subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(1), 1343(3), 1343(4), and 42 U.S.C. § 1983. Sovereign also seeks a declaratory judgment and therefore alleges jurisdiction under 28 U.S.C. § 2201. The court finds that jurisdiction is proper under each statutory provision cited in Sovereign's complaint. *See generally, Hanna v. Drobnick,* 514 F.2d 393, 398–399 (6th Cir. 1975); *Patterson v. City of Chester,* 389 F.Supp. 1093, 1095–1096 (E.D.Pa.1975); *Amen v. Dearborn,* 532 F.2d 554, 559 (6th Cir. 1976); *Wiley v. Memphis Police Department,* 548 F.2d 1247, 1254 (6th Cir. 1977); *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 571–572, 50 L.Ed.2d 471 (1977).

3. Count II of Sovereign's complaint seeks an injunction against the defendants on the theory that they perpetrated the Ohio common law torts of trespass and conversion against Sover-

eign, as well as an illegal search and seizure under the laws of Ohio. The Court assumes that these state law claims are joined in the complaint under the doctrine of pendent jurisdiction.

4. *See,* transcript [hereinafter, Tr.] at pp. 3–4.

5. *See,* Tr. 5–19.

6. *See,* Tr. 5–19.

7. On the morning of March 29, 1977 the Cleveland Law Department, representing the individually named Cleveland police officer defendants, filed a brief, arguing various reasons, under Ohio law, why this court should not grant the injunction sought by Sovereign. The court rejects the arguments based solely on Ohio law.

8. *See,* defendant Falke's motion filed March 29, 1977.

9. *See,* Tr. 22.

10. *See,* Tr. 23.

11. *See,* Tr. 21.

At the conclusion of the arguments of counsel, the court overruled defendant Falke's motion to change venue,[12] and withheld ruling on the motions to dismiss until it heard the evidence elicited during the preliminary injunction hearing.[13]

On March 30, 1977, the second day of the hearing on the preliminary injunction, counsel for the defendant Cleveland police officers, moved the court *in limine* to limit the testimony of several of the Cleveland police officer defendants.[14] The court denied the motion, and permitted Mr. Berkman, counsel for Sovereign, to continue his examination of the police officers called as witness-

---

12. *See*, Tr. 37–38, 44. *See*, 28 U.S.C. §§ 1391(b), 1392(a), and 1404(a). The first concern of the court in a § 1404 proceeding is whether the action which a party seeks to transfer "could have been brought" originally in the proposed transferee district. *Continental Grain Co. v. Barge F.B.L.–585*, 364 U.S. 19, 22, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960); *Hoffman v. Blaski*, 363 U.S. 335, 343–344, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960). This action could have been brought in the Southern District of Ohio. *See*, 28 U.S.C. § 1392(a). However, in considering a motion to transfer, "the district court is vested with a wide discretion . . ." *Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 756 (3rd Cir. 1973); *Nowell v. Dick*, 413 F.2d 1204, 1212 (5th Cir. 1969). This court exercised its discretion *not* to transfer this case out of the Northern District of Ohio, Eastern Division because that district is where the search warrant was obtained and the search was conducted; it is also where the overwhelming number of the parties to this litigation are located, and it is the district from which most of the witnesses including Cuyahoga County Common Pleas Judge Spellacy, were to be called. *Compare, Starnes v. McGuire*, 168 U.S.App.D.C. 4, 17, 512 F.2d 918, 931 (1974). Also, the court gave substantial weight to plaintiff Sovereign's selection of this forum. *See, Vasquez v. Falcon Coach Co.*, 376 F.Supp. 815, 822–823 (D.N.D. 1974); *Cooper v. Camp Pinecrest, Inc.*, 175 F.Supp. 817, 818–819 (E.D.N.Y.1959).

13. This court did not invite the Ohio Attorney General to intervene as a party in this litigation for purposes of calling witnesses to offer testimony during the hearing on the preliminary injunction at which the constitutionality of Ohio Revised Code §§ 2907.32, 2907.01, and 2923.04 were drawn in question because 28 U.S.C. § 2403(b), Pub.Law 94–381, 1976 *U.S. Code Cong. & Admin.News* at 90 Stat. 1119–1120, authorizes such intervention by a state's attorney general *only* "in any action, suit, or proceeding in a court of the United States to which a State or *any agency, officer,* or employee thereof *is not a party*." (Emphasis added). In this action, the Dayton and Cuyahoga County Prosecutors are both parties. Under Ohio law, the offices of these two officials are agencies of the State of Ohio and the officials themselves are officers of the State of Ohio for purposes of enforcing Ohio's criminal laws, such as the laws drawn into question in this case. Ohio Revised Code § 309.08 explicitly provides:

> "The prosecuting attorney may inquire into the commission of crimes within the county and shall prosecute *on behalf of the State,* all complaints, suits, and controversies *in which the State is a party* . . . ."

Therefore, this court lacks the power to permit the Ohio Attorney General to intervene under 28 U.S.C. § 2403(b), as a litigant in the hearing on the preliminary injunction because the two county prosecutors who were already parties are officers of the State of Ohio for purposes of the administration of the Ohio legislation challenged as unconstitutional.

This court's application of § 2403(b) is consistent with the statute's legislative intent as stated in the legislative history of the 1976 amendments to the Three Judge Court Act, P.L. 94–381. *See*, 1976 *U.S.Code Cong. Admin. News*, pp. 1988–2001.

In the case of *Larry Flynt, et al. v. Simon L. Leis, et al.*, Case No. C–1–76–553 (S.D.Ohio, November 30, 1976) the identical Ohio statutes that are challenged by Sovereign in this case, were challenged as unconstitutional by plaintiffs Larry Flynt, *et al.* One defendant in the *Flynt* case was the county Prosecutor for Hamilton County, Ohio. The court in the *Flynt* case conducted a preliminary injunction hearing. *See, Flynt, supra*, Slip Op., pp. 1, 7. Examination of certified copies of both the district court's opinion and the docket entries in the *Flynt* case reveals that the district court in *Flynt, supra*, did not certify any questions to the Ohio Attorney General and that office did not participate in the preliminary injunction hearing. The *Flynt* case is further precedent for the proposition that when Ohio criminal statutes are challenged as unconstitutional in a United States district court, and that court conducts a preliminary injunction hearing on the constitutional issue, at which hearing an Ohio county prosecutor is a party, then the district court lacks power under 28 U.S.C. § 2403(b) to permit the Ohio Attorney General to intervene as a party during the preliminary injunction hearing. Of course the district court retains discretion to invite the Ohio Attorney General to intervene as an *Amicus Curiae*, and this court exercised that discretion in this case.

14. *See*, Tr. 123–125.

es during the preliminary injunction hearing.[15]

On March 31, 1977, the hearing on the preliminary injunction was concluded[16] and each of the defendants renewed their motions to dismiss Sovereign's declaratory and injunctive claims.

On April 1, 1977, after the close of the hearing, the court, pursuant to motions made by the defendants, stated that it would treat the hearing as one dealing with the preliminary injunction, and that it would consider the request for a declaratory judgment "only with respect to the [purely legal] issue of the constitutional validity of [Ohio Revised Code] Sections 2907.-32, 2907.01, and 2923.04. The court will not now entertain consideration of the plaintiff's declaratory judgment claims other than the claim that Sections 2907.32, 2907.-01 and 2923.04 violated the United States Constitution."[17] At the same time the court reiterated its earlier ruling that the question of money damages would be considered only after further proceedings, and not based on the hearing conducted between March 29 and 31, 1977.

At the conclusion of the April 1, 1977 proceeding, the defendants' respective motions to dismiss Sovereign's declaratory judgment and injunction claims were pending before the court. Sovereign's motion for a declaratory judgment on the constitutional validity of Ohio Revised Code §§ 2907.32, 2907.01, and 2923.04, and its motion for a preliminary injunction were also pending. All defendants filed answers to Sovereign's complaint by April 13, 1977, and all defendants except the Dayton policemen filed their briefs by April 25, 1977.[18]

By April 14, 1977, defendant Falke, pursuant to an agreement among the parties,[19] supplemented the record of the earlier hearing by filing Exhibits 100–141.[20] These exhibits consist of photographs which were not located in Cleveland at the time of the hearing.

On May 14, 1977, the court served copies of the plaintiff's complaint, a copy of the transcript of the hearing on the preliminary injunction, and copies of other portions of the record upon the Ohio Attorney General with an invitation that he file an *amicus curiae* brief in this case regarding the issues currently pending before the court. On May 19, 1977, the Ohio Attorney General accepted the court's invitation and filed an *amicus curiae* brief, followed by a supplemental brief filed on June 16, 1977.

On June 21, 1977, defendant Falke filed a motion to supplement the record of the March 29–31, 1977 evidentiary hearing with a certified copy of a Montgomery County Grand Jury indictment, filed in the Montgomery County Common Pleas Court on May 3, 1977.[21] The court denies Prosecutor Falke's motion to reopen the record of the March evidentiary hearing to include the May indictment, because the document was not in existence at the time of the March hearing. However, the court will take judicial notice that the Montgomery County grand jury returned such an indictment on May 3, 1977. *See*, Federal Rules of Evidence 201, 902(4).

On July 29, 1977 Sovereign filed its post-hearing reply brief in opposition to the answer briefs previously filed by the defendants, and in opposition to the Ohio Attorney General's *amicus curiae* briefs.

15. *See*, Tr. 127.

16. *See*, Tr. 274.

17. *See*, Tr. 286–287, and *cf.*, Tr. 125–127.

18. Dayton police officers Dalrymple and Robinson filed no briefs on the preliminary injunction question after the court concluded the hearing.

19. *See*, Tr. 243–246, 258.

20. *See*, this court's order dated April 14, 1977.

21. The motion which defendant Falke filed on June 21, 1977 erroneously indicated that the indictment was filed on "March 3, 1977." However, by a letter dated August 1, 1977, defendant Falke acknowledges that the indictment was actually returned by the Montgomery County grand jury on May 3, 1977.

## II.

### THIS COURT'S FACTUAL FINDINGS

#### A. THE CLEVELAND AND DAYTON POLICE OBTAIN ACCESS TO SOVEREIGN'S PREMISES.

During the April, 1976 term, the *Hamilton County* Ohio Grand Jury indicted Sovereign for pandering obscenity within the jurisdiction of *Hamilton County*, Ohio, in violation of Ohio Revised Code §§ 2923.04 and 2907.32.[22]

On November 1, 1976, the *Montgomery County* Ohio law enforcement authorities commenced an investigation of Sovereign for pandering obscenity within the jurisdiction of Montgomery County[23] in violation of Ohio Revised Code §§ 2907.32, 2907.01 and 2923.04. The record shows that the Montgomery County investigation was sparked "as a result of complaints"[24] received by authorities in that jurisdiction. Nothing in the record suggests that the Montgomery County inquiry was related to the Hamilton County prosecution. The Montgomery County investigation focused on the interrelation between twelve book stores in the City of Dayton, Ohio, and the stores' supposed supplier, Sovereign, located in Cleveland, Ohio.[25]

The Dayton police placed the twelve Dayton stores under surveillance, and observed deliveries of boxes of magazines by vans which they determined were rented by Sovereign. Dayton Police Officer E. R. Robinson visited each of the twelve bookstores, examined various magazines, and purchased twelve which he submitted to a Dayton Municipal Judge. According to Officer Robinson's affidavit,[26] the purchased magazines:

"dealt almost exclusively with pictures and portraits of nude males and females engaging in various acts of sexual intercourse, bestiality, sodomy, cunnilingus, and acts of sexual perversion. The printed matter was negligible and not relevant."[27]

On December 19, 1976, the Municipal Judge to whom the twelve magazines were submitted issued search warrants authorizing the Dayton police to conduct a search of the twelve Dayton bookstores. A search was conducted and materials were confiscated from each location.[28]

Officer Robinson also learned from several of the bookstore owners that they were supplied from Sovereign's Cleveland installation, that they personally knew Sovereign's chief executive officer, Reuben Sturman, and that they dealt with him. One bookstore operator advised Robinson that other bookstore operations were subsidized by Sovereign, and that "these others may be on Sovereign News Company's payroll and/or Reuben Sturman's payroll."[29]

Based on the information unearthed during this investigation, the Dayton police contacted the Cleveland Police Department, which itself had been conducting its own continuing, intensive investigation of pornography in Cleveland, including Sovereign's Cleveland operation. Captain Delau, one of the two officers in charge of the February 16, 1977 search of Sovereign's Cleveland premises, testified that the Cleveland police had Sovereign's Cleveland building under surveillance and would "love to" dedicate more time to that surveillance program. Delau also testified that the Cleve-

---

22. *See*, Exhibit 1–d.

23. *See*, Exhibit 1, pp. A through A–2.

24. *See*, Tr. 27.

25. *See*, Exhibit 1, p. A.

26. This is the affidavit which Robinson signed before Judge Spellacy on February 1, 1977. *See*, Exhibit 1. The earlier affidavit placed

before the Dayton Municipal Judge has not been entered into the record of this case.

27. *See*, Exhibit 1, p. A–1.

28. *See*, Tr. 248; Exhibit 1, pp. A, A–1.

29. The record is unclear whether Robinson was told this information before, during, or after the execution of the search warrants in Dayton. *See*, Exhibit 1, pp. A–1, A–2.

land police have followed Sovereign employees.[30]

On February 14, 1977, Dayton Police Sergeant Reynolds telephoned Cleveland Police Lieutenant Vanyo, the supervisory officer for the Cleveland Police Department's Intelligence Unit, and requested Vanyo's assistance in obtaining a warrant to search Sovereign's Cleveland installation.[31] Vanyo, who, along with another Cleveland police officer, had entered Sovereign's Cleveland building pursuant to a search warrant on March 19, 1975,[32] furnished the Dayton authorities with a description of the interior and exterior of Sovereign's Cleveland premises.[33]

On February 15, 1977 Cleveland Police Lieutenant Vanyo and Cleveland Police Captain Delau met in Cleveland with Dayton Police Officers Robinson and Dalrym-

---

**30.** *See*, Tr. 217, 223–224. Sergeant McIntosh also testified regarding the Cleveland Police Department's investigation of Sovereign's Cleveland activities. The court finds the following testimony by McIntosh to be particularly credible.

"Q And are you presently employed by the Cleveland Police Department?
"A Yes, sir.
"Q What is your job description or title?
"A I'm a Sergeant in the Cleveland Police Department. I'm the officer in charge of the obscenity detail.
"Q Is that known as the Smut Squad?
"A Yes, sir.
"Q For how long a period of time have held that responsibility?
"A I've been in charge of the obscenity detail since December of 1976.
"Q And during the course of your activity in that connection, have you had occasion to keep Sovereign News Company under surveillance?
"A Yes, sir, I have.
"Q Can you tell me whether or not the police department obscenity unit, which is under your direction and control, is presently investigating the activities of Sovereign News Co. in connection with possible criminal violations?
"A Yes, they are.
"Q And, as a matter of fact, the statutes whose violations are presently under investigation are the Ohio statute involving pandering obscenity, is that right?
"A That's correct.
"Q And organized crime, which is another Ohio Statute, is that right?
"A That's correct.
"Q O.K. As a matter of fact, you know that the organized crime statute is a felony?
"A Yes, sir." *See*, Tr. 57–59.
McIntosh also gave testimony which this court believes when he said:
"Q Sgt. McIntosh, yesterday you were asked about whether or not, in your role as chief of the Smut Squad, you knew whether or not Sovereign News Co. was under investigation by the Cleveland police, and you answered in the affirmative. Do you remember that testimony?
"A Yes.

"Q Well, as a matter of fact, the investigation is *current and ongoing, isn't it?*
"A *That's correct.*
"Q And, as a matter of fact, it has involved a stake out of the building, hasn't it?
"A Yes, sir, we have done surveillance there.
"Q There has been surveillance at the building itself?
"A Yes.
"Q Employees have been followed?
"A Yes, sir.
"Q Contacts have been made with other law enforcement agencies to get information which other law enforcement agencies may have with respect to Sovereign News Co. and its employees, isn't that the case?
"A Yes.
"Q You have contacted public agencies with respect to information on file, isn't that correct, with respect to Sovereign and its employees?
"A That's correct.
"Q And the investigation with respect to possible prosecution under the Ohio pandering obscenity law and the organized crime statute is presently ongoing and continuing, isn't that correct?
"A That's correct.
"Q When you have investigations of this kind, Sergeant, your purpose is always to gather evidence so that a prosecution can be sustained, isn't that correct, as a matter of police procedure?
"A Yes, sir. Any law violation that is investigated by the police department is to determine whether or not in fact there is a law violation and present that material for—
"Q And the investigation that you have just identified as being continuing and ongoing is not just a matter of personal curiosity, it's a matter of official police action designed to ultimately culminate in prosecution, isn't that correct?
"A Yes, sir, if law violations are found." *See*, Tr. 90–93 (emphasis added).

**31.** *See*, Tr. 182.

**32.** *See*, Tr. 177–178, 203; Exhibit 98.

**33.** *See*, Tr. 183.

ple. Officer Vanyo took the two Dayton policemen to the office of John T. Corrigan, the Cuyahoga County Prosecuting Attorney, in order to obtain a search warrant for Sovereign's Cleveland building.[34]

The two Dayton police officers, Robinson and Dalrymple, armed with unexecuted copies of the affidavit [35] prepared under the Cuyahoga County Prosecutor's supervision, along with Prosecutor Corrigan personally, and at least one Cleveland police officer, appeared before Cuyahoga County Common Pleas Judge Leo M. Spellacy in the afternoon of February 15, 1977. After the law enforcement authorities explained the purpose of the search warrant, Officer Robinson executed the affidavit in Judge Spellacy's presence, and the judge then issued the search warrant based solely on the information in the affidavit.[36] The search warrant, which authorized both the Cleveland Police Department and Dayton Police Officer Robinson to search Sovereign's Cleveland offices and warehouse, stated:

"TO: CHIEF OF POLICE OF THE CLEVELAND POLICE DEPARTMENT and/or members of said Department

E. R. ROBINSON, a member of the DAYTON, OHIO POLICE DEPARTMENT

"Whereas there has been filed with me an affidavit consisting of four pages, a copy of which is attached hereto, designated as Exhibits A, A–1, A–2 and A–3, and incorporated herein as though fully rewritten, wherein the affiant avers that he believes and has good cause to believe that on the premises located at 2075 East 65th Street, Cleveland, Ohio, the same being a two story red brick building, located in a commercial area, which is a warehouse and general office building containing the Sovereign News Company and/or offices of Reuben Sturman, of which the second floor is devoted to general offices and the ground level and basement level are devoted to warehousing, there is now being unlawfully kept concealed and possessed evidence of pandering of obscenity and the violations of the Ohio organized crime statute, particularly any copies of the following magazines: [a list of thirteen magazines with sexually explicit titles was contained in this portion of the search warrant], invoices and bills of lading dealing with the shipment of magazines to the following stores located in Dayton, Ohio: Gaiety Book Store, Adult Book Store, Eros Book Store, Cinema X Book Store, Today's Book Store, Adult Books, Art Movies, Adult Book Store, Exotic Book Store, Discount Book Store, Rexic Book Store and Bonnett's Book Store from November 1st, 1976 and thereafter, payroll records as well as orders and other communications and other evidence of relationship between Reuben Sturman, the Sov-

---

34. *See*, Tr. 63–64, 180–181, 216, 248.

35. *See*, Exhibit 1. In his examination of Vanyo, Assistant Cuyahoga County Prosecutor Armstrong elicited testimony which illuminates the important role which Cuyahoga County Prosecutor Corrigan performed in securing the search warrant on which the search of Sovereign's premises was based:

"Q Lieutenant, where did you meet Mr. Corrigan with the two police from Dayton in respect to the affidavit for the search warrant?
"A His Office.
"Q Is that in the Justice Center?
"A Yes, sir.
"Q Do you remember the day?
"A Yes, sir.
"Q When was that?
"A It was February 15, 1977. It was in the morning, just before noon.

"Q February 15th?
"A Yes, sir, the day before the search.
"Q Did you meet with any of the other prosecutors at that time?
"A No, I did not.
"Q What was the purpose of your visit to Mr. Corrigan?
"A To accompany the Dayton police officers in their attempt seeking a search warrant for the premises of Sovereign News.
"Q What did Mr. Corrigan do to aid the search warrant effort?
"A He questioned the two detectives at length, and then after a period of time called in his secretary who took notes, dictated notes to her, and she in turn typed up an affidavit, which was subsequently taken to a Common Pleas Judge." Tr. 204–205.

36. *See*, Tr. 45–51.

ereign News Company and the aforementioned book stores.

"I am satisfied that there is probable cause to believe that the property described is being concealed on the premises above described and that probable cause for issuance of this search warrant exists.

"You are hereby commanded, in the name of the State of Ohio, with the necessary and proper assistance, to serve this warrant and search forthwith the premises named for the property specified, making search in the day season, and if the property or any part thereof be found there, you are commanded to seize it, leaving a copy of this warrant and a receipt for the proper [*sic*] taken, prepare a written inventory of the property seized and return this warrant and bring the property taken on such search forthwith before me, or some other judge or magistrate of the county having cognizance thereof, to be disposed of and dealt with according to law. Said search is to be made within three days of the date hereof.

"Given under my hand this 15th day of February, 1977." [37]

On the morning of February 16, 1977, at 9:00 a. m.,[38] the Cleveland Police, along with the two Dayton police, met to discuss strategy for the execution of the search warrant signed by Judge Spellacy. Cleveland Police Lieutenant Vanyo and Cleveland Police Captain Delau were in charge if the search [39] and briefed approximately thirty Cleveland policemen [40] before the raid. Captain Delau described the materials which were to be seized and stated the officers must avoid seizing materials not described in the warrant.[41] Copies of the search warrant and copies of the covers of the magazines named in the search warrant, were distributed to the thirty Cleveland policemen selected to conduct the search.[42] Despite the lack of authorization in the search warrant for the employment of photographic recording devices or video and audio tape recordings, officers from Lieutenant Vanyo's unit employed such equipment during the search. Sergeant Richard McIntosh of the Cleveland Police Department's "Smut Squad" [43] testified,

"Q My question is with respect to the recording materials, Sergeant, what instructions were given as to what they were to record with those cameras and tape recorders?

"A I don't remember the specific instructions. I believe the general instructions were that any information that can be obtained and used because of the search warrant should be taken down.

"Q And they were left to their own devices as to determine what should be taken by recorder and what

37. *See*, Exhibit 2. The affidavit executed by Officer Robinson explicitly states:

"Affiant requests that a search warrant be issued to search for the aforesaid evidence of *pandering obscenity* and *Ohio organized crime statute law violations* and that the search warrant be issued to be executed in the day season in company with the Cleveland Police Department." *See*, Exhibit 1, pp. A–2, A–3 (emphasis added).

Thus Judge Spellacy knew, at the time the affidavit was executed, and the search warrant issued, that the Cleveland and Dayton police would be searching for evidence of the felony of conducting an illegal business of pandering obscenity.

38. *See*, Tr. 70.

39. *See*, Tr. 180.

40. The court concludes from the testimony that at least thirty Cleveland policemen participated in the February 16, 1977 raid on Sovereign's Cleveland building. *See*, Tr. 70, 84, 179, 203, 218; Exhibits 50, 51. The court disbelieves Sergeant McIntosh's suggestion that, "during the entire proceedings," there were only "12 to 14" officers inside the premises. Tr. 64.

41. *See*, Tr. 72, wherein Sergeant McIntosh characterized the preraid briefing instructions when he testified, "And it was pointed out that no materials were to be seized or taken which did not—were not listed in the search warrant." However, if such an instruction was furnished to the search participants, they did not adhere to it. *See*, Part II B of this court's Memorandum of Opinion, *infra*.

42. *See*, Tr. 70.

43. *See*, Tr. 57.

should be taken by camera or video tape equipment, is that right?

"A Within the scope of the instructions to limit themselves to material that they were searching for.

"Q And there is no question but that those who were in charge of the search were aware of all of these recording devices on the persons of the officers involved in the raid before the time for the raid began?

"A I'm sure that they were, yes, sir.

"Q The cameras and tape recording equipment was not surreptitiously sneaked onto the premises?

"A No, sir.

"Q It was with the full acceptance and understanding of those in charge of the police detail, isn't that correct?

"A That's correct."

Cleveland Police Detective Berkey [44] carried a still shot camera and a audio tape recorder onto Sovereign's premises. He testified that Cleveland Police Officer Millett carried a video tape recorder, which also recorded sound. Both Millett and Berkey employed their equipment to "record and preserve evidence of the scene," and "documents" for "identification purposes." [45] In addition to the photographic and recording devices employed by Cleveland Police Officers Berkey and Millett, Dayton Police Officer Dalrymple carried a camera onto Sovereign's premises, and Lieutenant Vanyo observed Dalrymple photographing items during the search.[46]

After Delau and Vanyo completed their briefing, the thirty Cleveland police officers, along with Dayton officers, traveled in ten vehicles [47] to Sovereign's Cleveland offices and warehouse. Upon arriving, Sergeant McIntosh spoke into the intercom on the wall adjacent to the locked exterior door of the building, and announced his presence and the presence of the Cleveland Police Department. He stated that the police were there pursuant to a search warrant.[48] After the elapse of three or four minutes, and because the exterior door was not opened from the inside, the Cleveland police broke the door with a battering ram.[49] The first group of police entered the building and ascended a flight of stairs to a landing on the second floor where they found a second door which was locked.[50] The officers again announced that they were there to search the premises pursuant to a search warrant. After the elapse of sixty seconds and because the second door was not opened, the police broke down the door with the battering ram, and entered Sovereign's main offices.[51]

Upon entering, approximately thirty Cleveland police officers [52] and two Dayton police officers fanned throughout the premises and spent the next four hours searching the office, including "every single box" of magazines and books [53] in Sovereign's warehouse for evidence of pandering obscenity, Revised Code § 2907.32 and organized crime offenses, Revised Code § 2923.04.[54] By the time the search was under way, counsel for

44. *See*, Tr. 77–78.

45. *See*, Tr. 129–130. *See also*, Exhibits 18 (photo of Cleveland Officer Millett with video tape equipment inside Sovereign's building), 19 (photo of Cleveland Officer Berkey holding a still shot camera inside Sovereign's building), 20 (photo of Dayton Officer Dalrymple using a still shot camera inside Sovereign's building).

46. *See*, Tr. 194, 210–211.

47. *See*, Tr. 65.

48. *See*, Tr. 157; Exhibits 50, 51, 63, 64, 65, 125, 126. The video tape, Exhibit 95, contains a visual and audio record of the events which

occurred at the front outside door to Sovereign's installation.

49. *See*, Tr. 66–68.

50. *See*, Tr. 68.

51. *See*, Tr. 68–69; Exhibits 21, 23, 24, 25, 26, 27, 45, 104, 107, 131.

52. *See*, fn. 40, *supra*.

53. *See*, Tr. 80, 131, 202.

54. *See*, Exhibits 22, 33, 40, 41, 42, 43, 44, 45, 62, 105, 106, 107, 108, 109, 110, 118, 120, 122, 123, 124, 125, 127, 128.

Sovereign, Mr. Larry Gordon,[55] arrived on the premises. Mr. Gordon carried an audio tape recorder and was accompanied by a photographer hired by Sovereign.[56] Despite requests from the police officers, none of Sovereign's representatives furnished keys to locked cabinets and desks on the premises, and therefore many desks and other enclosures were forced open with crowbars.[57]

## B. THE MATERIALS SEIZED TO SUPPORT CLEVELAND'S INVESTIGATION OF SOVEREIGN

Common Pleas Judge Spellacy's search warrant confined the permissible scope of the search to twelve books, copies of which had been purchased and adjudicated obscene in Montgomery County, invoices and bills of lading dealing with the shipment of magazines to twelve named bookstores in Dayton, Ohio from November 1, 1976 forward, and payroll records, orders, and other communications and other evidence of a relationship between the twelve Dayton bookstores and Sovereign and Reuben Sturman.[58] Thus the scope of the search was restricted to seeking evidence of a commercial link between Sovereign's Cleveland operation and the sale of twelve specific items

in twelve separate locations in Dayton, Ohio.

However, the items actually seized under the shield of Judge Spellacy's warrant reveal that the thirty Cleveland police officers who implemented it greatly exceeded its scope by seizing material that was unrelated to the operation of an illegal business of pandering obscenity in Dayton, Ohio. The abundance of evidence which exceeded the Montgomery County orientation of the search warrant, but was nevertheless seized, impels this court to conclude that the thirty Cleveland police officers who participated in the February 16, 1977 raid on Sovereign's premises employed the Dayton investigation as an excuse to gather evidence in support of the Cleveland authorities' own ongoing investigation of Sovereign's operations including whether it was engaged in violations of the pandering obscenity and organized crime statutes in Cleveland and Cuyahoga County.

The record demonstrates repeated instances in which the Cleveland police seized material that was both beyond the authorization of the search warrant and unrelated to Sovereign's alleged Dayton operations.[59]

---

**55.** Mr. Gordon, who was seated at Sovereign's trial table during the hearing on the motion for a preliminary injunction and declaratory judgment, is depicted in the photographic exhibits wearing a gray pinstripe suit. *See*, Exhibits 36, 42, 47, 58.

**56.** *See*, Exhibits 42, 45, 48, and Tr. 160–161, 260–268. Despite the testimony by Cleveland Policeman Vanyo that "No one was asked to leave the premises" Tr. 200, the record, specifically Exhibit 96, the audio tape made by Cleveland Policeman Berkey, conclusively shows that Officer Berkey ordered Sovereign's woman photographer to give him her name so that he could subpoena her photographs. When she refused he ordered her to leave the premises, threatened to arrest her for not leaving, and further, attempted to deny her access to Sovereign's attorney, Mr. Gordon, who Officer Berkey knew was inside the Sovereign building. Tr. 260–267. Berkey's tape is reproduced in the transcript. *See* particularly Tr. 265–266:

"DET. BERKEY: But if you have no name and no business here, *you'll have to leave the premises. Now, which is it?* Do you want to continue taking photographs? Then give me

your name and who you work for. If you do not work here or belong here, please leave. *Do you hear that? Do you understand what I said?*

"FEMALE VOICE: I'd like to consult the gentlemen [Attorney Gordon] I came with.

"DET. BERKEY: *No, you just leave.* If you have no business here, you leave. If you have business here, I'd like your name and address and who you work for. All right. *You can leave or you can tell me. Which is it?* You're at the front door, you want to leave or do you want to stay?

"FEMALE VOICE: *I would like to consult the lawyer I came here with.*" (emphasis added).

**57.** *See*, Tr. 82–85, 134, 166, 185, 197–198, 225–226; Exhibit 28 (photo of Cleveland policeman applying a crowbar to a desk).

**58.** *See*, Exhibit 2, p. 1, and text accompanying fn. 37, *supra*.

**59.** The court in Part II(B) of this Memorandum of Opinion does not examine whether seizures were made beyond the scope of the search

Exhibits 30 and 31 are photographs of a letter discovered in Sovereign's files, addressed to the attention of Marjorie Rollins at Sovereign News, and written on the legal stationary of Sovereign's legal counsel in this case, the law firm of Berkman, Gordon, Kancelbaum and Levy. The letter, and the file to which it was clipped at the time the photograph was taken, pertains to a written statement from the law office of John T. McCall regarding the arrest of an individual in Cincinnati and Louisville.[60] The record contains no evidence that the information on this photographed letter from an attorney's office to a client has any relationship to the magazines, the "invoices and bills of lading dealing with the shipment of magazines," or the "payroll records as well as orders and other communications and other evidence of relationship between Reuben Sturman, the Sovereign News Company and the Dayton bookstores" named in Judge Spellacy's search warrant.[61] Furthermore, the information gleaned from this photographed attorney-client letter

warrant for purposes of determining the validity of Sovereign's Fourth Amendment claims. The court's concern is now focused on whether the Cleveland police conducted the search in a fashion designed to further their own continuing investigation of Sovereign's commercial activities exclusively within the Cleveland area. Cf., fn. 30, supra, and accompanying text. Since the search warrant is restricted to information showing Sovereign's Dayton connections, evidence that the Cleveland authorities deliberately seized evidence which was both beyond the scope of Judge Spellacy's search warrant, and relevant only to Sovereign's exclusively Cleveland oriented transactions, reveals the intensity of the Cleveland authority's own investigative interest in Sovereign, and obviously supports the conclusion that the Cleveland participants in the search sought to further their own investigation of Sovereign, thereby posing a threat of prosecution of Sovereign solely for its Cleveland related transactions. Whether such a threat of prosecution by solely the Cleveland authorities existed, is crucial to the abstention issue now before this court. See, Steffel v. Thompson, 415 U.S. 452, 459, 475, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

**60.** See Tr. 131, 140–144, 187–188.

**61.** See, Exhibit 2, and text accompanying fn. 37, supra.

makes no reference to any activity in Montgomery County, Ohio.

Exhibits 38 and 132 are photographs of a drawer in Reuben Sturman's desk.[62] These photos depict three items located in the drawer. One item is a photograph of a nude female[63]; a second, a revolver in a holster; and a third, a box labeled "cartridges." The revolver was seized by the Cleveland police and was not sent to Dayton with the other material taken during the February 16, 1977 raid.[64] Sergeant McIntosh also wrote down the revolver's serial number. The items displayed in the two photographs have no bearing either on the materials described in the search warrant or on the investigation of Sovereign's supposed Dayton involvements. However, the seizure and notation of the serial number on the weapon are useful to the Cleveland authorities in their "continuing" investigation of Sovereign's activities because they furnish an additional item of information by which the police could trace those persons having contacts with people in Sovereign's Cleveland headquarters.[65]

**62.** See, Tr. 106, 131–133, 244.

**63.** See, Miller v. California, 413 U.S. 15, 24–26, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

**64.** See, Tr. 86, where Cleveland Policeman McIntosh testified:

"Q Sgt. McIntosh, can you tell me what happened to all of the material seized during that raid on February 16th?

"A I believe all the material, with the exception of a revolver and a holster were taken by the Dayton police officers.

"Q Taken directly to Dayton, is that right?

"A I suppose they did. I don't know." Although McIntosh's testimony suggests that the Cleveland police seized and retained the revolver and holster in their possession, the inventory receipt of the search, Exhibit 3, makes no mention of the seizure of those items. The court concludes that the two items are currently in the custody of the Cleveland police.

**65.** The serial number on the weapon could be used to trace its previous owners, including the person who transferred it to someone associated with either Sovereign or Sturman. However, the record contains no evidence that the seizing authorities had any reason whatsoever to believe that the putative transferor had any relationship with Montgomery County, Ohio.

Exhibit 79–A [66] is a memorandum, dated March 25, 1976, from Reuben Sturman to all Sovereign employees exhorting them to actively oppose "Senate Bill 1," which had been introduced in the United States Senate earlier that year. A four page newsletter published by the Cleveland branch of the American Civil Liberties Union, characterizing that legislation as the "most dire threat to civil liberties since McCarthy," and "an attempted repeal of much of the Bill of Rights" [67] is attached to Sturman's note.

The seized ACLU material attacks specific portions of S–1, but does not deal explicitly with obscenity. At worst, Exhibit 79–A consists of an innocent, written political diatribe, i. e., pure political speech, and is therefore an example of the form of expression to which the First Amendment of the United States Constitution extends the greatest measure of protection from governmental interference. [68] Despite the highly protected character of the pure political speech material contained in Exhibit 79–A the Cleveland police officers who conducted the February 16, 1977 search seized that document as evidence that Sovereign engaged in the organized crime activity of pandering obscenity. Exhibit 79–A contains no references to Montgomery County, Ohio. The seizure of such pure political expression was beyond the scope of Common Pleas Judge Spellacy's search warrant, and cannot be justified or tolerated on the speculative theory that Exhibit 79–A relates to any obscenity investigation in Montgomery County. The only purpose for seizing this political material is to identify the political views and affiliations of Sovereign and its chief executive officer, Sturman, for future reference in connection with the Cleveland Police Department's continuing investigation of Sovereign's and Sturman's Cleveland operation.

Exhibit 71 consists of a printed, eleven-page mailing list of locations throughout Ohio. It was discovered in Sturman's office. [69] The eleven separate pages are connected by only one staple at the top of each page. A notation on the outside of the envelope containing Exhibit 71 indicates that the eleven documents contain residential and store addresses in the Dayton area. However, only five of the eleven documents seized show addresses within the jurisdiction of Montgomery County. The first two pages of Exhibit 71 show addresses located only in the Columbus, Ohio, metropolitan area; the third and fourth sheets show addresses located only in the Cleveland, Ohio, metropolitan area; sheets five and six contain addresses primarily situated only in Cleveland, Akron and Canton, Ohio [70]; and the rest of the documents each contain at least one reference to a Montgomery County address. [71] The documents seized in Exhibit 71 exceed the scope of the search warrant to the extent that six readily severable records dealing with locations unrelated to Montgomery County were seized along with a few records containing addresses located within Montgomery County's jurisdiction. The seizure of documents with addresses outside Montgomery County, and especially the seizure of the documents with Cleveland addresses, reveals the thirty Cleveland police officers focused attention on possible violations of the Ohio's pandering obscenity and organized crime statutes in the Cleveland area, and in the

---

66. See, Tr. 103, 242. Exhibit 79–A is located inside the envelope marked Exhibit 79.

67. See, Exhibit 79–A, p. 1 of the ACLU newsletter.

68. See, this court's decision in *McNea et al. v. Garey et al.*, 434 F.Supp. 95, 105–112 (N.D. Ohio, 1976) (Manos, J.); *Kucinich et al. v. Forbes et al.*, 432 F.Supp. 1101, 1110 ("The right to freedom of speech is the cornerstone of the American system of government") (N.D. Ohio, 1977) (Manos, J.).

69. See, Exhibit 3, No. 11.

70. The sixth page of Exhibit 71 contains one address located in Columbus, Ohio.

71. None of the Montgomery County locations depicted on Exhibit 71 are addresses of bookstores contained in the search warrant. All of the Montgomery County addresses appear to be solely residential locations, which may be beyond the restrictions in Judge Spellacy's search warrant.

areas of the state other than Montgomery County.

Exhibit 86–A consists of an alphabetical accordian file containing many separate pads of typed address labels located in thirteen different Ohio cities, including Cleveland, Olmsted Falls, Lorain, Toledo and Dayton. The accordian file also contains address label pads for locations in Fort Worth, Texas and Indianapolis, Indiana. Despite the severability [72] of each address label from the accordian file, the Cleveland policemen conducting the search seized the whole file, thus seizing addresses relating not only to Sovereign's commercial activities in the Dayton area, but also its activities in other states, and other Ohio cities, including its commercial relations with bookstores situated in Cleveland. The seized Cleveland address labels are undoubtedly a great asset to the Cleveland Police Department's own continuing investigation of Sovereign. However, Judge Spellacy's search warrant did not authorize seizures of information unrelated to Sovereign's alleged Dayton activity. The seizure of that information by Cleveland policemen, despite the lack of search warrant authorization for seizures pertaining to Sovereign's solely Cleveland oriented transactions, indicates that the thirty Cleveland police officers who implemented the search warrant were seeking evidence to support their own investigation of Sovereign as well as evidence helpful to Robinson's and Dalrymple's Dayton investigation.[73]

Exhibit 89, is a three-ring, loose-leaf notebook labeled "General News Gallery" containing nine separate,[74] enumerated documents of typed information regarding the distribution volume of the magazines *Hustler*, *Chic*, and *Best of Hustler*, to various drugstores, delicatessens, and cigar stores across Ohio. The first four documents among these business records seized from Sovereign contain no references to stores located in Montgomery County. The four business records delineate distribution patterns of the three magazines to thirty-two different locations in the Cleveland metropolitan area. Documents six through nine establish distribution channels for the three magazines to states outside Ohio,[75] and other locations throughout Ohio, but outside Montgomery County, including seventeen separate stores in the greater Cleveland area. Of the nine separately numbered business documents contained in Exhibit 89, evidence of a commercial distribution channel from Sovereign to locations within the jurisdiction of Montgomery County appears only on the fifth document.[76]

Several additional separate handwritten documents are clipped to the back inside cover of the notebook marked Exhibit 89. Among these seized documents are three sheets of white paper containing store names and a few commercial addresses, none of which are located in Montgomery County, a handwritten invoice indicating the February 2, 1977 sale of fifty copies of the March edition of *Hustler* magazine to the Zodiac Bookstore East in Columbus, Ohio, and five sheets of yellow legal size paper containing the same information as the nine typed documents found in the notebook.

The seizure of the notebook, marked Exhibit 89, with all of its severable documentary contents, resulted in the Cleveland and Dayton authorities obtaining voluminous information describing Sovereign's commercial distribution patterns for three maga-

---

**72.** By "severability" the court means that each document was readily detachable, in a fashion which would leave the documents which were beyond the scope of the search warrant and unrelated to Sovereign's activities in Dayton undisturbed.

**73.** Several other photographic exhibits appear, on their face, to be outside the warrant and unrelated to Sovereign's alleged Dayton connections. *See, e. g.,* Exhibits 129, 139, 141.

**74.** *See,* fn. 72, *supra.*

**75.** Exhibit 89 also shows transactions involving Sovereign's locations in Indiana, Texas, Iowa, and New York. The transactions depicted on Exhibit 89 deal exclusively with the three magazines: *Hustler*, *Chic*, and *Best of Hustler*.

**76.** The four Dayton locations named in Exhibit 89 are also named in Judge Spellacy's search warrant.

zines throughout the State of Ohio and into four other states. None of this was covered by the Common Pleas Judge's search warrant.[77] The seizure of all the documents in the notebook furnished evidence to the Cleveland authorities of commercial transactions with forty-nine separate retail outlets within the Cleveland area, despite the search warrant instructions limiting the seizure of records to those relating to commercial activity in Montgomery County. Document number five is the only record in Exhibit 89 which relates to business activities in Montgomery County, because it demonstrates connections with four bookstores in Dayton. However, the Cleveland Police Department's seizure of eight separate documents, showing forty-nine commercial connections with stores in the Cleveland area, illustrates how the search warrant was used as a vehicle for furthering Cleveland's own continuing investigation of Sovereign for violations of the Ohio organized crime and pandering obscenity laws within the Cleveland area.

Exhibit 90 is a three-ring loose-leaf notebook labeled "A/R Invoice # Listing," containing 105 separate[78] documents of handwritten data depicting Sovereign's accounts receivable (*i. e.,* "A/R") invoice numbers, the name of the retail customers for each invoice, the city in which the customer maintains its retail business, the amount of each invoice, and a date. Of the one-hundred-five separate loose-leaf documents contained in Exhibit 90, sixty-eight documents contain no entries involving commercial transactions between Sovereign and persons or businesses situated within the jurisdiction of Montgomery County, Ohio,

the sixty-eight seized documents, which have no evidentiary value regarding pandering obscenity and organized crime violations in Montgomery County, nevertheless contain evidence of commercial transactions between Sovereign and book retailers throughout the rest of Ohio and in many states outside Ohio. For example, those sixty-eight seized documents which have no bearing on the Montgomery County investigation, record two-hundred-ninety separate sales transactions between Sovereign and book retailers within the Cleveland metropolitan area. Those sixty-eight documents, which are unrelated to Sovereign's activities in Montgomery County and therefore beyond the scope of the search warrant, must have been seized by the Cleveland Police Department as evidence in support of its own continuing investigation of Sovereign's possible violation of Ohio's pandering obscenity and organized crime statutes by selling arguably obscene books within the greater Cleveland area.

The characteristics of the evidence seized by thirty Cleveland and two Dayton policemen in the February 16, 1977 raid on Sovereign's building conclusively demonstrates the searching party's orientation on the day of the search. This court finds that the Cleveland police participants in the February, 1977 raid sought evidence of possible violations of Ohio's organized crime and pandering obscenity statutes by Sovereign in *both* the Dayton *and* Cleveland metropolitan areas, despite the restrictions in Judge Spellacy's search warrant which authorized a search *only* for evidence relating to Sovereign's Dayton connections.[79]

---

77. *Compare,* Exhibit 2 and text accompanying fn. 37, *supra.*

78. *See,* fn. 72, *supra.* Exhibit 90 also contains an isolated sheet of paper, without three ring binder holes, on which appears telephone numbers of several individuals. This page is the 106th document in Exhibit 90.

79. The record is replete with facts which cause this court to expressly reject the argument that the Cleveland authorities were mere instruments of the Dayton authorities. First, several Cleveland police officers testified regarding their continuing investigation and surveillance

of Sovereign. *See,* fn. 30, *supra,* and accompanying text. Second, the Cleveland Police Department seized much material which was outside the scope of the search warrant, unrelated to Sovereign's Dayton operation, and pertinent only to Sovereign's Cleveland operation. *See,* this Memorandum of Opinion, Part II B, *supra.* The Cleveland police were so ardent to gather evidence pertaining to Sovereign's photographer who they knew to be lawfully at the scene of the search, that they threatened to arrest her, or to eject her from the scene, without furnishing her with an opportunity to talk to counsel who was located at the scene of the

## C. EVENTS AFTER THE RAID ON SOVEREIGN

After completing the search of the premises, Cleveland Police Sergeant McIntosh and Dayton Policeman Robinson, working together, cataloged Exhibits 70 through 90, the documents and physical objects seized, and both men signed the inventory receipt form listing twenty-two items taken from Sovereign's premises.[80] No cataloging or inventory was made by Officers Millett, Berkey or Dalrymple regarding the photographic, video and audio recordings.[81] The video tape made by Cleveland Policeman Millett,[82] and the audio recording made by Cleveland Policeman Berkey[83] never left the custody of the Cleveland Police Department. The still photographs taken by Officer Berkey were developed by the Cleveland Police Department,[84] and reviewed by Sergeant McIntosh "two or three weeks"

after the raid.[85] At least one set of Berkey's photographs never left the custody of the Cleveland Police until the start of the preliminary injunction hearing.[86] Sometime after the preparation of the search inventory receipt form,[87] the Cleveland and Dayton policemen jointly filed a return on the search warrant in the Cuyahoga County Common Pleas Court and Judge Spellacy signed it.[88] Exhibits 70 through 90 were transported to Dayton sometime thereafter.[89]

On March 3, 1977 the Montgomery County Prosecutor's Office issued the first subpoenas compelling witnesses to appear before the Montgomery County Grand Jury in connection with that body's investigation of Sovereign's possible violation of the pandering obscenity and organized crime statutes. On March 7, 1977, Sovereign filed this action in the United States District Court of

search. *See,* fn. 56, *supra.* Third, the Cleveland Police Department seized evidence by the use of photos, video and audio tape, and also seized a gun and holster, retaining these items without delivery to the Dayton authorities, except for the still photos, of which the Cleveland police retained at least one set of copies at all times. *See,* fns. 44–46, 64, 65, *supra,* 86, *infra,* and accompanying text. Finally, the whole episode involving the search of Sovereign was triggered by a second warrant prepared by the Cuyahoga County Prosecutor personally and directed in part to the Cleveland Police Department. *See,* fns. 34, 35, *supra,* and accompanying text. All of these facts, taken together, cause this court to conclude that the Cleveland authorities participated in the search of Sovereign's premises in order to further their own independent investigation of Sovereign's Cleveland activities with an eye toward prosecuting Sovereign in Cuyahoga County, for violations of Ohio's pandering obscenity and organized crime statutes arising solely from Sovereign's Cleveland activities.

**80.** *See,* Tr. 101–104; Exhibits 3, 69–E.

**81.** *See,* Tr. 117, 194, 210–211, 243–244, 258; Exhibit 3.

**82.** *See,* Tr. 209.

**83.** *See,* Tr. 169, 209.

**84.** *See,* Tr. 169.

**85.** *See,* Tr. 115.

**86.** *See,* Tr. 169, where Cleveland Policeman Berkey testified,

> "Q The photographs that you have taken that have been identified here, have they been in your possession or the possession of the Cleveland Police ·Department since you've taken them?
>
> "A Yes, sir, until yesterday afternoon.
>
> "Q All right. Who developed the photographs?
>
> "A The police department."

Yet, Policeman Vanyo testified that he sent photos to the Dayton Police Department shortly after the raid. *See,* Tr. 193–194, 209–210. The record does not suggest that Berkey physically transported the photos to Dayton and then took them back to Cleveland. The court resolves this conflict in the testimony of Cleveland Police Officers Berkey and Vanyo by concluding that at least one set of copies of the photos taken by Berkey on February 16, 1977 during the Sovereign raid remained in the custody of the Cleveland Police Department until the commencement of this court's preliminary injunction hearing. Vanyo must have sent a different set of copies to Dayton. Furthermore, the court notes that no evidence in the record suggests that Berkey's photos, Exhibits 18 through 67, were presented to the Montgomery County grand jury. *Cf.,* Tr. 246–251.

**87.** *See,* Exhibit 3.

**88.** *See,* Tr. 51–52.

**89.** *See,* Tr. 242.

the Northern District of Ohio.[90] On March 10 and 11, 1977, the Montgomery County Grand Jury heard testimony from 15 different witnesses pertaining to Sovereign's transactions in that county,[91] and the vast majority of Exhibits 70 through 90 were presented to that Grand Jury on March 10, 1977.[92] Mr. Brogan, the Assistant Montgomery County Prosecutor in charge of presenting evidence of Sovereign's behavior to the Montgomery County Grand Jury characterized the state of that body's deliberations as of March 31, 1977 when he testified:

"Q Now, without divulging the secrecy of the grand jury proceedings inside the chambers where the grand jury sits in Montgomery County, is it a fact that you, as first assistant county prosecutor of Montgomery County, have been conducting an investigation or presentment to the Montgomery County grand jury in connection with matters involving Sovereign News Co. and/or its employees?

"A That's correct.

"Q As a matter of fact that grand jury investigation is going on right now, is it not?

"A That's correct.

"Q As a matter of fact there have been subpoenas issued for certain employees, five or six of them, of the Sovereign News Co. for an appearance at the grand jury tomorrow morning, April 1, 1977, isn't that right?

"A That's correct.

"Q And I suppose tomorrow afternoon as well? .

"A That's correct.

"Q All right.
Is it fair to say, again without revealing evidence taken inside the grand jury chambers, is it fair to say that that grand jury investigation is investigating the question of whether or not

Sovereign News Co. and/or a number of its employees are to be charged with crimes for violation of the Ohio pandering obscenity statute and the Ohio organized crime statute?

"A That's correct." [93]

. . . . .

"Q And as I understand it, there are no pending state prosecutions against Sovereign News Co. or its employees that you are aware of under these statutes at the present time?

"A Well, again I guess if you mean whether there is an actual indictment returned against Sovereign News or any of the employees, there is not an indictment as of yet.

"Q All right. And I take it that when you say there is no indictment, you mean that there are no outstanding complaints or informations, either, at the present time?

"A Yes, that's correct.

"Q All right, So that with respect to what we normally consider a criminal prosecution beginning with either an indictment or a complaint or an information, there are no such cases pending at the present time, is that a fact?

"A That's correct.

"Q And when you say "yet," it sounds to me as though you're suggesting that there might soon come a time when such prosecutions will occur?

"A It's possible that an indictment might be returned.

"Q All right.
And there is no doubt in your mind that even though the pandering obscenity statute itself is a misdemeanor statute for a first offense, that the grand jury has the power to return an indictment under those circumstances?

"A Yes, under the organized crime section it indicates five or more persons who do anything illegal for gain. So

90. *See,* Sovereign's Complaint.

91. *See,* Tr. 252.

92. *See,* Tr. 253.

93. *See,* Tr. 246–247.

if the misdemeanor is illegal, I take it it would fall within that concept.

"Q And you can independently prosecute for a misdemeanor under Rule 7?

"A We could. It would probably be transferred to Municipal Court for prosecution in the event of only a misdemeanor indictment.

. . . . .

"Q But it is clear that both statutes are under consideration now in terms of possible prosecution of Sovereign News Co. and its employees?

"A Yes.

"Q And can you tell me whether or not that company is a distributor of sexually oriented magazines, books and films?

"A Our investigation reveals that, yes." [94]

As noted above, this court concluded the hearing on the preliminary injunction on April 1, 1977; all the defendants filed their answers to the plaintiff's complaint by April 13, 1977; and the court received the initial briefs from all the defendants and the plaintiff by April 25, 1977.

On June 21, 1977 defendant Falke, the Montgomery County Prosecutor for the first time furnished this court with a copy of the Montgomery County Grand Jury's May 3, 1977 indictment of Sovereign which pertinently reads:

"THE GRAND JURORS of the County of Montgomery, in the name, and by authority of the State of Ohio, on their oaths do present and find that Sovereign News . . .,

"Between the 1st day of November, 1976 and the 21st day of December, one thousand nine hundred and seventy-six in the

County of Montgomery, aforesaid, and State of Ohio, did, with purpose to establish or maintain a criminal syndicate or to facilitate any of its activities, commit or act as accomplices in the commission of any offense of a type in which a criminal syndicate engages on a continuing basis, to-wit: Pandering Obscenity, a violation of Section 2907.32 of the Revised Code; contrary to the form of the statute (in violation of Section 2923.04(A)(5) of the Ohio Revised Code) in such case made and provided, and against the peace and dignity of the State of Ohio.

"*SECOND COUNT*:

"AND the grand jurors of this County, in the name and by the authority of the State of Ohio, upon their oaths, do find and present that: SOVEREIGN NEWS, Incorporated, . . . between the 1st day of November, 1976 and the 21st day of December, 1976 in the County of Montgomery, aforesaid, and State of Ohio, with knowledge of the character of the material involved, did exhibit or advertise for sale or dissemination or sell or publicly disseminate or display obscene material contrary to the form of the statute (in violation of Section 2907.32(a)(2) of the Ohio Revised Code) in such case made and provided, and against the peace and dignity of the State of Ohio." [95]

Based on these facts, this court must decide under either the *Younger*[96] or *Pullman*[97] doctrines whether it should abstain from considering the issuance of an injunction or a declaratory judgment against both the Montgomery County and the Cuyahoga County law enforcement officers, or against either separately. The court first directs its attention to the abstention issue, as that issue pertains to the Montgomery County authorities.

---

94. *See*, Tr. 249–251.

95. *See*, certified copy of Montgomery County Grand Jury indictment of Sovereign, attached to First Assistant Montgomery County Prosecutor Brogan's August 1, 1977 letter to the court.

96. *See*, *Younger v. Harris*, 401 U.S 37, 53–55, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

97. *See*, *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 501–502, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

### III.

THIS COURT ABSTAINS, UNDER THE DOCTRINE OF *YOUNGER v. HARRIS*, FROM CONSIDERING THE ISSUANCE OF EITHER AN INJUNCTION OR A DECLARATORY JUDGMENT AFFECTING THE PROCEEDINGS IN MONTGOMERY COUNTY.

The watershed decision of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), defined the basis for federal judicial abstention in cases involving issues which are pending in parallel state proceedings. In *Younger*, plaintiff Harris filed a federal complaint seeking an injunction restraining the Los Angeles County District Attorney from prosecuting him on a California indictment in which he was charged with criminal syndicalism. Harris contended that the state prosecution "inhibited him in the exercise of his rights of free speech and press . . . guaranteed . . . by the First and Fourteenth Amendments."[98] Two individuals intervened in Harris' federal action, claiming that his prosecution "would inhibit them as members of the Progressive Labor Party from peacefully advocating the program of their party."[99] A college instructor also intervened, claiming that Harris' prosecution "made him uncertain as to whether he could teach about the doctrines of Karl Marx or read from the Communist Manifesto as part of his classwork."[100] The three-judge district court issued the injunction restraining Harris' prosecution. On appeal, the United States Supreme Court reversed the three-judge court's grant of the injunction, and held that the lower federal court should have abstained from deciding Harris' feder-

al claims. In Part I of its opinion, the *Younger* court held that the three plaintiffs, who had neither been indicted in state court, nor threatened with prosecution, but who nevertheless felt "inhibited" in exercising their First Amendment rights because of Harris' indictment,[101] failed to plead a sufficiently "live controversy" to sustain standing to challenge the California Criminal syndicalism statute.[102] With respect to plaintiff Harris, the *Younger* court conceded that he sustained standing to challenge the criminal syndicalism statute by virtue of his state court indictment. However, the court concluded in Part II of its opinion that district courts, in deference to the role of state courts in our federal system, should normally abstain from litigating issues involving the constitutionality of a state statute when the federal plaintiff who asserts those issues in a federal district court has the opportunity to assert the same issues in defense of a *single* pending criminal proceeding in state court.[103] The *Younger* court carefully limited the scope of this abstention doctrine to situations in which the federal plaintiff could establish no "extraordinary circumstances," such as a bad faith state prosecution,[104] which would cause the federal plaintiff to sustain an uniquely severe burden if he were denied access to the federal forum. The *Younger* decision, and the complex web of subsequent United States Supreme Court decisions which formulate the "*Younger* doctrine," must be considered by this court before it can decide the merits of Sovereign's claim that Ohio's pandering obscenity and organized crime statutes violate the First Amendment.

98. *See, Younger*, 401 U.S. *supra*, at 39, 91 S.Ct. at 748.

99. *See, id.*

100. *See, Younger*, 401 U.S. *supra*, at 39–40, 91 S.Ct. at 748.

101. *See, Younger*, 401 U.S. *supra*, at 42, 91 S.Ct. 746.

102. *See, Younger*, 401 U.S. *supra*, at 41–42, 91 S.Ct. 746.

103. *See, Younger*, 401 U.S. *supra*, at 43–53, 91 S.Ct. 746.

104. *See, Younger*, 401 U.S. *supra*, at 53, 91 S.Ct. at 755. The court also indicated that some statutes "might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it." such state statutes would also give rise to "extraordinary circumstances."

**330**

## A. STANDING

 Any federal district court charged with the duty to determine whether the doctrine of *Younger v. Harris,* 401 U.S. 37, 53–55, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) applies to a plaintiff's claim must first decide whether the plaintiff sustains standing under Article III of the United States Constitution to personally assert its claims against the defendant. In this case, the record demonstrates that as of April 25, 1977,[105] Sovereign was the target of an advanced investigation conducted by the Dayton Police Department, the Montgomery County Prosecutor's Office, and the Montgomery County Grand Jury. The Montgomery County authorities' investigation focused solely on Sovereign's alleged violation, in Montgomery County, of Ohio Revised Code §§ 2907.32, 2907.01, and 2923.04 which comprise the Ohio pandering obscenity and organized crime statutes.[106] The record indicates that the Dayton police conducted interviews with Dayton bookstore operators, as well as searches and seizures of publications and other merchandise in certain enumerated Dayton book establishments.[107] Based on the information obtained in Dayton, the Montgomery County authorities enlisted the assistance of law enforcement authorities in Cuyahoga County who were conducting a parallel "continuing" investigation of Sovereign's possible violations of the same pandering obscenity and organized crime statutes in Cuyahoga County. The result of this alliance was the February 16, 1977 search of Sovereign's Cleveland office and warehouse, ostensibly for evidence of Sovereign's alleged organized crime and pandering obscenity viola-

tions in Montgomery County.[108] Much of the evidence from that search was presented to the Montgomery County Grand Jury by March 11, 1977, and that body had subpoenaed several Sovereign employees as of March 31, 1977.[109] James Brogan, the Montgomery County Assistant Prosecutor in charge of presenting evidence to the grand jury, testified that as of March 31, 1977 the grand jury's investigation of Sovereign focused on violations of Ohio organized crime statutes and the Ohio pandering obscenity statute in Montgomery County.[110] This evidence persuades the court, beyond a reasonable doubt, that as of April 25, 1977,[111] at the latest, Sovereign was threatened with prosecution by the authorities in Dayton and Montgomery County for violations of Ohio Revised Code §§ 2907.32, 2907.01, and 2923.04, and therefore had standing under Article III of the United States Constitution, to challenge the constitutional validity of these provisions. *See, Younger,* 401 U.S. *supra,* at 41–42, 91 S.Ct. 746; *Steffel v. Thompson,* 415 U.S. 452, 458–460, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974) ("At the threshold we must consider whether petitioner presents an 'actual controversy,' a requirement imposed by Art. III of the Constitution. . . . Unlike three of the appellees in *Younger v. Harris* . . . 401 U.S. at 41, 91 S.Ct. [746,] at 749, petitioner has alleged threats of prosecution that cannot be characterized as 'imaginary or speculative,' *id.,* at 42, 91 S.Ct. [746] at 749"); *Doran v. Salem Inn,* 422 U.S. 922, 928, 930–931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 1433, 51 L.Ed.2d 752 (1977); *Contrast, Steffel, supra,* 415 U.S. at

---

**105.** This is the latest possible date on which substantial proceedings on the merits of Sovereign's federal complaint transpired in federal court. *See,* discussion of *Hicks v. Miranda,* 422 U.S. 332, 350, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), *infra,* this Memorandum of Opinion at fns. 114–134 and accompanying text.

**106.** *See,* pp. 131–133 and 144 for the text of Ohio Revised Code §§ 2907.32, 2907.01 and 2923.04, respectively.

**107.** *See,* fns. 26–32, *supra,* and accompanying text.

**108.** *See,* Part II B of this Memorandum of Opinion, *supra.*

**109.** *See,* fns. 90–95, *supra,* and accompanying text.

**110.** *See,* fns. 92–94, *supra,* and accompanying text.

**111.** In fact, the threat probably concretely materialized as of March 11, 1977. *Compare,* fns. 105, *supra.*

476, 94 S.Ct. 1209 (Stewart, J., concurring); *Boyle v. Landry,* 401 U.S. 77, 80–81, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); *O'Shea v. Littleton,* 414 U.S. 488, 493–499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Allee v. Medrano,* 416 U.S. 802, 827–830, 94 S.Ct. 2191, 40 L.Ed.2d 566 (Burger, C. J., joined by JJ., White and Rehnquist, concurring in part and dissenting in part) (1974).[112]

Montgomery County's May 3, 1977 indictment[113] of Sovereign for violating Ohio's organized crime and pandering obscenity statutes solely in Montgomery County, reinforces this court's conclusion that as of April 25, 1977 Sovereign sustained a concrete threat that its operation of a book distribution network in Montgomery County would result in a criminal prosecution for alleged violations of Ohio Revised Code §§ 2907.32, 2907.01, and 2923.04 arising solely within the Montgomery County's jurisdiction. *See, Dombrowski v. Pfister,* 380 U.S. 479, 483–484, 486–489, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *Younger,* 401 U.S. *supra,* at 41–42, 91 S.Ct. 746 (placing a limiting gloss on *Dombrowski's* standing rule); *Steffel,* 415 U.S. *supra,* at 458–460, 94 S.Ct. 1209.

## B. THE DOCTRINE OF *YOUNGER v. HARRIS* APPLIES TO THE CRIMINAL ENFORCEMENT ACTION WHICH MONTGOMERY COUNTY INITIATED AGAINST SOVEREIGN

█ Having decided that a plaintiff has standing to seek an injunction restraining state officers from enforcing state criminal statutes against the plaintiff, and declaratory relief, the court must next determine whether the doctrine of *Younger v. Harris,* 401 U.S. *supra,* at 53–55, 91 S.Ct. 746 (1971)

applies. *Younger* does not require this court to abstain in every case where state proceedings have been initiated. If the court concludes that the procedural posture of the state criminal enforcement proceedings which the plaintiff attacks has not advanced to the point that the *Younger* doctrine applies,[114] then this court must immediately decide the merits of the federal plaintiff's challenge to the actions of the defendants. *See, Steffel v. Thompson,* 415 U.S. 452, 460, 474–475, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Doran v. Salem, Inn, Inc.,* 422 U.S. 922, 930, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Wooley v. Maynard,* 403 U.S. 705, 97 S.Ct. 1428, 1433–1434, 51 L.Ed.2d 752 (1977). However, if the procedural posture of the criminal enforcement activity conducted by the defendants did advance to a point where *Younger* applies to the plaintiff's injunctive and declaratory complaint, then the federal court must not deal with merits of the plaintiff's constitutional claims, unless the plaintiff first establishes that its case involves "extraordinary circumstances" justifying federal judicial incursion into an advanced stage of a state criminal enforcement action. *See, Younger,* 401 U.S. *supra,* at 53–54, 91 S.Ct. 746; *Perez v. Ledesma,* 401 U.S. 82, 85, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); *Samuels v. Mackell,* 401 U.S. 66, 75–76, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *Dyson v. Stein,* 401 U.S. 200, 203, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); *Mitchum v. Foster,* 407 U.S. 225, 230–231, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); *Kugler v. Helfant,* 421 U.S. 117, 123–126, fn. 4, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975); *Allee v. Medrano,* 416 U.S. 802, 819 fn. 14, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Hicks v. Miranda,* 422 U.S. 332, 350–352, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *Huffman v. Pursue,*

**112.** Sovereign, unlike the Union in *Allee, supra,* is threatened as a corporate entity with a criminal prosecution. *Compare,* the Chief Justice's position in *Allee, supra,* at 830, 94 S.Ct. 2191.

**113.** *See,* fn.95, *supra,* and accompanying text. That indictment, on its face, is restricted to Sovereign's alleged violations of the pandering obscenity and organized crime acts "in the County of Montgomery."

**114.** In deciding whether the state enforcement action has advanced to the point entitling it to *Younger's* cloak of protection, this court, applying the doctrine of *Hicks v. Miranda,* 422 U.S. 332, 350, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), first fixed the point at which substantial federal proceedings on the merits of the federal plaintiff's complaint transpired. State proceedings which occurred after substantial federal proceedings cannot be relied on to justify federal abstention. See, fn.133, *infra,* and accompanying text of this Memorandum of Opinion.

*Ltd.,* 420 U.S. 592, 611–612, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Rizzo v. Goode,* 423 U.S. 362, 379, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Juidice v. Vail,* 430 U.S. 327, 338, 97 S.Ct. 1211, 1218–1219, 51 L.Ed.2d 376 (1977); *Trainor v. Hernandez,* 431 U.S. 434, 442–448 fn. 7, 97 S.Ct. 1911, 1917–1920 fn. 7, 52 L.Ed.2d 486 (1977); *Sendak v. Nihiser,* 431 U.S. 961, 97 S.Ct. 2914, 53 L.Ed.2d 1057 (1977); *Compare, Cline v. Frink Dairy,* 274 U.S. 445, 451–453, 47 S.Ct. 681, 71 L.Ed. 1146 (1927). Thus, the introduction of the *Younger* abstention issue into federal litigation between state criminal enforcement officials and plaintiffs who are targets for the enforcement of state criminal statutes, which they contend are unconstitutional, demands that the federal court carefully assess the procedural posture of the state criminal enforcement action. However, assessment of the procedural posture of the defendants' state-oriented criminal enforcement action is complicated because those state enforcement activities may frequently progress during the course of the federal litigation[115] so that the state activities which the plaintiff challenges may move through successively more advanced stages as the federal litigation itself goes forward.

■ This problem arose in *Hicks v. Miranda,* 422 U.S. 332, 337–342, 349–350, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) in which police, acting pursuant to search warrants, seized four copies of the movie "Deep Throat" from a theatre in Orange County, California and three days later, on November 27, 1974, a California state court held the seized film obscene. On November 29, 1974, the plaintiffs, owners of the theatre, who were not then parties to any litigation in state court,[116] filed a suit against four of the police officers who participated in the seizure and the Orange County, California District Attorney. The *Hicks* plaintiffs sought a federal court order declaring the California obscenity statute, pursuant to which the seizure occurred, unconstitutional and mandating the return of the four seized copies of the film. The federal court heard the plaintiffs' motion for a temporary restraining order and denied it. A three-judge court[117] was convened on January 8, 1974, and service of the federal plaintiffs' complaint was made on January 14, 1974.[118] On January 15, 1974, prior to the federal defendants filing their answers to the complaint, and prior to "any proceedings whatsoever before the three-judge court,"[119] but long after the filing of the federal complaint and the federal court's denial of the plaintiffs' request for a temporary restraining order, the California officials formally charged the federal plaintiffs as defendants in a state prosecution, arising from the original seizure, under the statutes which the federal plaintiffs challenged in the federal litigation. The United States Supreme Court held that the *Younger* doctrine applied to the federal plaintiffs' complaint in federal court, notwithstanding that the

115. For example, several weeks after this court conducted its hearing on Sovereign's declaratory judgment and preliminary injunction claims, and long after all the Ohio law enforcement defendants' answered Sovereign's federal complaint, the Montgomery County grand jury indicted Sovereign. *See,* text accompanying fn.95, *supra.*

116. However, several of the plaintiffs' employees were at that time named defendants in technically initiated state criminal litigation. *See, Hicks,* 422 U.S. *supra,* at 335–336, 339, 95 S.Ct. 2281.

117. Since a state statute was challenged as unconstitutional, the convening of three-judge court was the appropriate procedure at the time the *Hicks* case arose in the federal district court. *See,* 28 U.S.C. §§ 2283, 2284 (1965). However, that procedure was not appropriate when Sovereign's case arose in this federal court. *See,* Pub. Law 94–381, 1976. *U.S. Code Cong. & Admin.News* at 90 Stat. 1119–1120.

118. *See, Hicks,* 422 U.S. *supra,* at 338, 95 S.Ct. 2281.

119. *See, Hicks,* 422 U.S. *supra,* at 349–350, 95 S.Ct. at 2292, where the Supreme Court also indicated that no substantial federal proceedings had occurred because none of the defendants had filed answers to the federal complaint prior to technical initiation of formal state litigation. *Contrast,* Sovereign's federal case, where *all* defendants filed answers to Sovereign's federal complaint by April 13, 1977, a full twenty days before the Montgomery County Grand Jury's May 3, 1977 indictment. *See,* text accompanying fns.21, 24, *supra.*

state activities which the federal plaintiffs challenged had advanced to the stage of a pending criminal action in state court several weeks *after* the plaintiffs filed their federal complaint and the federal court denied the request for a temporary restraining order.[120] The *Hicks* court reasoned:

"[W]e now hold that where state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but *before any proceedings of substance on the merits have taken place in the federal court,* the principles of *Younger v. Harris* should apply in full force." *See, Hicks,* 422 U.S. *supra,* at 349, 95 S.Ct. at 2292 (emphasis added).

Thus *Hicks, supra,* suggests that a federal district court, charged with the duty to determine whether the *Younger* doctrine applies to federal injunctive and declaratory litigation between state law enforcement officials and plaintiffs who are the targets of state criminal enforcement activities, must first decide on what date "proceedings of substance on the merits have taken place in the federal court." [121] After fixing such a date, the federal court must determine the procedural posture of the state's enforcement actions, *as of the date on which substantive proceedings occurred in the federal litigation.* If the state's act, which is the subject of the federal plaintiffs' complaint, *did not attain a sufficiently advanced procedural stage* within the state's criminal justice system, by the date "proceedings of substance" transpired in the federal litigation, then the federal court may decide the merits of the plaintiffs' complaint without analyzing the impact of the *Younger* doctrine. *Compare, Town of Lockport v. Citizens For Community Action,* 430 U.S. 259, 1051 fn. 8, 97 S.Ct. 1047, 1051 fn. 8, 51 L.Ed.2d 313 (1977).[122] However, if the defendants' conduct, which is

**120.** The *Hicks* Supreme Court majority reached this conclusion without impeaching the district court's express finding that state authorities instituted the state criminal charge against the federal plaintiff in retaliation for the federal plaintiff filing of a federal action. *See, Hicks, supra,* at 350–351 fn.19, 95 S.Ct. 2281, and *compare, Hicks,* at 357 fn.2, 95 S.Ct. 2281 (Stewart, J., joined by Douglas, Brennan and Marshall, JJ., dissenting). Implicit in the *Hicks* holding is the principle that a purposeful, retaliatory state prosecution, inaugurated after filing of a federal complaint but before attainment of substantial federal proceedings does *not* constitute an "extraordinary circumstances" exception to the *Younger* abstention rule.

**121.** *See, Hicks,* 422 U.S. *supra,* 349, 95 S.Ct. at 2292. Apart from the express holding of *Hicks,* the five-justice Supreme Court majority noted in passing that, although no state criminal proceedings were pending against the federal plaintiffs prior to the filing of their federal complaint, two of their employees were technically charged with state crimes on which they were represented by the federal plaintiff's attorneys, and four copies of the federal plaintiff's movie had been adjudged obscene in a state court adversary hearing. The court thus suggested that the federal plaintiffs sustained a "substantial stake" in the state proceedings before filing their federal complaint. *See, Hicks,* 422 U.S. *supra,* at 335, 348–349, 95 S.Ct. 2281. *Contrast,* Sovereign's case, where none of its employees or associates were technically charged with state crimes at any time prior to April 25, 1977, the date on which Sovereign's federal action attained substantial proceedings on the merits. *See,* text following fn.94, *supra.* Furthermore, the record in Sovereign's federal action reveals no juncture at which Sovereign was afforded the opportunity to appear in state court for an adversary hearing on whether its publications are obscene, or to obtain the return of its seized property prior to April 25, 1977.

**122.** In *Town of Lockport,* 430 U.S. 259, at 264 fn.8, 97 S.Ct. *supra,* at 1051 fn.8, 51 L.Ed.2d 313, the appellant municipality argued that the district court should have abstained under *Younger* from reaching the merits of a Fourteenth Amendment Equal Protection Clause challenge to a New York statute, which required approval of a majority of voters living within city limits and a majority of voters living outside the city limits before a new county charter could be adopted. Mr. Justice Stewart rejected this argument by stating in fn.8:

"The District Court also enjoined pending state proceedings brought by the appellants to challenge the certification and enforcement of the 1974 Charter. The appellants now argue that the District Court should have deferred to the jurisdiction of the state court. Even assuming that *Younger v. Harris,* 401 U.S. 37, [91 S.Ct. 746, 27 L.Ed.2d 669,] principles are fully applicable in the civil context, however, the original action challenging the dual majority provisions of New York law had been brought in the federal court well before the appellants filed their state court suit, and principles of comity and federalism do not require that a federal court abandon jurisdiction it has properly acquired

the subject of the plaintiff's complaint, attained a sufficiently advanced stage within the state's criminal justice enforcement system by the date "proceedings of substance" transpired in the federal litigation, then *Younger* descends over that federal litigation, and the federal court must determine if it has jurisdiction in terms of *Younger's* comity principles.[123]

 The court concludes that "proceedings of substance on the merits" occurred in Sovereign's federal litigation against the Montgomery County and Cuyahoga County law enforcement authorities on April 25, 1977. As of that date: (1) Sovereign's federal complaint was filed,[124]

simply because a similar suit is later filed in a state court."

The court has selected the latest of several possible dates for fixing the point of substantial federal proceedings. In this case, conceivably April 1, 1977, the date this court concluded the hearing on the merits of Sovereign's declaratory judgment claim and the hearing on Sovereign's motion for a preliminary injunction, might well be viewed as the date substantial proceedings were attained in Sovereign's federal action. *See, Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969) ("The proper inquiry was whether a 'controversy' requisite to relief under the Declaratory Judgment Act existed at the time of the *hearing* . . .."); *see also, Perez,* 401 U.S. *supra,* at 103, 117 fn.9, 91 S.Ct. at 693 (". . . whether *federal court relief would be proper when a state prosecution pending at the time of the federal hearing was begun after the federal suit was filed"*), 130, 91 S.Ct. 674 (Mr. Justice Brennan's separate opinion). Alternatively, substantial federal proceedings in Sovereign's federal litigation might be fixed at April 13, 1977, the date by which all federal defendants answered Sovereign's federal complaint. *Compare, Hicks,* 422 U.S. *supra,* at 349–350, 95 S.Ct. 2281. Because of the novelty of this legal question the court conservatively selected the April 25, 1977 date, as the point at which there can be no doubt whatsoever that substantial federal proceedings occurred. However, in other factual circumstances earlier procedural points, such as those discussed in *Golden, supra,* and *Hicks, supra,* might well be appropriate landmarks signaling the attainment of substantial federal proceedings.

123. Once *Younger* is interpreted to apply to a federal case, the federal court may reach the merits of that case only in "extraordinary circumstances." *See, Younger,* 401 U.S. *supra,* at 53–54, 91 S.Ct. 746, and other cases cited in the text preceding fn.115, *supra.*

and served on all the defendants;[125] (2) a motion for a preliminary injunction was filed;[126] (3) this federal court conducted a three-day hearing at which it denied a motion to transfer venue, heard testimony and extensive legal arguments *on the merits* of both Sovereign's preliminary injunction and declaratory judgment claims;[127] (4) all the defendants *answered* Sovereign's complaint;[128] (5) the Montgomery County Prosecutor's Office filed supplementary evidence to *complete* the record of the preliminary injunction and declaratory judgment hearing;[129] (6) and all defendants had filed their briefs in opposition to Sovereign's assertion of entitlement, *on the merits* of its

124. *See,* fn.2, *supra.* The complaint was filed on March 7, 1977.

125. Summons proving service of Sovereign's complaint on the federal defendants were returned on March 16, 24, and April 4, 1977. *See,* docket in Sovereign's federal case.

126. *See,* text preceding fn.4, *supra.* The motion was filed on March 28, 1977.

127. *See,* text accompanying fns.4–20. The hearing lasted from March 29, 1977 through April 1, 1977 when this court definitively held that it would consider the ultimate merits of only the limited First Amendment question of the legal validity of the challenged statutes with respect to the declaratory judgment request. However, the court also stated that it would determine all issues, including the First and Fourth Amendment claims, on which Sovereign sought a preliminary injunction. This approach avoids the problem of prematurely involving the court in jury questions pertinent to Sovereign's constitutional tort damage claims, since the court's factual determinations for purposes of a preliminary injunction have no *res judicata* effect with respect to such damage claims. *See,* this court's April 1, 1977 oral ruling, Tr. 284–287; *Berrigan v. Sigler,* 162 U.S.App.D.C. 378, 382 fn.11, 499 F.2d 514, 518 fn.11. (Determinations regarding preliminary injunctions are not binding on the merits.).

128. *See,* text accompanying fn.21, *supra.* All federal defendants answered the federal complaint by April 13, 1977. *Compare,* fns.121, 122, *supra.*

129. *See,* fn.23, *supra.* Defendant Falke supplemented the federal record on April 14, 1977.

First Amendment claim to a declaratory judgment, and on its claim, for a preliminary injunction.[130] Having fixed April 25, 1977 as the date on which Sovereign's federal litigation ripened into *"proceedings of substance on the merits,"* [131] the court concludes that the issue of whether *Younger* applies must depend upon the procedural posture of the Montgomery County and Cuyahoga County enforcement activities as of April 25, 1977. Procedural stages which occur within the jurisdiction of a state's criminal justice system, after the date on which "proceedings of substance on the merits" transpired in the related [132] federal declaratory and injunctive litigation cannot terminate the more advanced federal action.[133] This court cannot permit officials

**130.** *See,* text accompanying fn.21, *supra.* These briefs were filed on April 25, 1977. The two Dayton policemen, Dalrymple and Robinson filed no post-hearing briefs.

**131.** *See, Hicks,* 422 U.S. *supra,* at 349–350, 95 S.Ct. 2281, and discussion in fns.116–123, and accompanying text, *supra. Compare, B. Coleman Corporation v. Walker,* 400 F.Supp. 1355, 1367 (N.D.Ill.1975) (applying *Hicks,* and *Doran, supra,* to a federal case which had not attained substantial proceedings).

**132.** By use of the word "related" federal case, this court refers to the federal civil litigation which threatens to interfere with an identifiable state enforcement action.

**133.** This court's analysis partially answers the question asked by Justice Stewart, joined by Justices Brennan, Douglas, and Marshall, in the *Hicks* dissent, 422 U.S. *supra,* at 354, fn.1, 95 S.Ct. at 2294. "What are 'proceedings of substance on the merits'?" In doing so, this court accommodates the state's interest in the orderly administration of its criminal law with the need to preserve the historic role of the federal courts as "the primary and powerful reliances for vindicating every right given by the Constitution, the laws and treaties of the United States," Frankfurter & Landis, *The Business of the Supreme Court: A Study in the Federal Judicial System,* 65 (1927). Sovereign initiated this action partly under 42 U.S.C. § 1983, a congressional enactment which established "the role of the Federal Government as a guarantor of basic federal rights against state power," *Mitchum v. Foster,* 407 U.S. 225, 239, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972). The federal judiciary must not forget that "[t]he very purpose of § 1983 was to interpose the federal courts between the states and the people." *Mitchum, supra,* at 242, 92 S.Ct. at 2162. As the United States Supreme Court stated in *Ex Parte Young,* 209 U.S. 123, 161–162, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908): "It is further objected (and the objection really forms part of the contention that the State cannot be sued) that a court of equity has no jurisdiction to enjoin criminal proceedings by indictment or otherwise, under the state law. This, as a general rule, is true. But there are exceptions. When such indictment or proceeding is brought to enforce an alleged unconstitutional statute, which is the subject matter of inquiry in a suit *already pending in a Federal Court, the latter court having first obtained jurisdiction over the subject matter, has the right, in both civil and criminal cases, to hold and maintain such jurisdiction, to the exclusion of all other courts, until its duty is fully performed. Prout v. Starr,* 188 U.S. 537, 544, [23 S.Ct. 398, 47 L.Ed. 584]." (emphasis added in part). Thus the federal judiciary must apply with caution rules which oust the federal courts from their historic function as the "primary reliances" that vindicate constitutional freedoms. The federalist doctrine demands "sensitivity to the legitimate interests of *both* State and National Governments," see, *Younger,* 401 U.S. *supra,* at 44, 91 S.Ct. at 750. Ouster of a federal court from jurisdiction after it has concluded a hearing on the merits, received answer pleadings, and also received legal memoranda is just as offensive to "Our Federalism" as the federal injunction restraining state criminal proceedings which *Younger* condemns. The *Hicks* rule may well create an "unseemly . . . race to the court house," see, *Hicks,* 422 U.S. *supra,* at 354, 95 S.Ct. at 2294, but a federal court house should not crumble into dust when the federal plaintiff wins that race! *Compare,* Mr. Justice Stewart's opinion in *Town of Lockport,* 430 U.S. *supra,* at 264 fn.8, 97 S.Ct. at 1051 fn.8, discussed in fn.122, *supra.* When the identical question of *Younger's* effect of ousting a federal district court from jurisdiction over a case filed with it arose in *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 925, 929, 95 S.Ct. 2561, 2566, 45 L.Ed.2d 64, the majority, per Justice Rehnquist, simply stated: "When the criminal summons issued against M & L on the days immediately following the filing of the federal complaint, the federal litigation was in an embryonic stage and no contested matter had been decided." Curiously, *Doran* makes no mention of *Hicks* despite the fact that *Hicks* was decided six days *before Doran.* Under *Doran's* "no contested matter . . . decided" test, this court may properly analyze *Younger's* application to this litigation by reference to events which transpired *before* April 25, 1977, and ignore the May 3, 1977 Montgomery County indictment, because contested matters were de-

of a state to manipulate the comity principles of *Younger* in order to oust the court's jurisdiction over a case raising significant constitutional questions. That intolerable result would materialize if the state could obtain *Younger's* protection by continuing their enforcement activities *after all parties,* and the court itself, invested substantial resources in the determination of the federal litigation, at a point in time *before* the federal defendants' state enforcement activities advanced to a posture entitling them to *Younger's* cloak. Thus, this court will not permit state officials, who are usually the defendants in cases like Sovereign's, to strip a federal court of jurisdiction by advancing the state enforcement activities, which a plaintiff claims are unconstitutional, to a stage protected by *Younger, after* that federal court conducted substantial proceedings. Such an expansion of *Younger's* scope, *beyond* the carefully delineated limitations expressed in *Hicks,* would eviscerate the right of citizens to protect themselves from irreparable injury by resort to immediate federal litigation, when they sustain Article III and 28 U.S.C. § 2201 standing to challenge a threatened state criminal enforcement action, predicated on an unconstitutional state statute, *prior to* the actual initiation of the threatened state proceeding.[134]

## C. EXAMINATION OF THE STATUS, AS OF APRIL 25, 1977, OF THE MONTGOMERY COUNTY LAW EN-FORCEMENT OFFICERS' ACTIVITIES WITHIN THE OHIO CRIMINAL JUSTICE SYSTEM REVEALS THAT THOSE ACTIONS WERE SUFFICIENTLY ADVANCED TO TRIGGER THE PROTECTIVE CLOAK OF THE *YOUNGER* DOCTRINE

The record demonstrates that before April 25, 1977, the date on which proceedings of substance on the merits of Sovereign's federal complaint took place in this federal court, the Montgomery County authorities took the following steps toward prosecuting Sovereign within the Ohio state system: (1) on November 1, 1976, responding to complaints, the Dayton police commenced an investigation of Sovereign's activities in that city;[135] (2) twelve Dayton bookstores were placed under surveillance;[136] a Dayton Municipal Judge determined the twelve seized magazines obscene;[137] (3) on December 19, 1976 the Municipal Judge issued a search warrant authorizing the search of the twelve Dayton bookstores;[138] (4) the Dayton search warrant was executed and the Dayton police were told of the close connection between at least some of the Dayton stores and Sturman and Sovereign;[139] (5) on February 15, 1977 the Montgomery County authorities, acting in conjunction with the Cuyahoga County authorities, obtained a search warrant for Sovereign's Cleveland premises from a Cuyahoga County Common Pleas judge;[140] (6) on February 16, 1977 the Dayton police, furnished with assistance by the Cleveland police, searched every office, and every box of magazines inside Sover-

---

cided before April 25, 1977. For example, this court denied the contested motion to change venue before April 25, 1977.

**134.** *See, Steffel v. Thompson,* 415 U.S. 452, 475, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Doran v. Salem Inn,* 422 U.S. 922; 929–931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). Great care must be exercised in applying the *Hicks* approach, *see,* fn.133, *supra,* otherwise the federal judiciary may be demoted to proceeding only at the whim of the federal defendants, especially in light of this court's view of the procedural status at which a state enforcement action becomes entitled to *Younger's* protection. *See,* Part III C of this memorandum of opinion, *infra.*

**135.** *See,* text accompanying fn. 23, *supra.*

**136.** *See,* text accompanying fn.26, *supra.*

**137.** *See,* text following fn.27, *supra.*

**138.** *See,* text accompanying fn.28, *supra.*

**139.** *See,* text accompanying fn.29, *supra.*

**140.** *See,* text accompanying fn.34, *supra.*

eign's Cleveland building, and located some evidence of Sovereign's book dealings in Montgomery County.[141] By March 11, 1977, most of the documentary evidence seized in the February raid was presented to the Montgomery County grand jury,[142] which had subpoenaed several Sovereign employees as witnesses,[143] and heard testimony from other individuals in connection with the Sovereign investigation.[144] According to First Assistant Montgomery County Prosecutor Brogan, it was "possible" that as of March 31, 1977, the grand jury's investigation of Sovereign would result in Sovereign's indictment for pandering obscenity and organized crime violations under Ohio statutes.[145]

According to Sovereign's argument, the above events reveal that the Montgomery County criminal enforcement action against Sovereign, as of April 25, 1977,[146] had not advanced to a point within the Ohio criminal justice system that entitled the Montgomery County authorities to protection [147] under *Younger* from federal injunctive and declaratory intervention. Sovereign contends that the *Younger* doctrine cloaks from federal judicial scrutiny only those state criminal enforcement activities which attain the post-indictment phase, and argues that *Younger* is inapplicable to the Montgomery County's defendants' [148] activities because at the time substantial federal

proceedings occurred, the Montgomery County prosecution had not produced an indictment. This court rejects Sovereign's argument that *Younger* only applies to federal litigation if formal criminal litigation is pending in the state courts against the federal plaintiff prior to the time at which the federal case attained substantial proceedings.

However, the court recognizes that Sovereign's view sustains identifiable support from many sources. For example, in *McSurely v. Ratliff*, 282 F.Supp. 848 (E.D. Ky., 1967), Circuit Judge Combs, writing for a three-judge district court, expressly held that arrest and seizure of the plaintiff's possessions, did not initiate a "pending" state criminal proceeding barring a federal court from exercising its equity power against state law enforcement officers, because the pendency of a state criminal action depended on the issuance of a state indictment, which was presented by the Pike County Kentucky Grand Jury *after* substantial federal proceedings took place in the federal action, but before the federal district court issued its injunctive order. *See, McSurely, supra* at 850–851, 853–854; *appeal dismissed*, 390 U.S. 412, 88 S.Ct. 1112, 19 L.Ed.2d 1272 (1968); 398 F.2d 817, 818 (6th Cir. 1968) (Sixth Circuit Judges Phillips, Celebrezze, and McCree, reversing the district court's refusal to order the fed-

141. *See,* text accompanying fns.52–57, *supra.*

142. *See,* text accompanying fn.92, *supra.*

143. *See,* text accompanying fns.91, 93–94, *supra.*

144. *Id.*

145. *See,* text accompanying fn.94, *supra.*

146. This is the date the court has fixed as the point when substantial proceedings occurred in the federal litigation. *See,* Part III B of this memorandum of opinion.

147. Whenever a court analyzes *Younger's* impact on a particular federal litigation, the *first* question is, does *Younger* apply, *i. e.,* does the federal litigation under examination threaten to disrupt a "pending" state civil or criminal judicial enforcement action? *See, Trainor v. Her-*

nandez, 431 U.S. 434, 439–448, 97 S.Ct. 1911, 1916–1920, 52 L.Ed.2d 486 (1977). Therefore, the definition of "pending" state civil or criminal judicial enforcement action is crucial to the correct application of *Younger,* because that variable determines whether *Younger's* shroud of protection cloaks the state's enforcement activity. However, that shroud is not impermeable. If the federal court decides that such a state enforcement action is "pending," and its viability is threatened by the federal litigation, then the *second* question is, does one of *Younger's* "extraordinary circumstances" exceptions apply? If not, then the federal district court must abstain.

148. These defendants are Montgomery County Prosecutor Falke, and Dayton Policemen Dalrymple and Robinson.

eral defendants, *i. e.*, Kentucky law enforcement officers, to immediately return the federal plaintiffs' papers which the state officials had seized.); 138 U.S.App.D.C. 187, 426 F.2d 664 (1970) (Bazelon, C. J.).[149] *Compare, Honey v. Goodman,* 432 F.2d 333, 336–337, 342–344 (6th Cir. 1970) (Celebrezze, J.).

Sovereign's position also finds support in the language of several opinions written by Supreme Court Justices dealing with the *Younger* doctrine. For example, in *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), a case decided on the same day as *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), Justice Brennan, joined by Justices Marshall and White, adopted the view, which Sovereign now advocates, that *Younger* applies *only* when the pending state criminal enforce-

ment action has attained the stage of technically filed criminal litigation in a state court. He wrote:

"The third threshold question is whether the state prosecution *under the ordinance was 'pending'* so as to make federal intervention inappropriate. The fact is, as I have already noted, that informations against appellee Ledesma for violation of the ordinance were outstanding when this federal suit was filed. However, the *nolle prosequi* of those informations was entered before the three-judge court convened and heard the case. *That court therefore treated the case as one in which no prosecution under the ordinance was pending. This was not error.* The availability of declaratory relief was correctly regarded to depend upon the situation at the time of the hearing and not

149. Substantial authority differs with the holding expressed by Judge Combs of the Sixth Circuit. For example, in *Steffel,* supra, 415 U.S. at 480, 94 S.Ct. at 1226, Justice Rehnquist and Chief Justice Burger state that "any *arrest* prior to resolution of the federal action would constitute a pending prosecution and bar declaratory relief under the principles of *Samuels*" (emphasis added). *See also,* 415 U.S. at 481 fn. 2, 94 S.Ct. 1209. *Compare, Cousins v. Wigoda,* 409 U.S. 1201, 1205–1206, 84 S.Ct. 2610, 34 L.Ed.2d 15 (1972) (Circuit Justice Rehnquist). In *Brooks v. Briley,* 274 F.Supp. 538, 553 (Md.Tenn.1967) (two judges holding that "there is no express authority one way or the other, the court is of the opinion that the arrest and the issuance of a warrant by a magistrate, a state judicial officer, formally charging the plaintiffs with criminal violations constitute 'proceedings' within the meaning of § 2283"), aff'd citing *Cameron v. Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 at 391 U.S. 361, 88 S.Ct. 1671, 20 L.Ed.2d 647 (1968). *Eastin v. City of New Orleans,* 475 F.2d 191, 192 (5th Cir. 1973) (*Younger* bars federal litigation was pending); *Oldroyd v. Kugler,* 352 F.Supp. 27, 31 (D.N.J.1973) (holding that arrest, prior to indictment, triggers Younger's application), aff'd 412 U.S. 924, 93 S.Ct. 2753, 37 L.Ed.2d 153 (1973); *Burak v. Commonwealth of Pennsylvania,* 339 F.Supp. 534, 536 (E.D. Penn.1972) (indictment does not control operation of *Younger*); *Universal Amusement Co. Inc. v. Vance,* 404 F.Supp. 33, 46–47 (S.D.Texas, 1975) (a felony action is "pending" in state court for purposes of Younger's application at the complaint stage, prior to indictment, although the court concedes "what definitively constitutes a pending case has yet to be determined") vacated, solely that three judge district

court may enter a fresh appealable order to the Court of Appeals. *See, Butler v. Dexter,* 425 U.S. 262, 267 fn. 12, 96 S.Ct. 1527, 47 L.Ed.2d 774.

In a series of decisions the United States Supreme Court noted that indictment constitutes the "critical stage" in the state criminal process such that several fundamental constitutional safeguards for the criminally accused attach only at that stage. *See, United States v. Wade,* 388 U.S. 218, 239 fn. 30, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (pretrial lineup held to be a critical stage at which Sixth Amendment right to counsel attaches); *see also, Gilbert v. California,* 388 U.S. 263, 273, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Simmons v. United States,* 390 U.S. 377, 382–383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (Sixth Amendment right to counsel at a pretrial lineup attaches only at the post-indictment stage); *Compare, Coleman v. Alabama,* 399 U.S. 1, 21, 90 S.Ct. 1999, 26 L.Ed.2d 387 (Burger, J., dissenting); *Kirby v. Illinois,* 406 U.S. 682, 689–690 (majority), 691, 92 S.Ct. 1877, 32 L.Ed.2d 411 (Burger, J., concurring); *Adams v. Illinois,* 405 U.S. 278–285, 92 S.Ct. 916, 31 L.Ed.2d 202 (Burger, J., concurring); *United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 30 L.Ed.2d 468 (Sixth Amendment right to speedy trial attached post-indictment). Thus it might be argued that *Younger* should attach at the same procedural stage that a defendants' important constitutional protections attach in the state judicial system, and not before. *Compare, Huffman v. Pursue, Ltd.,* 420 U.S. 592, 615, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (Brennan, J., dissenting). However, the court has not been persuaded to that view.

upon the situation when the federal suit was initiated. See, *Golden v. Zwickler*, 394 U.S., at 108 [89 S.Ct. [956] at 959, 22 L.Ed.2d 113.] The principles of comity as they apply to federal court intervention, treated by the Court today . . . present this issue. The key predicate to answering the question whether a federal court should stay its hand, is whether there is a pending state prosecution where the federal court plaintiff may have his constitutional defenses heard and determined. *Ordinarily, that question may be answered merely by examining the dates upon which the federal and state actions were filed. If the state prosecution was first filed and if it provides an adequate forum for the adjudication of constitutional rights, the federal court should not ordinarily intervene. When, however, as here, at the time of the federal hearing there is no state prosecution to which the federal court plaintiff may be relegated for the assertion of his constitutional defenses, the primary reason for refusing intervention is absent.* Here, there was no other forum for the adjudication of appellees' constitutional objections to the ordinance.

"There is, of course, some intrusion into a state administration of its criminal laws whenever a federal court renders a declaratory judgment upon the constitutionality of a state criminal enactment. The Court holds today in *Samuels v. Mackell, supra,* that considerations of federalism *ordinarily make the intrusion impermissible if a state prosecution under that enactment is proceeding at the time the*

*federal suit is filed.* The Court says, '[I]n cases where the state criminal prosecution was begun prior to the federal suit, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment, and * * where an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well.' 401 U.S., at 73 [91 S.Ct. [764] at 768.] But *considerations of federalism are not controlling when no state prosecution is pending and the only question is whether declaratory relief is appropriate.* In such case, the congressional scheme that makes the federal courts the primary guardians of constitutional rights, and the express congressional authorization of declaratory relief, afforded because it is a less harsh and abrasive remedy than the injunction, become the factors of primary significance." *Perez, supra,* at 103–104, 91 S.Ct. at 686 (emphasis added).

*See also, Perez,* at 117, 91 S.Ct. 674; *Samuels v. Mackell,* 401 U.S. 66, 67, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971) (*Younger* doctrine applied to federal litigation challenging a state criminal prosecution as violative of the First and Fourteenth Amendments, which was initiated *after* the federal plaintiff was indicted by a state grand jury).[150]

In *Steffel v. Thompson,* 415 U.S. 452, 454, 475, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), the majority in the United States Supreme Court held that the *Younger* doctrine did

---

**150.** *Compare, Byrne v. Karalexis,* 401 U.S. 216, 218 fn. 2, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971), where a pending state criminal action was initiated in state court prior to the filing of the federal complaint, was "dismissed" during the course of the federal litigation, and returned to the state grand jury stage. Subsequently, during the pendency of the federal action, the grand jury reindicted the federal plaintiff. Despite the fact that the second state enforcement action was "pending" *after* the initiation of the federal litigation, the High Court applied *Younger.* Thus *Byrne* decided the same day as *Perez,* appears, on its face to be inconsistent with Justice Brennan's position expressed in the quotation in the text from his *Perez* opin-

ion. In *Byrne* Justice Brennan, joined by Justices White and Marshall, dissents from the majority's decision to remand stating, 401 U.S. at 220–221, 91 S.Ct. at 780:

"The injunction appealed from issued December 6, 1969, after appellees' convictions in state court on November 12, 1969, of exhibiting an obscene film in violation of state law. In the absence of any showing of bad faith or harassment, appellees were therefore obliged to pursue their constitutional defenses on appeal from the convictions to the state appellate court, and the Federal District Court erred in enjoining appellants from interfering with future showings of the film."

not apply to federal litigation in which a plaintiff sought a declaratory judgment ruling a state statute unconstitutional because the plaintiff was merely threatened with prosecution and no formal criminal litigation was pending in the state court against him at any time during the pendency of the federal action. Justice Brennan, who delivered the opinion of the court,[151] cited his own "separate opinion" in *Perez, supra,* as authority for the proposition that a state's criminal enforcement activities are not entitled to *Younger's* protection unless they have ripened into formal criminal litigation in state court. Brennan wrote in *Steffel*:

"These reservations anticipated the Court's recognition that the relevant principles of equity, comity, and federalism 'have little force in the absence of a pending state proceeding.' *Lake Carriers' Assn. v. MacMullan,* 406 U.S. 498, 509, 92 S.Ct. 1749, 1757, 32 L.Ed.2d 257 (1972). *When no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system*; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles. In addition, while *a pending state prosecution* provides the federal plaintiff with a concrete opportunity to vindicate his constitutional rights, a refusal on the part of the federal courts to intervene when *no state proceeding is pending* may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding. Cf., *Dombrowski v. Pfister,* 380 U.S. 479, 490, 85 S.Ct. 1116, 1123, 14 L.Ed.2d 22 (1965).

"When *no state proceeding is pending* and thus considerations of equity, comity,

and federalism have little vitality, the propriety of granting federal declaratory relief may properly be considered independently of a request for injunctive relief. Here, the Court of Appeals held that, because injunctive relief would not be appropriate since petitioner failed to demonstrate irreparable injury—a traditional prerequisite to injunctive relief, *e. g., Dombrowski v. Pfister, supra*—it followed that declaratory relief was also inappropriate. . . . [T]he court erred in treating the requests for injunctive and declaratory relief as a single issue. '[W]hen *no state prosecution is pending* and the only question is whether declaratory relief is appropriate[,] . . . the congressional scheme that makes the federal courts the primary guardians of constitutional rights, and the express congressional authorization of declaratory relief, afforded because it is a less harsh and abrasive remedy than the injunction, become the factors of primary significance.' *Perez v. Ledesma,* 401 U.S. 82, 104, 91 S.Ct. 674, 680, 27 L.Ed.2d 701 (1971) (separate opinion of Brennan, J.)." *See, Steffel, supra* at 462–463, 94 S.Ct. at 1217–1218 (emphasis added) (*compare* this quotation with the preceding quotation from *Perez* in the text *supra* of this court's Memorandum of Opinion.

In *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) the plaintiffs initiated a civil rights action under 42 U.S.C. §§ 1983 and 1985, alleging the unconstitutionality of certain Texas statutes under the First and Fourteenth Amendments, and also alleging that the defendants, Texas Rangers, Starr County Sheriffs Deputies, and a Starr County Justice of the Peace, conspired to deprive the plaintiffs of their constitutional protections. The plaintiffs sought injunctive relief against the law enforcement activities of the defendants, but the record before the Supreme Court did not reveal that the plaintiffs challenged formal criminal litigation in the

---

**151.** Justice Brennan's opinion was adopted by Justices Douglas, Marshall, Powell, and Blackmun; Justice Stewart, joined by Chief Justice Burger, filed a separate concurring opinion, 415 U.S. at 475, 94 S.Ct. 1209; Justice Rehnquist, joined by Chief Justice Burger, filed a separate concurring opinion, 415 U.S. at 478, 94 S.Ct. 1209.

state court.[152] However, the record did reveal that the three-judge district court enjoined the Texas law enforcement officers from enforcing several Texas statutes which that court held unconstitutional. *See, Allee, supra,* at 814, 94 S.Ct. 2191. On appeal the United States Supreme Court, Justice Douglas delivering the Opinion of the Court,[153] stated that the *Younger* abstention doctrine did not apply to federal litigation if the record revealed no parallel[154] criminal litigation pending in a state court simultaneously with the federal litigation.

> "We first note that this portion of the decree [of the three federal judge court] creates no interference with prosecutions pending in the state courts, so that the special considerations relevant in cases like *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 2199 do not apply here." *See, Allee, supra,* at 814, 94 S.Ct. at 2199, *see also,* pp. 816–820, 94 S.Ct. 2191.[155]

In *Doran v. Salem Inn Inc.,* 422 U.S. 922, 925–927, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), three corporate operators of taverns filed federal complaints against the town attorney for North Hempstead, New York, charging the state official with threatening to enforce an allegedly unconstitutional[156] ordinance prohibiting tavern owners and others from permitting female employees and entertainers to appear in public with

visibly exposed breasts. After the filing of the federal complaint and the denial of the plaintiffs' request for a temporary restraining order, one of the tavern operators permitted topless dancing in his establishment and was promptly served with state criminal summons charging it with violation of the ordinance. The other two plaintiffs, Salem and Tim-Rob, did not allow exposed female breasts in their taverns until after the district court entered a preliminary injunction in their favor, and consequently no formal criminal prosecution was started in state court against these later two plaintiffs during the federal preliminary injunction litigation. *See, Doran, supra,* at 925–927, 95 S.Ct. 2561. The United States Supreme Court, in an opinion written by Justice Rehnquist, held that the *Younger* abstention doctrine applied to the plaintiff who had been served with summons for violating the ordinance, because a formal parallel[157] state criminal charge was pending in a state court against that plaintiff.[158] On the other hand, the Supreme Court held that the *Younger* doctrine did not apply to the other two federal plaintiffs, solely because they were not defendants in any parallel state court criminal litigation at the time the district court heard oral argument[159] on the preliminary injunction. In support of this conclusion, Justice Rehnquist found that the *Younger* doctrine is triggered only by the initiation of a formal

---

**152.** *See, Allee,* 416 U.S. *supra,* at 817–819, 94 S.Ct. 2191.

**153.** Justice Powell took no part in the decision, and Chief Justice Burger filed a separate opinion, joined by Justices White and Rehnquist.

**154.** By "parallel" the court means that the same facts or issues are presented in the federal litigation in the simultaneous, pending state enforcement action.

**155.** The *Allee* court remanded the case regarding three of the Texas statutes which were repealed after the district court issued its order. That remand was based on the possible mootness of the controversy. *Allee,* 416 U.S. *supra,* at 818, 94 S.Ct. 2191. The *Allee* court also remanded the issues pertaining to the two statutes in existence after the district court's ruling, for a determination of whether pending or

threatened prosecutions existed. *See, Allee, supra,* at 820, 94 S.Ct. 2191.

**156.** The *Doran* complaints charged the federal defendants with enforcing and threatening to enforce an ordinance which violated the First and Fourteenth Amendments.

**157.** *See,* fn. 154, *supra.*

**158.** In *Doran,* the federal complaint was filed ahead of the state criminal charge. Nevertheless, the *Doran* court does not cite the *Hicks v. Miranda,* 422 U.S. 332, 350, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) authority for resolving that problem, despite the fact that *Hicks* was decided six days before *Doran.*

**159.** *See, Doran,* 422 U.S. *supra,* at 927–931, 95 S.Ct. 2561.

criminal proceeding in a state court.[160] He wrote:

> "The principle underlying *Younger* . . . is that *state courts* are fully competent to adjudicate constitutional claims, and therefore a federal court should, in all but the most exceptional circumstances, refuse to interfere with an *ongoing state criminal proceeding. In the absence of such a proceeding*, however, as we recognized in *Steffel*, a plaintiff may challenge the constitutionality of the state statute in federal court, assuming he can satisfy the requirements for federal jurisdiction.
>
> . . .
>
> "*No state proceedings were pending* against either Salem or Tim-Rob at the time the District Court issued its preliminary injunction. Nor was there any question that they satisfied the requirements for federal jurisdiction. . . . [W]e think that Salem and Tim-Rob were entitled to have their claims for preliminary injunctive relief considered without regard to *Younger's* restrictions." *See, Doran, supra*, at 930–931, 95 S.Ct. at 2567.

Based on the lower court precedents and the language in the United States Supreme Court decisions starting with Justice Brennan's "separate opinion" [161] in *Perez*, through *Steffel, Allee*, and *Doran*, Sovereign might argue that no state criminal enforcement activity is entitled to *Younger's* protection from federal injunctive or declaratory relief unless the state criminal enforcement effort matured into formal litigation in the state court *prior to* substantial proceedings on the merits in the parallel federal injunctive and declaratory litigation. While the language used by many of the authorities requires a fixed, wooden test for the application of *Younger's* abstention standards, this court concludes that the important competing policies which underlie the *Younger* doctrine demand a more flexible approach to the question of when a federal district court must assess its *own* power to decide a case or controversy [162] which arises from an alleged violation of the Bill of Rights in a parallel state criminal enforcement action. Overwhelming authority establishes that the proper accommodation of the sensitive question of federalism, which the architects of the *Younger* doctrine sought to resolve, requires a federal district court to balance the plaintiff's right for a federal forum against the importance of the state's interest in vindicating its own state authority through an enforcement action within its own institutions.[163]

In *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), Justice White, writing for a four Justice [164] plurality of the United States Supreme Court, held that the *Younger* rule was crafted primarily to implement the fundamental policy that the Constitution contemplates a vibrant *federal* system of government; *i. e.*, a system in which the federal government, and especially the federal judiciary, permit the states to perform legitimate state functions in which the states have important governmental interests.

> "Beyond the accepted rule that equity will ordinarily not enjoin the prosecution

---

**160.** Of course the state enforcement action must be initiated before "proceedings of substance on the merits," *Hicks*, 422 U.S. *supra*, at 349, 95 S.Ct. at 2292 occur in the federal litigation, or alternatively, when "the federal litigation was in an embryonic stage and no contested matter had been decided." *Doran*, 422 U.S. *supra*, at 929, 95 S.Ct. at 2566. *See*, discussion in fn. 133, *supra*.

**161.** *See, Steffel*, 415 U.S. *supra*, at 462, 94 S.Ct. 1209, *quoting* Justice Brennan's opinion in *Perez*, 401 U.S. *supra*, at 104, 91 S.Ct. 674.

**162.** *See*, United States Constitution Article III; *Kucinich v. Forbes*, 432 F.Supp. 1101, 1107 (N.D.Ohio 1977).

**163.** In *Huffman v. Pursue, Ltd.*, 420 U.S. *supra*, 605–607, 95 S.Ct. 1200, the High Court clearly determines *Younger's* applicability by balancing the state's interest in operating its justice system in an orderly fashion, against the federal plaintiffs' *immediate* need for access to the federal forum. Expressing the "balance of interests" test, *see, Hicks*, 422 U.S. *supra*, at 354, 357, 95 S.Ct. 2281 (Stewart, J., joined by three Justices, dissenting); *Trainor*, 431 U.S. *supra*, at 448, 97 S.Ct. *supra*, at 1920 (Blackmun, J., concurring).

**164.** The plurality consisted of Justices White, Powell, Rehnquist, and Chief Justice Burger.

of a crime, however, the Court voiced 'a more vital consideration,' id. [Younger], at 44, [91 S.Ct. [746,] at 750] namely, that in a union where both the States and the Federal Governments are sovereign entities, there are basic concerns of federalism which counsel against interference by federal courts, through injunctions or otherwise, with legitimate state functions, particularly with the operation of state courts. Relying on cases that declared that courts of equity should give 'scrupulous regard [to] the rightful independence of state governments,' Beal v. Missouri Pacific R. Corp., 312 U.S. 45, 50 [61 S.Ct. 418, 421, 85 L.Ed. 577] (1941), the Court held, that in this intergovernmental context, the two classic preconditions for the exercise of equity jurisdiction assumed new dimensions. Although the existence of an adequate remedy at law barring equitable relief normally would be determined by inquiring into the remedies available in the federal rather than in the state courts, Great Lakes Company v. Huffman, 319 U.S. 293, 297, [63 S.Ct. 1070, 1072, 87 L.Ed. 1407] (1943), here the inquiry was to be broadened to focus on the remedies available in the pending state proceeding. 'The accused should first set up and rely on his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection.' Younger v. Harris, 401 U.S. at 45, [91 S.Ct. [746], at 751,] quoting Fenner v. Boykin, 271 U.S. 240, 243–244, [46 S.Ct. 492, 493, 70 L.Ed. 927] (1926). Dismissal of the federal suit 'naturally presupposes the opportunity to raise and have finally decided by a competent state [court] tribunal the federal issues involved.' Gibson v. Berryhill, 411 U.S. 564, 577, [93 S.Ct. 1689, 1677, 36 L.Ed.2d 488] (1973). 'The policy of equitable restraint . . . is founded on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights.' Kugler v. Helfant, 421 U.S. 117, 124, [95 S.Ct. 1524, 1531, 44 L.Ed.2d 15] (1975).

" . . . The burden of conducting a defense in the criminal prosecution was not sufficient to warrant interference by the federal courts with legitimate state efforts to enforce state laws; only extraordinary circumstances would suffice. As the Court later explained, to restrain a state proceeding that afforded an adequate vehicle for vindicating the federal plaintiff's constitutional rights 'would entail an unseemly failure to give effect to the principle that state courts have the solemn responsibility equally with the federal courts' to safeguard constitutional rights and would 'reflect[] negatively upon the state court's ability' to do so. Steffel v. Thompson, 415 U.S. 452, 460–461, 462, [94 S.Ct. 1209, 1216, 1217, 39 L.Ed.2d 505] (1974). The State would be prevented not only from 'effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies.' Huffman v. Pursue, Ltd., 420 U.S. 592, 604, [95 S.Ct. 1200, 1208, 43 L.Ed.2d 482] (1975).

"Huffman involved the propriety of a federal injunction against the execution of a judgment entered in a pending state court suit brought by the State to enforce a nuisance statute. Although the state suit was a civil rather than a criminal proceeding, Younger principles were held to require dismissal of the federal suit. Noting that the State was a party to the nuisance proceeding and that the nuisance statute was 'in aid of and closely related to the State's criminal statutes,' the Court concluded that a federal injunction would be 'an offense to the State's interest in the nuisance litigation [which] is likely to be every bit as great as it would be were this a criminal proceeding.' 420 U.S., at 604, [95 S.Ct. [1200] at 1208]. Thus . . . the more vital consideration' of comity, id., 420 U.S., at 601, [95 S.Ct. [1200,] at 1208], quoting Younger v. Harris, supra, 401 U.S., at 44, [91 S.Ct. [746,] at 750], coun-

seled restraint as strongly in the context of the pending state civil enforcement action as in the context of a pending criminal proceeding. In these circumstances, it was proper that the federal court stay its hand.

"We have recently applied the analysis of *Huffman* to proceedings similar to state civil enforcement actions—judicial contempt proceedings. *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, [51 L.Ed.2d 376] (1977). The Court again stressed the 'more vital consideration' of comity underlying the *Younger* doctrine and held that the state interest in vindicating the regular operation of its judicial system through the contempt process—whether that process was labeled civil, criminal, or quasi-criminal—was sufficiently important to preclude federal injunctive relief unless *Younger* standards were met." *See, Trainor*, 431 U.S. *supra*, at 441, 97 S.Ct., at 1916–1918.[165]

Justice Blackmun wrote a separate concurring opinion in *Trainor* in which he placed even greater stress on the balance of interest approach to federalism as the key to *Younger's* applicability than the four-justice plurality.

"I join the Court's opinion and write only to stress that the substantiality of the State's interest in its proceeding has been an important factor in abstention cases under *Younger v. Harris*, 401 U.S. 37 [91 S.Ct. 746, 27 L.Ed.2d 669] (1971), from the beginning. In discussing comity, the Court in *Younger* clearly indicated that both federal and state interests had to be taken into account:

'The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in

which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.' *Id.*, at 44, [91 S.Ct. [746,] at 751].

"Consistently with the requirement of *balancing* the federal and *state interests*, the Court in previous *Younger* cases has imposed a requirement that the State must show that it has an important interest to vindicate in its own courts before the federal court must refrain from exercising otherwise proper federal jurisdiction. In *Younger* itself, the Court relied on the State's vital concern in the administration of its criminal laws. In *Huffman v. Pursue, Inc.*, [*sic*] 420 U.S. 592 [95 S.Ct. 1200, 43 L.Ed.2d 482] (1975), the court stressed the fact that it dealt with a quasi-criminal state proceeding to which the State was a party. The proceeding was both in aid of and closely related to criminal statutes. Thus, the State's underlying policy interest in the litigation was deemed to be as great as the interest found in *Younger*. Similarly in *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211 [51 L.Ed.2d 376] (1977), the Court found that the State's interest in its contempt procedures was substantial.

"In cases where the State's interest has been more attenuated, the Court has refused to order *Younger* abstention. Thus, in *Steffel v. Thompson*, 415 U.S. 452, [94 S.Ct. 1209, 39 L.Ed.2d 505] (1974), in which a state prosecution was merely threatened, the federal court was free to reach the merits of the claim for a declaratory judgment. *Id.*, at 462 [94 S.Ct. [1209,] at 1217.] In such a case, 'the opportunity for adjudication of constitutional rights in a federal forum, as authorized by the Declaratory Judgment Act, becomes paramount.' *Ellis v. Dyson*, 421 U.S. 426, 432 [95 S.Ct. 1691, 1695, 44 L.Ed.2d 274] (1975)." *See, Trainor*, *supra*, 97 S.Ct. at 1920–1921 (emphasis added).

**165.** *Compare*, the discussion of the appropriate balance of interests in *Sole v. Grand Jurors of New Jersey for Counties of Passaic and Bergen*, 393 F.Supp. 1322, 1326–1331 (D.N.J., 1975).

In *Trainor*, a state public assistance agency filed a civil lawsuit in the state court against two citizens on October 30, 1974, alleging that the two citizens had fraudulently concealed assets when they applied for and received public assistance. Such conduct constituted a crime under the applicable state law. However, the state agency elected to proceed civilly, seeking only the return of the money alleged to have been wrongfully received. The state agency simultaneously instituted a statutory, *ex parte* pre-judgment attachment proceeding against the state defendant's property, and the clerk of the state court issued a writ of attachment on the state defendant's credit union accounts which was executed on November 5, 1974. On December 3, 1974, the state defendants initiated a federal action against the enforcement officials of the state agency challenging the pre-judgment attachment proceedings as violative of the Due Process Clause of the Fourteenth Amendment, and seeking only the release of the attached funds. The three-judge district court issued an order refusing to apply *Younger* because the pending state attachment action was not a criminal or quasi-criminal proceeding, and then held the attachment statute unconstitutional. The Supreme Court majority reversed, holding that the policy rationale underlying the *Younger* doctrine applied to the state's anti-fraud civil enforcement and attachment actions because the state's participation, as a party in these enforcement proceedings, furthered important state governmental interests. In reaching this result, the Supreme Court majority explicitly recognized that a state's interest in enforcement activities of lesser magnitude than its cognizable interest in completing formally initiated *criminal* litigation could trigger *Younger's* cloak of protection. Thus the *Trainor* court wrote:

"The District Court thought that *Younger* policies were irrelevant because suits to recover money and writs of garnishment were available to private parties as well as the State; it was only because of the coincidence that the State was a party that the suit was 'arguably' in aid of the criminal law. But the fact remains that the State was a party to the suit in its role of administering its public assistance programs. Both the suit and the accompanying writ of garnishment were brought to vindicate important state policies such as safeguarding the fiscal integrity of those programs. The State authorities also had the option of vindicating these policies through criminal prosecutions. . . . Although, as in *Juidice*, the State's interest here is 'perhaps . . . not quite as important as is the State's interest in the enforcement of its criminal laws . . . or even its interest in the maintenance of a quasi-criminal proceeding . . . ,' 430 U.S., at 335 [97 S.Ct. [1211,] at 1217,] the principles of *Younger* and *Huffman* are broad enough to apply to interference by a federal court with an ongoing civil enforcement action such as this, brought by the State in its sovereign capacity.

"For a federal court to proceed with its case rather than to remit appellees to their remedies in a pending state enforcement suit would confront the State with a choice of engaging in duplicative litigation, thereby risking a temporary federal injunction, or of interrupting its enforcement proceedings pending decision of the federal court at some unknown time in the future. It would also foreclose the opportunity of the state court to construe the challenged statute in the face of the actual federal constitutional challenges that would also be pending for decision before it, a privilege not wholly shared by the federal courts. Of course, in the case before us, the state statute was invalidated and a federal injunction prohibited state officers from using or enforcing the attachment statute for any purpose. The eviscerating impact on many state enforcement actions is readily apparent. This disruption of suits by the State in its sovereign capacity, when combined with the negative reflection on the State's ability to adjudicate federal claims that occurs whenever a federal court enjoins a pending state proceeding, leads us to the

conclusion that the interests of comity and federalism on which *Younger* and *Samuels v. Mackell, supra,* primarily rest apply in full force here." *See, Trainor, supra,* 97 S.Ct., at 1918–1919.[166]

Significantly, the federal plaintiffs in *Trainor* argued that the injunction issued by the district court "in no way interfered with a pending state case" because only the attachment proceeding was interfered with, while the underlying civil anti-fraud enforcement action [167] could continue unimpeded. Relying on *Lynch v. Household Finance Corp.,* 405 U.S. 538, 552–556, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972) (non-judicial garnishment order is not a pending state court action for purposes of 28 U.S.C. § 2283); *Fuentes v. Shevin,* 407 U.S. 67, 96–97, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and *Gerstein v. Pugh,* 420 U.S. 103, 108 fn. 9, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the federal plaintiff in *Trainor* argued that the pre-judgment attachment issued through the clerk of courts, did not constitute a "court proceeding" within the *Younger* doctrine. *See, Trainor, supra,* 431 U.S. at 446 fn. 9, 97 S.Ct., at 1919 fn. 9. The Supreme Court rejected this argument in a fashion which has a bearing on whether the Montgomery County grand jury actions which occurred in Sovereign's case constituted a pending state court proceeding under

*Younger.* The four Justice plurality opinion states:

"In this case the attachment was issued by a court clerk and is very much a part of the underlying action for fraud. Moreover, the attachment in this case contained a return date on which the parties were to appear in *court* and at which time the appellees would have had an opportunity to contest the validity of the attachment. Thus the attachment proceeding was 'pending' *in the state courts* within the *Younger* . . . doctrine at the time of the federal suit." *See, Trainor, supra,* 97 S.Ct. at 1919 fn. 9.[168]

The *Trainor* court held that the attachment proceeding constituted a "pending" state court action under *Younger* because it served the function of compelling the state defendants to appear in state *"court"* on the civil anti-fraud enforcement action. Similarly, a state Grand Jury proceeding can be viewed as a "pending" state action for *Younger* purposes because it, too, compels state defendants to appear in state court on a governmental enforcement action. However, the analogy is imperfect. The difference is that, in *Trainor,* the initial attachment action was designed to facilitate formally filed state enforcement litiga-

**166.** The High Court in *Trainor, supra* and *Huffman,* 420 U.S. *supra,* at 609, 95 S.Ct. 1200 stresses the avoidance of *duplicative litigation* as a reason for applying *Younger.* However, this is not the most crucial concern in this area of *Younger* jurisprudence, for, the Court has also noted:

"As worthy a value as this is in a unitary system, the very existence of one system of federal courts and 50 systems of state courts, all charged with the responsibility for interpreting the United States Constitution, suggests that on occasion there will be duplicating and overlapping adjudication of cases which are sufficiently similar in content, time, and location to justify being heard before a single judge had they arisen within a unitary system." *See, Doran,* 422 U.S. *supra,* at 928, 95 S.Ct. at 2566.

**167.** The civil anti-fraud enforcement action was predicated on alleged conduct by the federal plaintiffs which constituted a crime. *See, Trainor,* 431 U.S. *supra,* at 435–436, 97 S.Ct. *supra,* at 1914.

**168.** Thus the *Trainor* court applied *Younger* to the federal challenge to the state prejudgment attachment statute *because* the procedures proscribed by that statute were welded to the state's anti-fraud enforcement action. Therefore, in a case where the federal parties were solely private, or there was no parallel *state sponsored* civil action pending in a state court against the federal plaintiff, the *Trainor-Younger* abstention approach does not apply, and the federal plaintiff could attack the validity of a state prejudgment attachment statute in federal court. However, if the challenged state prejudgment attachment statute was ambiguous, and in addition, fairly susceptible to a narrowing construction, *and* a pattern of state court decisions demonstrate the state judiciary's inclination to narrow the prejudgment attachment statute, then perhaps abstention under the *Pullman* doctrine may be in order. *See, Carey v. Sugar,* 425 U.S. 73, 77–79, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976).

tion, whereas no such formal state criminal enforcement action was pending at the time the Montgomery County authorities presented evidence to the Grand Jury. Nevertheless, this court concludes, in light of the additional authorities cited *infra,* that *Younger's* applicability does not depend on so slim a distinction.

█ The key to the application of the *Younger* doctrine is whether, in the unique factual context of each case, the state's enforcement activities, which are challenged in the federal suit, have progressed to a point within the *state justice system* that the state sustains an important interest in resolving the enforcement dispute within its own institutions. *Younger's* applicability is crystal clear when the state's enforcement activity advances to the stage of formal criminal litigation pending in state court prior to the attainment of substantial proceedings on the merits in the federal action. In that situation, the state sustains an overwhelming interest in vindicating its sovereign power and the vitality of its own institutions by concluding the enforcement action within its own system.[169] However, a state sustains a diminished interest during the prelitigation phase of its enforcement activities. As the state's enforcement activity approaches stages beyond the bare investigation phase, and as the state judicial institutions commence involvement in the enforcement action, the state's legitimate governmental interest may attain sufficient magnitude to merit *Younger's* protection from federal intervention despite the fact that the state's interest is less important than the interest it sustains in concluding formally initiated crimi-

nal litigation in its courts.[170] This balance of interests approach to the question of *Younger's* application is the common thread unifying the complex web of Supreme Court decisions which compose the *Younger* abstention doctrine.

For instance, in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), seventeen black and two white residents of Cairo, Illinois, filed a federal action against the state's attorney for Alexander County, Illinois his investigator, the Police Commissioner of Cairo, a county magistrate, and a county judge, charging all the defendants with racially discriminatory administration of the criminal justice system in Alexander County, over a sustained period of years, all in violation of the First, Sixth, Eighth, Thirteenth, and Fourteenth Amendments, and 42 U.S.C. §§ 1981, 1982, 1983, and 1985.[171] *See, O'Shea, supra,* at 490–491, 94 S.Ct. 669. The county magistrate and the county judge were charged with setting unconstitutionally high bond primarily for black criminal defendants, ordering harsher sentences for black convicts, and compelling only blacks and indigents to pay for a trial by jury. *See, O'Shea, supra,* at 492, 94 S.Ct. 669. The plaintiffs sought injunctive and declaratory relief. The record before the United States Supreme Court in *O'Shea* did not establish that any of the federal plaintiffs were defendants in any pending state criminal enforcement litigation, nor did it even suggest that any of them were threatened with a future prosecution before the two state judicial officials.[172] Nevertheless, in Part II of the opinion of the court, five Supreme Court Justices, relying on the policies of comity and federalism, agreed that

**169.** *See, Younger,* 401 U.S. *supra,* at 41, 49–50, 91 S.Ct. 746; *Steffel,* 415 U.S. *supra,* at 457, 462–464, 94 S.Ct. 1209; *Huffman,* 420 U.S. *supra,* at 602–605, 95 S.Ct. 1200.

**170.** *Compare, Huffman,* 420 U.S. *supra,* at 604–606, 95 S.Ct. 1200; *Trainor,* 431 U.S. *supra,* at 443–446, 97 S.Ct. *supra,* at 1918–1919; *Juidice v. Vail,* 430 U.S. 327, 335–338, 97 S.Ct. 1211, 1217–1218, 51 L.Ed.2d 376 (1977); *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 480 fn.10, 97 S.Ct. 1898, 1904 fn.10, 52 L.Ed.2d 513 (1977) (When a state views its own interests as not sufficiently important to re-

quire *Younger* abstention, then a federal court need not apply *Younger's* analysis.).

**171.** The federal plaintiffs in *O'Shea* also charged the federal defendants with discrimination against the poor. *See, O'Shea, supra,* at 491, 94 S.Ct. 669.

**172.** In Part I of the *O'Shea* opinion the majority holds that the federal plaintiffs lacked standing under Article III of the United States Constitution. *See, O'Shea, supra,* at 498–499, 94 S.Ct. 669.

348

the *Younger* doctrine applied in the *O'Shea* context, because the relief which the federal plaintiffs sought would result in a continuing supervision of the judicial component of the state's criminal justice system by means of the federal judiciary's equity power, disrupting the normal, vigorous operation of an important state sovereign function.

"[R]ecognition of the need for a proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against the state officers engaged in the administration of the State's criminal laws in the absence of a showing of irreparable injury which is 'both great and immediate.' [*Younger*, 401 U.S.] *Id.*, at 46, [91 S.Ct.[746] at 751]. . . .
Those principles preclude equitable intervention in the circumstances present here.

"Respondents . . . seek . . . an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials. The order the Court of Appeals thought should be available if respondents proved their allegations would be operative only where permissible state prosecutions are pending against one or more of the beneficiaries of the injunction. Apparently the order would contemplate interruption of state proceedings to adjudicate assertions of noncompliance by petitioners.

" . . .. *The objection is to unwarranted anticipatory interference in the state criminal process by means of continuous or piecemeal interruptions of the state proceedings by litigation in the federal courts; the object is to sustain '[t]he special delicacy of the adjustment to be preserved between federal equitable pow-*

er *and State administration of its own law.'* Stefanelli v. Minard, 342 U.S. 117, 120, [72 S.Ct. 118, 120, 96 L.Ed. 138] (1951). An injunction of the type contemplated by respondents and the Court of Appeals would disrupt the normal course of proceedings in the state courts via resort to the federal suit for determination of the claim *ab initio*, just as would the request for injunctive relief from an ongoing state prosecution against the federal plaintiff which was *found to be unwarranted in* Younger." See, *O'Shea, supra*, 414 U.S. at 499–501, 94 S.Ct. at 678 (emphasis added).

Thus, *O'Shea, supra,* suggests that the applicability of *Younger* principles depends more on the importance of the state's sovereign interest which is threatened by federal judicial intrusion, rather than on a fixed, wooden rule that federal judicial interference with a state's criminal enforcement activity is always permissible so long as the federal litigation attains substantial proceedings before the state authorities ·can initiate formal criminal litigation in a state court.[173]

In *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) the Supreme Court again restated its view that the federal-state comity policy for which the *Younger* doctrine was crafted arises whenever federal litigation threatens to disrupt a state's important interest in maintaining a vigorous justice system. In *Huffman, supra*, state enforcement officials initiated a nuisance proceeding in an Ohio Common Pleas Court against a motion picture theatre. The nuisance action resulted in the state trial court rendering a judgment that the theatre had shown obscene movies and must therefore be closed for one year as a nuisance under Ohio law. *See*,

173. This court also recognizes that *O'Shea* does not fully solve the problems presented by Sovereign's case. In *O'Shea*, the federal plaintiff launched a massive federal assault on the day to day activity of the local courts. They did not focus their attention to a single, isolated factual situation, and they did not challenge the constitutional validity of any state statute. *See, O'Shea, supra*, at 500, 94 S.Ct. 669. Sov-

ereign has focused its attack on the Montgomery County enforcement action, standing alone, and on the constitutional validity of two Ohio statutes which operate in conjunction. However, this court finds the *O'Shea* court's treatment of the *Younger* question instructive of the appropriate balance of the underlying, competing policy interest marshaled around any *Younger* problem.

*Huffman.* Rather than appeal the state trial court's judgment, the state defendant filed a 42 U.S.C. § 1983 action in the Northern District of Ohio, alleging that the Ohio court's nuisance judgment constituted a deprivation of constitutional rights under color of state law, and seeking a federal injunctive and declaratory order holding the Ohio nuisance statute unconstitutional. In Parts II and IV of the opinion the United States Supreme Court recapitulated the federal policy considerations underlying the *Younger* doctrine, stressing at various points that *Younger* operates when a federal judicial action threatens to interfere with "the state criminal law enforcement process," [174] or "state criminal proceedings." [175] The *Huffman* [176] court indicated that *Younger's* concern for "threats to our federal system" [177] suggests that occasionally a state's identifiable enforcement interests are sufficient to compel the application of *Younger* to "state civil functions," [178] especially when those functions are inextricably fused to the operation of a state's "criminal justice system." [179]

"The seriousness of federal judicial interference with *state civil functions* has long been recognized by this Court. . . For example, *Massachusetts State Grange v. Benton,* 272 U.S. 525, [47 S.Ct. 189, 71 L.Ed. 387] (1926), involved an effort to enjoin the operation of a state daylight savings act. Writing for the Court, Mr. Justice Holmes . . . emphasized a rule that 'should be very strictly observed,' 272 U.S., at 529, [47 S.Ct. [189], at 190 'that no injunction ought to issue against officers of a State clothed with *authority to enforce the law in question,* unless in a case reasonably free from doubt and when necessary to prevent great and irreparable injury.' *Id.,* at 527, 47 S.Ct. [189] at 190.]

"Although Mr. Justice Holmes was confronted with a bill seeking an injunction against *state executive officers,* rather than against state judicial proceedings, we think that *the relevant considerations of federalism are of no less weight in the latter setting.* If anything, they counsel more heavily toward federal restraint, since interference with a state judicial proceeding prevents the state not only from effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies. Such interference . . . can readily be interpreted 'as reflecting negatively upon the state courts' ability to enforce constitutional principles.' *Cf. Steffel v. Thompson, supra,* 415 U.S. at 462, [94 S.Ct. [1209] at 1217.]

"The component of *Younger* which *rests upon the threat to our federal system is thus applicable to a civil proceeding such as this quite as much as it is to a criminal proceeding.* . . . [W]e deal here with a state proceeding which in important respects is more akin to a criminal prosecution than are most civil cases. The State is a party to the Court of Common Pleas proceeding, and the proceeding is both in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials. Thus, *an offense to the State's interest in the nuisance litigation is likely to be every bit as great as it would be were this a criminal proceeding. Cf. Younger v. Harris,* 401 U.S., at 55 n.2 [91 S.Ct. at 757] (Stewart, J., concurring). Similarly, while in this case the District Court's injunction has not directly disrupted Ohio's *criminal justice system, it has disrupted that State's efforts to protect the*

---

**174.** *See, Huffman,* 420 U.S. *supra,* at 600, 95 S.Ct. at 1206.

**175.** *Id.*

**176.** *Compare,* discussion of *Younger v. Harris,* immediately preceding Part III A, this *Memorandum of Opinion, supra.*

**177.** *See, Huffman,* 420 U.S. *supra,* at 604, 95 S.Ct. 1200.

**178.** *See, Huffman,* 420 U.S. *supra,* at 603, 95 S.Ct. 1200.

**179.** *See, Huffman,* 420 U.S. *supra,* at 604, 95 S.Ct. at 1208.

*very interests which underlie its criminal laws* and to obtain compliance with precisely the standards which are embodied in its criminal laws." *See, Huffman, supra,* at 603–605, 95 S.Ct. at 1208 (emphasis added).

In order to implement the important comity principles underlying the *Younger* abstention rule, the *Huffman* court ultimately held that the state quasi-criminal nuisance enforcement action was "pending," for purposes of the application of *Younger's* standards for federal equitable restraint, despite the finality of the Ohio trial court's judgment, because the federal plaintiff had failed to exhaust all available appellate remedies within the state's criminal justice system.

"Appellee contends that even if *Younger* is applicable to civil proceedings of this sort, it nonetheless does not govern this case *because at the time the District Court acted there was no longer a 'pending state court proceeding'* as that term used in *Younger. Younger* and subsequent cases such as *Steffel* have *used the term 'pending proceeding'* to distinguish state proceedings which have already commenced from those which are merely incipient or threatened. Here, of course, the state proceeding had begun long before appellee sought intervention by the District Court. But appellee's point, we take it, is not that the state proceeding had not begun, but that it had ended by the time its District Court complaint was filed.

"Appellee apparently relies on the facts that the Allen County Court of Common Pleas had already issued its judgment and permanent injunction when this action was filed, and that no appeal from that judgment has ever been taken to Ohio's appellate courts. As a matter of state procedure, the judgment presumably became final, in the sense of being nonappealable, at some point after the District Court filing, possibly prior to entry of the District Court's own judgment, but surely after the single judge stayed the state court's judgment. We need not, however, engage in such inquiry. For

regardless of when the Court of Common Pleas' judgment became final, *we believe that a necessary concomitant of Younger is that a party in appellee's posture must exhaust his state appellate remedies before seeking relief in the District Court, unless he can bring himself within one of the exceptions specified in Younger.*

"Virtually all of the evils at which *Younger* is directed would inhere in federal intervention prior to completion of state appellate proceedings, just as surely as they would if such intervention occurred at or before trial. Intervention at the later stage is if anything more highly duplicative, since an entire trial has already taken place, and it is also a direct aspersion on the capabilities and good faith of state appellate courts. Nor, in these state-initiated nuisance proceedings, is federal intervention at the appellate stage any the *less a disruption of the State's efforts to protect interests which it deems important.* Indeed, it is likely to be even more disruptive and offensive because the State has already won a *nisi prius* determination that its *valid policies are being violated in a fashion which justifies judicial abatement.*

"Federal post-trial intervention, in a fashion designed to annul the results of a state trial, also *deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction.* We think this consideration to be of some importance because it is typically *a judicial system's* appellate courts which are by their nature a litigant's most appropriate forum for the resolution of constitutional contentions. Especially is this true *when, as here, the constitutional issue involves a statute which is capable of judicial narrowing.* In short, we do not believe that *a State's judicial system would be fairly accorded the opportunity to resolve federal issues arising in its courts if a federal district court were permitted to substitute itself for the State's appellate courts.* We

therefore hold that *Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies." *See, Huffman, supra,* at 607–609, 95 S.Ct. at 1210 (emphasis added).[180]

Thus *Huffman* follows the pattern illustrated by *Trainor, supra,* and *O'Shea, supra,* of construing the application of *Younger's* cloak of protection for state enforcement activities by striking a balance in favor of the state's important interest in maintaining the vitality of the state institutions which comprise its "justice system." Intriguingly, the *Huffman* court broadly construed the scope of the term "pending" state prosecution, in order to include formally concluded state litigation under the sweep of *Younger's* protective shield. The court's opinion adopts the view that a state trial court decision, which becomes final before the federal court's decision because the federal plaintiff (*i. e.,* state court defendant) fails to take a state court appeal, is nevertheless a "pending" state action for *Younger* purposes. The court reached this result in order to insure the vigor of the appellate sector of the forum state's "judicial system." [181] Such an interpretation rebuts Sovereign's argument that *Younger* standards never apply unless state court litigation is formally pending prior to the attainment of substantial federal proceedings, because the *Huffman* court assumes that there was no formal state litigation pending at the time the *Huffman* federal district court issued its injunction. Thus *Huffman* indicates that the determination of whether a case is "pending" for purposes of *Younger's* abstention rule, is governed by balancing the interests underlying the comity policies of the *Younger* doctrine, and not a question controlled merely be examining

the date upon which the formal state litigation was initiated.[182] However, *Huffman* does not explicitly answer the question of whether Montgomery County's enforcement activities in this case are entitled to *Younger's* protection, because the problem in *Huffman* involved the deference to be accorded state litigation which had already been formally initiated and formally concluded,[183] albeit at the federal plaintiff's choice, whereas the Montgomery County enforcement activities attacked by Sovereign had not formally ripened into state court litigation at any time prior to the point at which substantial proceedings on the merits occurred in Sovereign's federal action.[184]

*Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), constitutes still another example of the United States Supreme Court's invocation of the *Younger* doctrine according to the need to protect a sovereign state's weighty interest in the vigor of its criminal enforcement institutions from federal judicial usurpation. The *Rizzo* court applied *Younger* despite the lack of parallel, technically "pending" state court litigation. In *Rizzo, supra,* the federal plaintiffs initiated a federal action under 42 U.S.C. § 1983 charging the Philadelphia Mayor, Police Commissioner, and City Manager with expressly authorizing, encouraging, and knowingly failing to stop intentional, pervasive, misconduct by the Philadelphia Police Department. The federal district court, holding that it sustained broad equitable power to supervise the function of a state police department,[185] issued an injunctive order against the federal defendants [*i. e.,* the Philadelphia municipal officials], "requiring [them] 'to submit to [the district] court for its approval [of] a comprehensive program for improving the handling of citizen complaints alleg-

---

**180.** *See,* fn.166, *supra.*

**181.** *See,* fn.180, *supra.*

**182.** *Compare, Perez,* 401 U.S. *supra,* at 104, 91 S.Ct. 674 (Justice Brennan's separate opinion).

**183.** *See, Huffman,* 420 U.S. *supra,* at 609, fn.21, 95 S.Ct. 1200.

**184.** *See also,* text of this Memorandum of Opinion accompanying fns.114–134, *supra.*

**185.** *Compare, Rizzo,* 423 U.S. *supra,* at 373–374 fn. 8, 380, 95 S.Ct. 1200.

ing police misconduct' in accordance with a comprehensive opinion filed together with the order." *See, Rizzo, supra,* at 364–366, 96 S.Ct. at 601, *see also, Rizzo,* fn. 2. No state litigation involving any segment of the state's justice system was pending during any stage of the federal litigation in *Rizzo.* Nevertheless, the United States Supreme Court held that the *Younger* doctrine shielded state executive law enforcement officials from injunctive interference by federal district courts, when such state officials were entrusted with the important state function [186] of managing a local police department and insuring that the local police conduct their affairs within constitutionally prescribed parameters. Justice Rehnquist, writing for five of the eight Justices [187] who considered the case, held:

"Where as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.' *Stefanelli v. Minard,* 342 U.S. 117, 120, [72 S.Ct. 118, 96 L.Ed. 138] (1951), quote in *O'Shea v. Littleton, supra,* 414 U.S., at 500, [94 S.Ct. [669] at 678].

"Section 1983 by its terms confers authority to grant equitable relief as well as damages, but its words 'allow a suit in equity only when that is the proper proceeding for redress, and they refer to existing standards to determine what is a proper proceeding.' *Giles v. Harris,* 189 U.S. 475, 486, [23 S.Ct. 639, 642, 47 L.Ed. 909] (1903) (Holmes, J.). Even in an action between private individuals, it has long been held that an injunction is 'to be used sparingly, and only in a clear and plain case.' *Irwin v. Dixon,* 9 How. 10, 33, 13 L.Ed. 25 (1850). . . .

"When the frame of reference moves from a unitary court system, governed by the principles just stated, to a system of federal courts representing the *Nation, subsisting side by side with 50 state judicial, legislative, and executive branches, appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief. Doran v. Salem Inn, Inc.,* 422 U.S. 922, 928, [95 S.Ct. 2561, 45 L.Ed.2d 648] (1975).

"So strongly has Congress weighted this factor of federalism in the case of a state criminal proceeding that it has enacted 28 U.S.C. § 2283 to actually deny to the District Courts the authority to issue injunctions against such proceedings unless the proceedings come within narrowly specified exceptions. Even though an action brought under § 1983, as this was, is within those exceptions, *Mitchum v. Foster,* 407 U.S. 225, [92 S.Ct. 2151, 32 L.Ed.2d 705] (1972), the *underlying notions of federalism which Congress has recognized in dealing with the relationships between federal and state courts still have weight.* Where an injunction against a criminal proceeding is sought under § 1983, 'the principles of equity, comity, and federalism' must nonetheless restrain a federal court. *Id.,* at 243, 92 S.Ct. [2151] at 2162.

"But even where the prayer for injunctive relief does not seek to enjoin the state criminal proceedings themselves, we have held that the principles of equity nonetheless militate heavily against the grant of an injunction except in the most extraordinary circumstances. In *O'Shea v. Littleton, supra,* 414 U.S. at 502, [94 S.Ct. [669] at 679, we held that 'a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings is in sharp conflict with the principles of

---

**186.** The *Rizzo* court notes that *Younger's* comity principles have their "greatest weight" when invoked to insulate state criminal proceedings. *See, Rizzo,* at 423 U.S. *supra,* at 380, 96 S.Ct. 598. However, it applied *Younger* to the *Rizzo* fact pattern which embraced *no* parallel pending state criminal trial. The *Rizzo* court thus implicitly recognized that state law enforcement interests of lesser weight than the interests underlying a state criminal trial may nevertheless trigger *Younger's* application.

**187.** Justice Stevens did not participate in the decision, and Justices Blackmun, Brennan, and Marshall dissented.

equitable restraint which this Court has recognized in the decisions previously noted.' And the same principles of federalism may prevent the injunction by a federal court of a state civil proceeding once begun. *Huffman v. Pursue, Ltd.,* 420 U.S. 592, [95 S.Ct. 1200, 43 L.Ed.2d 482] (1975).

"Thus the principles of federalism which play such an important part in governing the relationship between federal courts and state governments, though initially expounded and *perhaps entitled to their greatest weight in cases where it was sought to enjoin a criminal prosecution in progress, have not been limited either to that situation or indeed to a criminal proceeding itself. We think these principles likewise have applicability where injunctive relief is sought not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local governments such as [respondents] here.* Indeed, in the recent case of *Mayor v. Educational Equality League,* 415 U.S. 605, [94 S.Ct. 1323, 39 L.Ed.2d 630] (1974), in which private individuals sought injunctive relief against the Mayor of Philadelphia, we expressly noted the existence of such consideration, saying '[t]here are also delicate issues of federal-state relationships underlying this case.' *Id.,* at 615, [94 S.Ct. [1323], at 1331]." *See, Rizzo,* 423 U.S. *supra,* at 378–380, 96 S.Ct. at 607 (emphasis added).[188]

In *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), Justice Rehnquist, writing for a majority of five Justices, recently held that the applicability of *Younger's* abstention principles depends on the importance of a state's interest in maintaining the vigor and capacity of the institutions which comprise its justice system by concluding civil and criminal enforcement activities without federal judicial intervention. In *Juidice,* the plaintiffs failed to pay civil default judgments rendered against them by New York state courts, and subsequently the New York trial court, acting under a New York statute, held the federal plaintiffs in contempt. The state court also imposed a brief jail term because the plaintiffs failed to obey subpoenas requiring their attendance at depositions designed to furnish information pertaining to the satisfaction of the judgments. Shortly thereafter, the judgment debtors [189] who had been held in contempt filed an action in a federal district court seeking a federal injunction against application of the New York contempt statutes on the theory that the statutorily prescribed procedures leading to their imprisonment violated the Due Process Clause of the Fourteenth Amendment. At no time did the plaintiffs make their constitutional claim before any state tribunal, although New York procedural law permitted them the opportunity to do so. *See, Juidice,* 430 U.S. 327, *supra,* at 337, fn. 14, 97 S.Ct. 1211, *supra,* at 1218, fn. 14, 51 L.Ed.2d 376. A three-judge federal district court ruled several of the challenged New York statutes unconstitutional and issued a permanent injunction against the application of those statutes by the federal defendants [190] who appealed claiming that the abstention principles of *Younger* compelled the federal court to dismiss the federal plaintiff's action. Once again, the Supreme Court did not decide *Younger's* applicability by examining the potential friction between

---

**188.** *Compare,* Chief Justice Burger's separate opinion in *Allee v. Medrano,* 416 U.S. 802, 846–848, 854–860, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974), wherein the Chief Justice, clearly foreshadowing the *Rizzo* decision, notes the substantial difference between enjoining "police misconduct," as opposed to enjoining a statute, because the former class of injunction is *more* offensive to *Younger's* comity principles.

*Rizzo, supra,* is not alone dispositive of Sovereign's federal claim against the Montgomery County federal defendants for the same reasons that *O'Shea, supra,* is also not alone dispositive of the identical claims. However, this court relies on *Rizzo* for the same reasons it relies on *O'Shea. See,* fn.173, *supra.*

**189.** These were the persons who were the federal plaintiffs.

**190.** The contempt orders were issued by New York State court judges, who were the federal defendants.

*formal litigation* pending in state and federal courts. Instead, the Supreme Court scrutinized the substantiality of the state's interest, as a politically sovereign entity, in operating its civil and criminal enforcement institutions without interference from federal district courts so long as those state institutions furnish an identifiable opportunity for the plaintiff to litigate his constitutional claim within the state justice system.[191]

"We now hold, however, that the principles of *Younger* and *Huffman* are not confined solely to the types of state actions which were sought to be enjoined in those cases. As we emphasized in *Huffman*, 'the more vital consideration' behind the *Younger* doctrine of nonintervention lay not in the fact that the state criminal process was involved, but rather in

'the notion of comity, that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States *and their institutions* are left free to perform their separate functions in their separate ways.' *Huffman, supra,* [420 U.S.] at 601, [95 S.Ct. [1200,] at 1206,] quoting *Younger, supra,* [401 U.S.] at 44, [91 S.Ct. [746] at 758].

"This is by no means a novel doctrine. In *Ex parte Young,* 209 U.S. 123, [28 S.Ct. 441, 52 L.Ed. 714] (1908), the watershed case which sanctioned the use of the Fourteenth Amendment to the United States Constitution as a sword as well as a shield against unconstitutional conduct of state officers, the Court said:

'But the Federal court cannot, of course, interfere in a case where the proceedings were already pending in a state court. *Taylor v. Taintor,* 16 Wall. 366, 370 [21 L.Ed. 287]; *Harkrader v. Wadley,* 172 U.S. 148 [19 S.Ct. 119, 43 L.Ed. 399]' 209 U.S., at 162, [28 S.Ct. [441] at 455].

"These principles apply to a case in which the State's contempt process is involved. *A State's interest* in the contempt process, through which it *vindicates the regular operation of its judicial system,* so long as *that system* itself affords the opportunity to pursue federal claims within it, is surely an *important interest.* Perhaps it is not quite as important as is the *State's interest* in the enforcement of its criminal laws, *Younger, supra,* or even its *interest* in the maintenance of a quasi-criminal proceeding such as was involved in *Huffman, supra.* But we think it is of sufficiently great import as to require application of the principles of those cases. The contempt power lies at the core of the administration of a *State's judicial system,* . . . Whether disobedience of a court-sanctioned subpoena, and the resulting process leading to a finding of contempt of court, is labeled civil, quasi-criminal, or criminal in nature, we think the salient fact is that federal court interference with the State's contempt process is '*an offense to the State's interest* . . . likely to be every bit as great as it would be were this a criminal proceeding,' *Huffman, supra,* [420 U.S.] at 604, [95 S.Ct. [1200] at 1208]. Moreover, such interference with the contempt process not only '*unduly interferes with the legitimate activities of the State* [ ],' *Younger, supra,*

**191.** The Court's approach to the *Younger* abstention rule has been bitterly criticized. *See, Hicks,* 422 U.S. *supra,* at 353–357, fn. 1 (Stewart, J., dissenting); *Juidice v. Vail,* 430 U.S. 341, 342, 97 S.Ct. 1220, 1221 (1977) (Brennan, J., dissenting); *Trainor v. Hernandez,* 431 U.S. 434, 455–456, 97 S.Ct. 1911, 1924–1925, 52 L.Ed.2d 486 (Brennan, J., dissenting). Nevertheless, this court notes that the *Younger* doctrine appears to have been a weighty factor in persuading Congress to amend the three-judge court statute in a fashion substantially reducing the use of the three-judge federal court mechanism and the number of mandatory appeals, as of right, to the United States Supreme Court. *See,* Legislative History of Pub.Law 94–380 (1976), *1976 U.S.Code, Congressional, and Administrative News,* pp. 1989–1992 (In part quoting the Chief Justice's 1972 Report on the State of the Judiciary), 1995–1996, and also discussing how "Decisional Law Has Provided Its Own Safeguards Against Injunctive Action by Federal Judges". *Compare,* 28 U.S.C. §§ 2281–2284 prior to August 12, 1976.

[401 U.S.] at 44, [91 S.Ct. [746] at 750]—but also 'can readily be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles,' *Huffman, supra*, [420 U.S.] at 604 [95 S.Ct. 1200] at 1208." *See, Juidice, supra*, 430 U.S. at 332–337, 97 S.Ct., at 1216–1218 (emphasis added).

After expressing the broad federalism policy reasons which triggered *Younger*'s application, the *Juidice* majority, rejecting the district court's conclusion that *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) permitted the district court's exercise of federal jurisdiction, focused on the most crucial criterion in determining the applicability of *Younger*'s federal abstention analysis.

"The District Court relied upon our decision in *Gerstein v. Pugh*, [420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975),] to justify its refusal to dismiss appellees' suit, and it spoke of the possibility that a debtor in the position of appellees might be 'thrown in jail without an *actual* hearing,' (emphasis added). But *Gerstein* explained the reason for the inapplicability of *Younger* to that case in a way which clearly distinguishes it from this:

'The District Court correctly held that the respondents' claim for relief was not barred by the equitable restrictions on federal intervention and state prosecutions, *Younger v. Harris*, 401 U.S. 37, [91 S.Ct. 746, 27 L.Ed.2d 669] (1971). The injunction was not directed at the *state prosecutions as such*, but only at the legality of pretrial detention without a judicial hearing, *an issue that could not be raised in defense of the criminal prosecution.*' 420 U.S. 103, 108, n. 9, [95 S.Ct. 854, 86 n. 9, 43 L.Ed.2d 54] (emphasis added).

"Here it is abundantly clear that appellees *had an opportunity to present their federal claims in the state proceeding. No more is required to invoke Younger abstention.* There is no support in *Ger-*

*stein* or in our other cases for the District Court's belief that the state courts must have an *actual* hearing (to which a recalcitrant defendant would presumably be brought by force) in order for *Younger* and *Huffman* to apply. *Appellees need be accorded only an opportunity to fairly pursue their constitutional claims in the ongoing state proceedings, Gibson v. Berryhill*, 411 U.S. 564, 577, [93 S.Ct. 1689, 1697, 36 L.Ed.2d 488] (1973), and their failure to avail themselves of such opportunities does not mean that the state procedures were inadequate. *Presumptively*, therefore, the principles which underlie *Younger* call for dismissal of the action." *See, Juidice, supra*, 97 S.Ct., at 1218 (emphasis partially added).

▮ Thus, in a line of cases ranging from *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) through *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), the United States Supreme Court repeatedly stressed that whenever a plaintiff seeks a federal injunction or declaratory relief against state institutions, charged with the duty to civilly or criminally enforce state laws, the federal forum must decide whether the federalist policies of comity dictate the application of *Younger*'s abstention doctrine. The applicability of that doctrine is not mechanically restricted to those situations in which formal state enforcement litigation is pending [192] prior to the federal court's attainment of substantial proceedings on the merits of the federal complaint.[193] But *Younger* analysis applies when the record reveals that prior to the attainment of substantial proceedings on the merits of the federal complaint, a state civil or criminal enforcement action satisfied three elements which

---

192. *See*, the discussion of *O'Shea* in text accompanying footnotes 171–173, *supra*, and the discussion of *Rizzo* in the text accompanying footnotes 185–188, *supra*.

193. *See*, discussion in the text accompanying fns. 114–134, *supra*.

embody *Younger*'s balance of interests approach. The state civil or criminal enforcement activity must have:

(1) Posed a concrete adverse threat, within the contemplation of Article III of the United States Constitution, to the federal plaintiff, and to his enjoyment of a federal right; [194]

(2) Afforded the federal plaintiff an *OPPORTUNITY* to present its federal claims in a state forum at some time during the state's enforcement action; [195]

(3) Involved a state institution imbued with an important legitimate state interest.[196]

The sequence of Supreme Court holdings from *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), through *Allee v. Medrano*, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) is consistent with this interpretation of *Younger*'s applicability. *First*, in each of those cases, the Supreme Court took great care to carefully document the concrete threat of enforcement activity directed at the plaintiffs as of the date the federal complaint was filed.[197] *Second*, the Supreme Court delineated the procedural posture of the state enforcement action in each of the three cases, thereby revealing whether a plaintiff had an opportunity to litigate its federal claims in the state enforcement context, and if such an opportunity was identified, the court ordered abstention under *Younger*. *Third*, the court examined the weightiness of the state interest underlying the function of the particular state enforcement institution which, according to the federal plaintiff, violated the United States Constitution. Each of the three cases, consistent with all the other abstention cases, noted that the most highly protected state interest cognizable under *Younger* is the preservation of the state's authority to conclude criminal litigation formally pending in its judicial system.[198] More recent Supreme Court holdings indicate that state interests of lesser significance than state judicial completion of technically pending state criminal litigation are sufficiently important to the federal system of government to trigger *Younger*'s protection.[199] However, the more recent holdings are consistent with the holdings in *Steffel, Allee,* and *Doran* that the state interests underlying the state institutions which were affected by those three federal cases were not sufficiently weighty to deserve *Younger*'s protection.[200] The recent holdings in *Huffman, Rizzo, Juidice* and *Trainor* [201] extended *Younger*'s protections to state institutions with legitimate state interests analogous to the interests underly-

---

**194.** Obviously the threat must be generated by the federal defendants, whose state enforcement activity threatens to interfere with either the federal statutory or constitutional rights of the federal plaintiff. *See also*, Part III A, *supra*, of this Memorandum of Opinion.

**195.** *See, Juidice*, 430 U.S. *supra*, at 337, 97 S.Ct. *supra*, at 1218. Perhaps the "opportunity" to be heard in state court need be only arguable, *see, Trainor*, 431 U.S. *supra*, at 447, 97 S.Ct. *supra*, at 1920, fn. 10.

**196.** *See, Trainor*, 431 U.S. *supra*, at 439–446, 448–449, 97 S.Ct., *supra*, at 1916–1919, 1920–1921 (1977), and text accompanying fns. 165 and 169, *supra*, this Memorandum of Opinion; *O'Shea v. Littleton*, 414 U.S. 488, 499–501, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and text accompanying fn. 173, *supra*, this Memorandum of Opinion; *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 601, 603–604, 607–609, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), and text accompanying fns. 180–184, *supra; Rizzo v. Goode*, 423 U.S. 362,

379–380, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), and text accompanying fn. 186, *supra; Juidice*, 430 U.S. *supra*, at 333–336, 97 S.Ct. *supra*, at 1216–1218 (1977).

**197.** *See, Allee, supra*, 416 U.S. at 805–812, 816, fn. 10, 94 S.Ct. 2191. The court did note that events subsequent to the filing of the complaint might have a mootness effect. *See, Allee, supra*, at 818–820, 94 S.Ct. 2191.

**198.** For example, *see, Allee*, 416 U.S. *supra*, at 814, 819, 94 S.Ct. 2191.

**199.** *See, Huffman*, 420 U.S. *supra*, at 604, 608, 95 S.Ct. 1200; *Rizzo*, 423 U.S. *supra*, at 379–380, 96 S.Ct. 598; *Juidice*, 430 U.S. *supra*, at 334, 97 S.Ct. *supra*, at 1217; *Trainor*, 431 U.S. *supra*, at 443–444, 97 S.Ct. *supra*, at 1918.

**200.** *See*, fns. 173, 188, *supra*.

**201.** *See*, fn. 199, *supra*, for pertinent citations.

ing the state judicial process, and therefore different from the relatively insignificant state interests present in *Steffel, Allee,* and *Doran.*[202]

Applying the balance of comity interests test for *Younger's* application, the court fixed the point at which it sustained substantial proceedings on the merits,[203] and

determined that Sovereign presented a case or controversy within the appropriate time frame.[204] This court, continuing to apply the interest balance approach, must now decide whether the state enforcement activities, which took place within the applicable time frame,[205] afforded Sovereign an *opportunity* to present its federal claims during

**202.** In *Steffel,* 415 U.S. 452, 455, fn. 2, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) the federal declaratory order intruded solely on the state's interest in authorizing its police officers to repeatedly threaten to arrest a federal plaintiff. In *Allee,* 416 U.S. 802, 806–809, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974), the federal injunction intruded on the state's interest in permitting its police officers to exercise broad discretion to investigate a union movement, to arrest members, and to distribute an anti-union newspaper using state facilities. In *Doran,* 422 U.S. 922, 924–925, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), the federal injunction intruded upon the state's interest in securing a deterrent or "chilling" effect with respect to society at large because of the *bare* initiation of criminal litigation against the first offenders under a new criminal law. Significantly, the state's deterrent interest in *Doran* stemmed from the initiation of criminal litigation, *not* the securing of a valid criminal *conviction.*

*Contrast* the state interests found sufficient to trigger *Younger's* cloak of protection in *Huffman, Rizzo, Juidice,* and *Trainor.* In *Huffman,* 420 U.S. *supra,* at 604, 608, 95 S.Ct. 1200 (1977) the state interest in completion of state *judicial,* quasi-criminal, civil enforcement proceedings was elevated to the importance of pending judicial state criminal litigation, and protected by *Younger.* In *Rizzo,* 423 U.S. *supra,* at 379–380, 96 S.Ct. 598 (1976) the Court protected the state's interest in operating the day to day functions of a *massive* metropolitan police force without daily federal judicial supervision. In *Juidice,* 430 U.S. *supra,* at 335–336, 97 S.Ct. *supra,* at 1217 (1977) the Supreme Court protected the important state interest in maintaining a state judiciary with contempt power. In *Trainor,* 431 U.S. *supra,* at 443–444, 97 S.Ct. *supra,* at 1918 (1977) the Court protected the important state interest in completion of state *judicial,* civil anti-fraud enforcement proceedings.

Apparently the Supreme Court adopted a sliding scale of state interests for determining which state enforcement actions are entitled to *Younger's* insulation. At the most highly protected end of the scale rest state interests relating to judicial enforcement of state criminal laws, with state initiated civil, *judicial* enforcement actions viewed as almost as important. *See, Juidice,* 430 U.S. *supra,* at 334–335, 97 S.Ct. *supra,* at 1217 (1977); *Trainor,* 431 U.S. 443–444, 97 S.Ct. *supra,* at 1918 (1977). Pro-

tection of state police agencies from massive, day to day operational supervision appears to be about as important as state initiated judicial, civil enforcement actions. *See, Rizzo, supra,* 423 U.S. at 380, 96 S.Ct. 598. Whereas, at the opposite end of the spectrum of state interests cognizable under *Younger,* lie individual unexecuted threats to initiate criminal enforcement actions generated by the daily activities of executive or administrative law enforcement officers, who function beyond the immediate supervision of the state's judiciaries. Also, state interests which the state itself views as not sufficiently important to merit protection from the federal courts are likewise classed among the state interests least deserving of *Younger's* protection. *See, Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 480, 97 S.Ct. 1898, 1903–1904, fn. 10, 52 L.Ed.2d 513 (1977).

Sovereign's claims against the Montgomery County authorities raises a perplexing problem because the state's interest in the integrity of its grand juries, which may on occasion operate as tools of the prosecutor, *see, United States v. Dionisio,* 410 U.S. 1, 17, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), but which are also subject to more immediate state judicial control than the policeman of the street, appears to logically fall somewhere in the middle of the spectrum of state interests cognizable under *Younger,* because the grand jury functions under the effective control of both the courts and law enforcement administrators. However, this court concludes that the state's grand jury oriented interests are more closely aligned with the *Huffman* class of interests, than with the *Steffel* class of interests, and that decision obviously plays an important rule in this court's resolution of the Montgomery County abstention questions.

**203.** *See,* text accompanying fns. 114–134, *supra.*

**204.** *See,* Part III A, *supra,* this Memorandum of Opinion.

**205.** *See,* text accompanying fns. 114–134, *supra.* For the reasons discussed in that portion of this opinion, the court does not view the Montgomery County Grand Jury's May 3, 1977 indictment of Sovereign as at all pertinent or controlling the court's present analysis of *Younger's* applicability to the Montgomery County branch of Sovereign's federal action.

the state's enforcement action, and involved a state institution imbued with an important, legitimate state interest.

### C(1) THE MONTGOMERY COUNTY GRAND JURY PROCEEDING AFFORDS SOVEREIGN AN OPPORTUNITY TO PRESENT ITS FEDERAL CLAIMS AT SOME OCCASION DURING THE MONTGOMERY COUNTY ENFORCEMENT ACTION.

Arguably the Montgomery County Grand Jury proceeding at which evidence of Sovereign's alleged violations of the Ohio organized crime and pandering obscenity statutes was presented, threatened Sovereign with enforcement of those statutes without also furnishing it with an opportunity to present its federal constitutional claims to a competent Montgomery County forum. Thus, Sovereign concludes, by analogy to *Steffel, Allee,* and *Doran*[206] that *Younger* does not apply to its federal litigation against the Montgomery County authorities.

■ However, this court concludes that so long as a state criminal enforcement action attains a stage which assures the federal plaintiff an opportunity to present its constitutional defenses at some point during the "ongoing state proceedings," *i. e.,* either during the proceeding which itself poses the threat of enforcement, or at later proceedings which must occur prior to entry of a state criminal court's final judgment of conviction, then the state's enforcement ac-

tivity provides the federal plaintiff with a sufficient opportunity to present its federal claims for purposes of *Younger*'s application.[207] In *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), the court held that plaintiffs had sufficient opportunity to present their federal claims against the state's pre-judgment, clerk issued, *ex parte* attachment proceeding, by appearing in court *after* the issuance of the clerk's attachment order to contest the validity of the clerk's decision.[208] Thus, the *Trainor* court implicitly points out that *Younger* may apply to a federal plaintiff who had no opportunity to present his federal claim at the same state procedural stage which threatened a state enforcement action against him. As the court stated in *Juidice,* 430 U.S. *supra,* at 334–338, 97 S.Ct. *supra,* at 1217–1218, *Younger* may apply to federal constitutional litigation which is parallel to a state enforcement action "so long as [the state judicial] *system* itself affords the opportunity to pursue federal claims within it"[209] (emphasis added).

Sovereign might argue that this court's application of *Trainor* and *Juidice* is inconsistent with the Supreme Court's earlier pronouncements in *Steffel, Allee,* and *Doran.*[210] However, each of those cases involved enforcement threats against plaintiffs which originated from the discretionary acts of solely administrative law enforcement personnel, not from any adjudicatory body within the state's judicial system.[211] Assuming the statute involved had

---

**206.** *See, Steffel,* at 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Allee,* at 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Doran,* at 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

**207.** Of course, the other two factors necessary for *Younger*'s operation must also be present, *i. e.,* the federal plaintiff must sustain Article III standing, and the federal action must involve a state institution imbued with an important, legitimate state interest. *See,* text accompanying fns. 196–197, *supra.*

**208.** *See, Trainor,* 431 U.S. *supra,* at 446, 97 S.Ct. *supra,* at 1919, fn. 9.

**209.** *See, Juidice,* 430 U.S. *supra,* at 334–338, 97 S.Ct. *supra,* at 1217–1218.

**210.** *See,* fn. 206, *supra,* for appropriate citations.

**211.** Ohio grand juries operate under the effective supervision of both the Ohio Common Pleas Courts and the local county prosecutors. *See,* Ohio Revised Code §§ 2939.01–2941.63; Ohio Criminal Rules 6, 7. Therefore, the Ohio grand jury bridges the organizational gap between administrative, executive criminal law enforcement authorities, and the Ohio judiciary. Federal courts look to the law of the state to determine the judicial, or non-judicial, character of state proceedings which are pending and against which a federal plaintiff seeks a federal court order. *See, Hill v. Martin,* 296 U.S. 393, 400, 56 S.Ct. 278, 80 L.Ed. 293 (1935); *Geiger v. Jenkins,* 316 F.Supp. 370, 372 (N.D. Ga., 1970).

not been previously ruled unconstitutional,[212] state administrative law enforcement personnel, exercising their discretion, could threaten enforcement over a sustained period against a federal plaintiff like Sovereign merely to deter it from activity which the federal plaintiff viewed constitutionally protected.[213] In that situation the plaintiff, like those in *Steffel, Allee,* and *Doran,* has no opportunity to have state judges [214] authoritatively decide the validity of the federal plaintiff's constitutional objections to the state enforcement action threatened by state administrative law enforcement personnel. However, once an enforcement action reaches the state grand jury stage, one of two results must shortly materialize: first, the threat will be immediately dispelled by the grand jury's refusal to indict; or, second, the grand jury will make factual findings independent of the discretionary determinations of the state's administrative law enforcement personnel,[215] and issue an indictment which entitles the federal plaintiff to a full opportunity to present its federal claim before a state judicial tribunal.

 This court concludes that the Montgomery County Grand Jury proceedings which occurred in March, 1977 furnished Sovereign with an opportunity to ultimately pursue its federal claims within the *state judicial system* located in Montgomery County. Therefore, the application of

*Younger* to the Montgomery County branch of Sovereign's federal action is not precluded on the theory that Sovereign sustained no opportunity to present its federal claims to the state judicial system.

C(2) THE MONTGOMERY COUNTY GRAND JURY PROCEEDING INVOLVED A STATE INSTITUTION IMBUED WITH IMPORTANT LEGITIMATE STATE INTERESTS.

Part of the relief sought by Sovereign in its federal complaint consists of "a permanent injunction *suppressing* the use of the seized materials by the defendants and requiring that they be returned to the plaintiff" [216] (emphasis added). As the record indicates, entry of such a federal suppression order, as of the date on which substantial proceedings on the merits of Sovereign's federal action took place,[217] would severely interfere with the ongoing deliberations of the Montgomery County Grand Jury, a state institution charged with judging whether probable cause exists to proceed with state felony criminal litigation.[218] In *Douglas v. City of Jeannette,* 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), a seminal case developing the doctrine of federal equitable restraint with respect to state judicial criminal proceedings, Jehovah's Witnesses filed a federal suit challenging the constitutionality of a city ordi-

---

**212.** *See,* discussion of the good faith qualified immunity of public officials from damage suits for constitutional torts, in *O'Connor v. Donaldson,* 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Wood v. Strickland,* 420 U.S. 308, 315–322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Pierson v. Ray,* 386 U.S. 547, 555–557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

**213.** This is the situation which places the federal plaintiff " 'between the Scylla of intentionally flouting state law and the Charybdis of foregoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in [another] criminal proceeding.' *Steffel v. Thompson, supra,* 415 U.S., at 462 [, 94 S.Ct. 1209.]" *See, Wooley v. Maynard,* 430 U.S. 705, 710, 97 S.Ct. 1428, 1433, 51 L.Ed.2d 752 (1977).

**214.** State judges sustain a textually demonstrable constitutional duty to enforce the Constitution of the United States. *See,* U.S.Const. VI; *Huffman,* 420 U.S. *supra,* at 611, 95 S.Ct. 1200; *Schlesinger v. Councilman,* 420 U.S. 738, 755–756, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). Also state judges expose themselves to *criminal* convictions for purposeful violations of citizens' constitutional rights. *See, O'Shea,* 414 U.S. *supra,* at 503, 94 S.Ct. 669; 18 U.S.C. § 242.

**215.** *See, United States v. Dionisio,* 410 U.S. 1, 15–18, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973).

**216.** *See,* Sovereign's Complaint, p. 7, Prayer for Relief, ¶ B.

**217.** *See,* text accompanying fns. 114–134, *supra.*

**218.** *See,* fn. 232, *infra.*

nance restricting their rights to solicit membership in their religious organization, all in violation of the First and Fourteenth Amendments. Some of the Jehovah's Witnesses had been arrested and prosecuted for violating the ordinance, and the defendants [219] maintained a threat "to enforce the ordinance by arrests and prosecutions." *See Douglas, supra*, at 160–161, 165, 63 S.Ct. at 879. Chief Justice Stone, writing for the *Douglas* majority, held that the district court abused its discretion by enjoining the defendants from initiating and concluding state criminal prosecutions for violation of the clearly unconstitutional ordinance, without finding that the defendants threatened *in bad faith* to prosecute the federal plaintiffs. *Douglas, supra*, at 159, 162–164, 63 S.Ct. 877. *Compare, Murdock et al. v. Commonwealth of Pennsylvania*, 319 U.S. 105, 108–110, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). The *Douglas* court stressed the importance of avoiding federal judicial interference with the "[process] of the criminal law within the states," without distinguishing whether those proceedings were merely threatened, or formally pending.

"Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury 'both great and immediate.' . . .

"The trial court found that respondents had prosecuted certain of petitioners and other Jehovah's Witnesses for distributing the literature described in the complaint without having obtained the license required by the ordinance, and had declared their intention further to enforce the ordinance against petitioners and other Jehovah's Witnesses. But the court made no finding of threatened irreparable injury to petitioners or others, and we cannot say that the declared intention to institute other prosecutions is sufficient to establish irreparable injury in the circumstances of this case.

". . . . It does not appear from the record that petitioners have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith, or that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court." *See, Douglas, supra*, at 163–164, 63 S.Ct. at 881.[220]

In *Perez v. Ledesma*, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), the United States Supreme Court majority condemned the use of federal judicial equity power to suppress evidence on First, Fourth, and Fourteenth Amendment grounds [221] in a state criminal prosecution, especially since the federal plaintiffs, who were indicted prior to the commencement of the federal litigation, could assert the exclusionary rule in a state trial court.[222]

**219.** These were the City of Jeannette, and its Mayor. *See, Douglas*, 319 U.S. *supra*, at 159, 63 S.Ct. 877.

**220.** Any limitations imposed by *Douglas, supra*, on the federal judiciary's power to issue injunctions against threatened future state criminal prosecutions, have been stripped away. *See, Steffel*, 415 U.S. *supra*, at 463 fn. 12, 94 S.Ct. 1209; *Doran*, 422 U.S. *supra*, at 930–931, 95 S.Ct. 2561; *Compare, Wooley v. Maynard*, 430 U.S. 705, 710–712, 97 S.Ct. 1428, 1433–1434, 51 L.Ed.2d 752 (1977). *Contrast* how *Douglas* was applied to bar a federal plaintiff's post state indictment federal declaratory judgment action in *Samuels v. Mackell*, 401 U.S. 66, 68, fn. 3, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

**221.** Sovereign's complaint is predicated on the same constitutional provisions.

**222.** *See also, Stefanelli v. Minard*, 342 U.S. 117, 122, 72 S.Ct. 118, 96 L.Ed. 138 (1951) in which the Supreme Court suggests that federal courts should not exercise their equity powers to effectively suppress evidence relating to state prosecutions. The *Stefanelli* court instructed the lower federal courts to avoid a "flanking movement against . . . asserted unconstitutionalities" relating to state "grand . . . juries . . ." *See, Stefanelli, supra*, 342 U.S. at 124, 72 S.Ct. 118.

"It is difficult to imagine a more disruptive interference with the operation of the state criminal process short of an injunction against all state proceedings. Even the three-judge court recognized that its judgment would effectively stifle the then-pending state criminal prosecution.

> 'In view of our holding that the arrests and seizures in these cases are invalid *for want of a prior adversary judicial determination of obscenity, which holding requires suppression and return of the seized materials, the prosecutions should be effectively terminated.'* 304 F.Supp., at 670 (emphasis added).

Moreover, the District Court retained jurisdiction 'for the purposes of hereafter entering any orders necessary to enforce' its view of the proper procedures in the then-pending state obscenity prosecution. According to our holding in *Younger v. Harris, supra,* such federal interference with a state prosecution is improper. The propriety of arrests and the admissibility of evidence in state criminal prosecutions are ordinarily matters to be resolved by state tribunals, see *Stefanelli v. Minard,* 342 U.S. 117, [72 S.Ct. 118, 96 L.Ed. 138] (1951), subject, of course, to review by certiorari or appeal in this Court or, in a proper case, on federal habeas corpus. Here Ledesma was free to present his federal constitutional claims concerning arrest and seizure of materials or other matters to the Louisiana courts in the manner permitted in that State. Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith, without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown, is federal injunctive relief against pending state prosecutions appropriate. See *Younger v. Harris, supra; Ex parte Young,* 209 U.S. 123, [28 S.Ct. 441, 52 L.Ed. 714] (1908). There is nothing in the record before us to suggest that Louisiana officials undertook these prosecutions other than in a good-faith attempt to enforce the State's criminal laws. We therefore hold that the three-judge court improperly intruded into the State's own criminal process and reverse its orders suppressing evidence in the pending state prosecution and directing the return of all seized materials." *See, Perez, supra,* at 84–85, 91 S.Ct. at 676, 677.[223]

■ This court concludes that: (1) state grand juries are state institutions having a legitimate state interest deciding whether formal felony criminal litigation should go forth in state court; (2) invocation of the federal judiciary's equity power against a state grand jury to suppress evidence, developed after a lengthy police investigation and presented to the state grand jury would violate the policies underlying *Douglas* and *Perez, supra.*[224] These cases suggest that the states' judicial institutions which are designed to *initiate* state criminal litigation perform important state functions and

---

223. *See also, Allee,* 416 U.S. *supra,* at 834–839, 94 S.Ct. 2191 (Burger, C. J., concurring).

224. *See, Cato v. State of Georgia,* 302 F.Supp. 1143, 1144–1147 (N.D.Ga., 1969) where then Fifth Circuit Judge Griffin Bell, writing for a three-judge district court, held that several federal plaintiffs who were under indictment, and one federal plaintiff who had been *arrested and released on bond but never indicted or otherwise charged, were all barred* under *Douglas,* 319 U.S. *supra,* at 164, 63 S.Ct. 877, and *Stefanelli v. Minard,* 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1952), from seeking a federal injunctive or declaratory order holding a statute under which state law enforcement officers seized the federal plaintiff's telephone conversations invalid under the First and Fourth Amendments. This opinion was *affirmed per curiam* by the United States Supreme Court, citing *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); and *Stefanelli, supra. See,* 401 U.S. 984, 91 S.Ct. 1218, 28 L.Ed.2d 524 (1971).

The record in Sovereign's federal litigation does not indicate that Sovereign or any of its employees have been arrested, although the record clearly shows that Officer Berkey of the Cleveland Police Department *threatened* to arrest Sovereign's female photographer on the day of the search. *Compare, Steffel,* 415 U.S. *supra,* at 455–456, 475, 94 S.Ct. 1209. Therefore, the Supreme Court's decision in *Cato* cannot operate to bar Sovereign's claims against the Cleveland authorities. *See,* the Memorandum of Opinion Part IV, *infra.*

therefore should be left undisturbed in the ordinary case.

█ The important governmental function performed by grand juries was recognized by the Supreme Court in *United States v. Dionisio*, 410 U.S. 1, 16–18, fn. 15, 93 S.Ct. 764, 35 L.Ed.2d 67, (1973), and *United States v. Calandra*, 414 U.S. 338, 349–350, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The *Calandra* decision is pivotal because it holds that the application of the exclusionary rule to grand jury proceedings would intolerably disrupt them, and on that ground, the Supreme Court reversed a decision of a federal district court for the Northern District of Ohio, which had ordered evidence suppressed from the grand jury's deliberations. The *Calandra* court held:

> "In deciding whether to extend the exclusionary rule to grand jury proceedings, we must weigh the potential injury to the historic role and functions of the grand jury against the potential benefits of the rule as applied in this context. It is evident that this extension of the exclusionary rule would seriously impede the grand jury. Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial. Permitting witnesses to invoke the exclusionary rule before a grand jury would precipitate adjudication of issues hitherto reserved for the trial on the merits and would delay and disrupt grand jury proceedings. Suppression hearings would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary

objective. The probable result would be 'protracted interruption of grand jury proceedings,' *Gelbard v. United States*, 408 U.S. 41, 70, [92 S.Ct. 2357, 2372, 33 L.Ed.2d 179] (1972) (White, J., concurring), effectively transforming them into preliminary trials on the merits. In some cases the delay might be fatal to the enforcement of the criminal law. Just last Term we reaffirmed our disinclination to allow litigious interference with grand jury proceedings:

> 'Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws.'

> *United States v. Dionisio*, 410 U.S. 1, 17, [93 S.Ct. 764, 773, 35 L.Ed.2d 67] (1973).

> ". . .. In sum, we believe that allowing a grand jury witness to invoke the exclusionary rule would unduly interfere with the effective and expeditious discharge of the grand jury's duties." *See, Calandra, supra*, at 349–350, 94 S.Ct. at 620.[225]

If grand juries perform a sufficiently important function within the federal criminal justice system to preclude federal courts from suppressing the evidence, which is tendered before grand juries under the exclusionary rule, then certainly the intergovernment comity policies underlying *Douglas* and *Perez* magnify the importance of state grand juries and suggest that federal courts should not ordinarily employ their equitable and declaratory judgment power to suppress evidence at that stage of a state criminal proceeding.[226]

---

**225.** *Compare, National Land and Investment Company v. Spector*, 428 F.2d 91, 95–100 (3rd Cir. 1970) (federal plaintiff's *post* state indictment endeavor to restrain a state grand jury by means of a federal order rebuffed).

**226.** Of course, this court realizes that a state search and seizure, without an arrest, or presentation of a case to a state grand jury is cognizable in a federal declaratory judgment,

which may result in assessment of substantial attorney's fees against the federal defendants. *See, Stanford Daily v. Zurcher*, 353 F.Supp. 124, 135–136 (N.D.Calif.1972); 366 F.Supp. 18 (N.D.Calif.1973); 64 F.R.D. 680 (N.D.Calif. 1974); *aff'd*, 550 F.2d 464, 466 (9th Cir. 1977) adopting the district court's opinion cited at 353 F.Supp. 124; cert. granted 434 U.S. 816, 98 S.Ct. 52, 54 L.Ed.2d 71 (1977).

Several post-*Younger* cases bolster this view. For example, in *Byrne v. Karalexis*, 401 U.S. 216, 219, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971), the federal plaintiffs challenged the constitutionality under the First Amendment of a Massachusetts statute prohibiting possession of obscene films. At the time the federal plaintiffs filed their federal action, they had been indicted by the state. "While the federal action was pending those indictments were dismissed . . . and new indictments were returned." *See, Byrne, supra*, at 219, fn. 2,[227] 91 S.Ct. at 778. Despite the technical termination of the first state prosecution in *Byrne*, and the return of the *Byrne* case to the state grand jury stage during the pendency of the federal action, the Supreme Court nevertheless held that the state criminal proceeding was "pending" for purposes of *Younger*'s application and ordered the district court to abstain. *See, Byrne, supra*, at 219, fn. 2, 220, 91 S.Ct. 777.[228]

In *Kugler v. Helfant*, 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975), the federal plaintiff, Helfant, a state court defendant, who himself was a state municipal judge, charged in his federal complaint that his state indictment for obstruction of justice and false swearing before a state grand jury had arisen because the New Jersey Attorney General and several New Jersey Supreme Court Justices coerced him to testify before the grand jury to which he allegedly lied under oath. The Federal Third Circuit Court of Appeals ordered the Federal District Court to conduct an evidentiary hearing of Helfant's claim and to enter a declaratory judgment, after that hearing, on the question of whether Helfant's grand jury testimony should be admitted into evidence at Helfant's state criminal trial. The United States Supreme Court reversed the Court of Appeals and held that *Younger* barred the federal judicial inquiry into the admissibility of the evidence except by the New Jersey grand jury.

"This procedure closely resembles the course rejected by this Court in *Stefanelli v. Minard*, 342 U.S. 117, [72 S.Ct. 118, 96 L.Ed. 138.] In *Stefanelli* the Court affirmed the refusal of a Federal District Court to entertain proceedings to suppress the use in a pending state prosecution of evidence allegedly obtained in an unlawful search. As the Court explained:

'If the federal equity power must refrain from staying State prosecutions outright to try the central question of the validity of the statute on which the prosecution is based, how much more reluctant must it be to intervene piecemeal to try collateral issues.' *Id.*, at 123, [72 S.Ct. [118] at 121]. The Court thus held that 'federal courts should refuse to intervene in State criminal proceedings to suppress the use of evidence even when claimed to have been secured by unlawful search and seizure.' *Id.*, at 120, [72 S.Ct. [118] at 120]. Similarly, in *Perez v. Ledesma, supra*, the Court held: '[T]he propriety of arrests and the admissibility of evidence in state criminal prosecutions are ordinarily matters to be resolved by state tribunals, . . . subject, of course, to review by certiorari or appeal in this Court or, in a proper case, on federal habeas corpus.' 401 U.S. at 84–85, [91 S.Ct. [674] at 676]. See also, *Cleary v. Bolger*, 371 U.S. 392, [83 S.Ct. 385, 9 L.E.2d 390.]

"These precedents clearly establish that at least in the absence of 'extraordinary circumstances' federal courts must refuse to intervene in *state criminal proceedings to suppress* the use of evidence claimed to have been obtained through unlawful means." *See, Kugler, supra*, at 129–130, 95 S.Ct. at 1533 (emphasis added).

In *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) the United States Supreme Court held that news reporters possessed no constitutional privilege

---

**227.** *Compare*, Justice Brennan's separate opinion in *Perez*, 401 U.S. *supra*, at 103, 91 S.Ct. 674.

**228.** *See, Burak v. Commonwealth of Pennsylvania*, 339 F.Supp. 534, 536 (E.D.Pa.1972) (state proceedings are pending for *Younger* purposes at the time a criminal complaint is filed, prior to indictment).

from furnishing testimony to state grand juries. However, the *Branzburg* court carefully qualified its holding when it wrote:

"Finally, as we have earlier indicated, news gathering is not without its First Amendment protections, and grand jury investigations if instituted or *conducted other than in good faith*, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth." *See, Branzburg, supra,* at 707–708, 92 S.Ct. at 2670 (emphasis added).

The above-quoted qualification on the *Branzburg* holding was supported by footnote 42 in the *Branzburg* opinion, which consisted of a citation to *Younger v. Harris*, 401 U.S. 37, at 49, and 53–54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Those portions of the *Younger* opinion which are cited by the majority in *Branzburg* footnote 42, deal with the need to show "extraordinary circumstances" such as a bad faith prosecution in order to trigger federal intervention into a pending state prosecution. The clear implication of the *Branzburg* court's reliance on the cited passages from *Younger* is that the *Younger* doctrine applies to federal

challenges to state grand jury proceedings, and that federal relief against state grand jury proceedings will be granted only if the federal plaintiff establishes the existence of an extraordinary circumstances exception, such as bad faith conduct by state officials, to the *Younger* abstention rule.

In *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), the federal plaintiffs filed an action against several Louisiana state officials, charging that several state statutes violated the First and Fourteenth Amendments, and that the defendants threatened to enforce these statutes against the federal plaintiffs as part of a course of harassment perpetrated by the federal defendants. The federal plaintiffs sought injunctive relief, and the United States Supreme Court held that the district court need not abstain under the doctrine of equitable restraint. However, Justice Brennan, writing for the *Dombrowski* court, carefully noted,

"Since the *grand jury was not convened* and indictments were not obtained *until after the filing of the complaint*, which sought interlocutory as well as permanent relief, no state 'proceedings' were pending within the intendment of § 2283." *See, Dombrowski, supra,* 380 U.S. at 484 fn. 2, 85 S.Ct. at 1119 (emphasis added).[229]

This careful delineation of the procedural posture of the state proceedings at the time federal intervention was sought indicates that in the *Dombrowski* court's view, feder-

---

**229.** Of course it could be argued that this quotation should be conjunctively read to require *both* the convening of the grand jury *and* the issuance of indictments, in advance of the filing of the federal complaint, in order to trigger the preclusion of 28 U.S.C. § 2283. *Compare,* Justice Brennan's separate opinion in *Perez,* 401 U.S. *supra,* at 103, 129, fn. 18, 91 S.Ct. 674. Such an argument is bolstered by the fact that Justice Brennan himself authored the majority opinion in *Dombrowski, supra.* However, the portion of the footnote quoted from *Dombrowski* has been read to allow equitable restraint, under *Younger,* without a formal indictment. *See, Burak v. Commonwealth of Pennsylvania,* 339 F.Supp. 534, 536 (E.D.Pa.1972). The significance of the court's focus on the grand jury stage as the procedural point at which state litigation may fall under the umbrella of § 2283

is not blunted by the post-*Dombrowski* case of *Mitchum v. Foster,* 407 U.S. 225, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), holding 42 U.S.C. § 1983 an express exception to § 2283. At the same time the *Mitchum* court construed § 2283 to remove an *absolute* bar to § 1983 actions, it renewed the vigor of the judicially crafted *Younger* abstention doctrine. *See, Mitchum, supra,* at 229–231, 243, 92 S.Ct. 2151. If the Supreme Court viewed the state grand jury as the crucial stage for purposes of applying § 2283 in the pre-*Mitchum* case of *Dombrowski,* it certainly makes sense to conclude that the Supreme Court would focus on that same state procedural stage in applying the *Younger* doctrine, which post-*Mitchum,* operates as a more sensitive instrument for balancing the competing interests of the federal and state judiciaries.

al equitable intervention would not interfere with any "pending" state criminal litigation because "the grand jury was not convened." [230] The negative implication is that if the grand jury had been convened, then state criminal proceedings would have been "pending," and the Supreme Court would then have confronted the issue of whether the federal trial court sustained jurisdiction to entertain the federal plaintiff's claim.

The above-cited authorities denote that proceedings before a state grand jury involve sufficiently important legitimate state interests to compel a federal district court to apply the *Younger* doctrine before intruding on such state grand jury deliberations. However, the particular Montgomery County Grand Jury which Sovereign challenges has an uniquely weighty governmental interest, because its deliberations follow *a lengthy four-month*[231] *investigation* by the Montgomery County law enforcement officials, in which the state authorities in that county invested massive resources. Thus the state's interest in the Montgomery County Grand Jury proceedings with respect to Sovereign are considerably greater than in the standard state grand jury case. This court holds that the Montgomery County Grand Jury proceedings serve an important, legitimate state interest similar to those state interests which the United States Supreme Court

determined were sufficient to trigger *Younger's* cloak of protection. This conclusion is based on the important adjudicatory[232] and indicting functions which the grand jury performs,[233] and on the significant investment of state investigatory resources which the record indicates were expended in preparing the Montgomery County authorities' case against Sovereign, which was in the process of presentation to that grand jury at the time Sovereign sought federal intervention.[234]

This court further concludes that the Montgomery County enforcement action constitutes a pending state proceeding for purposes of applying the *Younger* doctrine because it: (1) poses Sovereign with a sufficient threat to give it Article III standing; (2) furnishes Sovereign an opportunity to present its federal claims during the state's enforcement action; (3) involves a state institution having a legitimate state interest.

Having found that *Younger* applies to Sovereign's litigation against the Montgomery County authorities, the court must now decide whether Sovereign has demonstrated applicability of one of the exceptions to the *Younger* doctrine, frequently denominated "extraordinary circumstances." *See, Younger v. Harris, supra,* 401 U.S. at 53, 91 S.Ct. 746.

**230.** *See,* quotation appearing in the text, *supra,* and accompanying fn. 229.

**231.** The Montgomery County law enforcement authorities commenced their investigation of Sovereign on November 1, 1977, *see,* text accompanying fn. 23, *supra,* over four months before the March 10–11 Montgomery County Grand Jury session at which much of the material which Sovereign seeks to have returned was presented. *See,* text accompanying fn. 92, *supra.*

**232.** The Ohio grand juries perform the important task of sifting through sworn testimony to determine whether there is probably cause to believe that an offense has been committed. *See,* Ohio Revised Code §§ 2939.06, 2939.08, 2939.13, 2939.23, 2939.24; Ohio Crim. Rules 6, 7. These provisions clearly contemplate that in some cases, no indictment will be returned.

**233.** Federal courts are most scrupulous in avoiding interference with a state grand jury's work. *See, Hammond v. Brown,* 323 F.Supp. 326, 336–337 (N.D.Ohio 1971) (Thomas, J.), *aff'd,* 450 F.2d 480, 481–482 (6th Cir. 1971). *But contrast, Flanders v. Schoville,* 350 F.Supp. 371, 374–375 (N.D.Iowa 1972).

**234.** For the reasons discussed in the text accompanying fns. 114–134 the court reached this conclusion regarding the government interest which attaches to the Montgomery County Grand Jury proceedings which Sovereign attacks by examining the record, as of April 25, 1977 and was uninfluenced by the May 3, 1977 indictment. It is important to emphasize that Sovereign's argument against abstention regarding Montgomery County would have been significantly bolstered had there been no lengthy police investigation, which augments the state's interest in the particular grand jury proceeding which Sovereign attacks.

**D. THIS COURT CONCLUDES THAT NONE OF THE EXCEPTIONS TO THE YOUNGER DOCTRINE APPLY TO SOVEREIGN'S FEDERAL LITIGATION AGAINST THE MONTGOMERY COUNTY AUTHORITIES.**

In crafting the *Younger* doctrine Justice Black recognized that "extraordinary circumstances" may arise in particular cases which justify a federal district court's issuance of a declaratory judgment or injunctive relief that interferes with a parallel pending state criminal enforcement action. Thus in *Younger, supra,* 401 U.S., at 53–54, 91 S.Ct., at 755, the Court states:

"There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown . . ."

" . . .

" . . . [U]nusual situations calling for federal intervention might . . . arise, but there is no point in our attempting now to specify what they might be."

The Supreme Court did not comprehensively catalogue the "extraordinary circumstances" which free a federal district court and a federal plaintiff from *Younger's* restrictions on the use of federal declaratory and equitable power against a pending state criminal proceeding. However, in six and one-half years since the *Younger* decision the Supreme Court furnished several examples of "extraordinary circumstances" sufficient to permit a federal district court to intrude on a pending state criminal enforcement action.

In *Younger* itself, the Supreme Court recognized that a state enforcement action brought in "bad faith," without hope of obtaining a valid conviction, or solely to harass the plaintiff, constituted "extraordinary circumstances" justifying federal intervention in the pending state action, as does state enforcement litigation predicated on a statute which was "flagrantly and patently violative of express constitutional provisions in every clause, sentence, and paragraph." *See, Younger, supra,* 401 U.S., at 53–54, 91 S.Ct. at 755 (majority), 56–57,

91 S.Ct. 755 (Brennan, White, Marshall, JJ., concurring in result), 56, 91 S.Ct. 757 (Stewart and Harlan, JJ., concurring) (1971); *Perez v. Ledesma,* 401 U.S. 82, 85, 91 S.Ct. 674, 27 L.Ed.2d 701 (majority), 97, 118, fn. 11, 91 S.Ct. 683, 693 (discussion and citation delineating forms of "bad faith"), 120, 122, fn. 15, 91 S.Ct. 694, 695 (Brennan, J., joined by Marshall, White, JJ.) (1971); *Samuels v. Mackell,* 401 U.S. 66, 75–76, 91 S.Ct. 764, 27 L.Ed.2d 688 (Brennan, White, Marshall, JJ.) (1971); *Dyson v. Stein,* 401 U.S. 200, 203, 91 S.Ct. 769, 27 L.Ed.2d 781 (majority remanding in light of *Younger* because the district court made no findings on the "extraordinary circumstances" question), 204–207, 91 S.Ct. 772–773 (Brennan, Marshall, Douglas, JJ., indicate that mass police seizure of two tons of newspaper issues without prior judicial determination of obscenity, along with the seizure of the tools and equipment used to publish the newspaper, may well establish bad faith and harassment) (1971); *Mitchum v. Foster,* 407 U.S. 225, 230–231, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); *Steffel v. Thompson,* 415 U.S. 452, 481–484, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (Rehnquist, J., and Burger, C. J., suggest that state officials' refusal to adhere to an earlier federal declaratory judgment order, issued under the *Steffel* holding, ruling a state statute unconstitutional, does *not* constitute "bad faith" on the state officials' part); *Kugler v. Helfant,* 421 U.S. 117, 124–126, fn. 4, 95 S.Ct. 1524, 1530, 44 L.Ed.2d 15 (1975) (Indicating that *Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 36 L.Ed.2d 488 established that "extraordinary circumstances" exist when the state trier of fact is shown to be "incompetent by reason of bias to adjudicate the issue pending before it."), fn. 6 (" 'bad faith' in [*Younger's*] context generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction"); *Allee v. Medrano,* 416 U.S. 802, 819, fn. 14, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Hicks v. Miranda,* 422 U.S. 332, 350–352, fn. 19, 95 S.Ct. 2281, 45 L.Ed.2d 223 (five Justice majority concludes that state police conduct of a search, within the authority of state search warrants, could not constitute "bad

faith and harassment" absent impeachment of the warrants by the district court); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 611–612, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Rizzo v. Goode,* 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976); *Juidice v. Vail,* 430 U.S. 327, 338, 97 S.Ct. 1211, 1218–1219, 51 L.Ed.2d 376 (1977) (New York contempt statute held not "flagrantly and patently violative of express constitutional prohibitions [in every clause, sentence and paragraph]"); *Trainor v. Hernandez,* 431 U.S. 434, 442, 97 S.Ct. 1911, 1917, fn. 7 [235] 52 L.Ed.2d 486 (1977) (civil anti-fraud enforcement action not brought by state officers in "bad faith," and state pre-judgment attachment statute was not "flagrantly and patently violative of express constitutional prohibitions"); *Sendak v. Nihiser,* 431 U.S. 961, 97 S.Ct. 2914, 53 L.Ed.2d 1057 (1977) (summarily affirming an unpublished district court decision holding that "extraordinary circumstances" authorized federal plaintiff's federal court challenge to Indiana's statute defining obscenity despite the pendency of an Indiana nuisance proceeding against the federal plaintiff).[236] *See also, Flynt et al. v. Leis, Jr. et al.,* 434 F.Supp.

481, 484–486 (S.D.Ohio 1977) (Rubin, J.) (holding that "extraordinary circumstances" justified federal court's intervention into pending state criminal prosecution and ordering state authorities to conduct a hearing regarding the admission to the Ohio bar, *pro haec vic* of the state defendant's New York attorneys).[237]

The record of Sovereign's federal litigation does not support the conclusion that any of the "extraordinary circumstances" discussed by the above citations apply to Sovereign's federal claims against the Montgomery County defendants. However, one as yet unmentioned category of "extraordinary circumstances" arguably applies to the Montgomery County branch of Sovereign's federal case.

During the development of the *Younger* doctrine, the United States Supreme Court stressed that *multiple* state enforcement actions pending against a plaintiff constitute circumstances sufficient to strip from state enforcement officials the cloak of protection which *Younger* extends to them. In the seminal *Younger* decision Justice Black noted:

> from arbitrarily removing out-of-state lawyers, admitted as counsel for accused *pro haec vic,* pending use by an accused of relief available in state courts.). In an earlier unpublished decision, *Larry Flynt, et al. v. Simon L. Leis, et al.,* Case No. C–1–76–553 (S.D.Ohio November 30, 1976), Slip Op. 4–5, Judge Rubin ruled that the Ohio statutes challenged by Sovereign are *not* "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph and in whatever manner and against whomever an effort might be made to apply" them. The court agrees that Sovereign has not established the applicability of this exception to *Younger.* This court also finds that the Montgomery County authorities are not guilty of bad faith in their enforcement actions against Sovereign. This court notes, in addition, that the standard used by Judge Rubin is exclusively used for determining whether "extraordinary circumstances" are present sufficient to overcome the shield of the *Younger* doctrine. Judge Rubin's decision did not pass on the constitutionality of § 2907.01 or § 2907.-32, but instead decided that the *Younger* abstention doctrine was applicable. *See also, Flynt v. Leis,* 434 F.Supp. 481, 486 (S.D.Ohio 1977).

---

**235.** The *Trainor* court, *supra,* at fn. 7, notes that "the very nature of 'extraordinary circumstances,' of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state criminal proceedings." Obviously such a standard is difficult for a district court to apply.

**236.** The decision affirmed by the United States Supreme Court in *Nihiser v. Sendak,* Civil No. 73F93 (N.D.Ind., August 16, 1976) was prepared after the three-judge court issued its opinion ruling Indiana's Pornographic Nuisance Act unconstitutional, *see,* 405 F.Supp. 482 (N.D.Ind., 1974), which was appealed to the Supreme Court, which remanded it to the Indiana three-judge court for reconsideration in light of *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *see,* 423 U.S. 976, 96 S.Ct. 378, 46 L.Ed.2d 291 (1975).

**237.** *Compare, Gilliard v. Carson,* 348 F.Supp. 757, 762–763 (N.D.Florida 1972) (*Younger* does not bar federal suit by indigents who are denied right to counsel); *Cooper v. Huchinson,* 184 F.2d 119, 123–125 (3d Cir. 1950) (District court must retain jurisdiction of action by persons accused of capital crime to enjoin state judge

"Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a *single criminal prosecution*, could not by themselves be considered 'irreparable' in the special legal sense of that term. Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a *single criminal prosecution*." (emphasis added) [238]

Later in the *Younger v. Harris* opinion, the majority states:

"There is no suggestion that this *single prosecution* against Harris is brought in bad faith or is only *one of a series of repeated prosecutions* to which he will be subjected." (emphasis added).[239]

In *Byrne v. Karalexis*, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971), the Supreme Court held that *Younger* applied to an obscenity case,[240] but remanded the litigation to the district court for a determination of whether "the threat to appellees' federally protected rights is 'one that cannot be eliminated by [their] defense against a *single criminal prosecution*'" [241]

In *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), the Supreme Court remanded M and L's case to the district court for consideration of M and L's claim that it was the target of "*repetitive*" state criminal enforcement actions.[242]

In *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), George Maynard and his wife Maxine filed a federal action, challenging the constitutionality of a New Hampshire statute mandating that noncommercial vehicles bear license plates embossed with the motto "Live Free or Die." [243] Prior to filing the federal action, Maynard was issued a criminal citation on November 27, 1974, for concealing the embossed motto, in violation of N.H.Rev. Stat.Ann. § 262:27–c. He appeared in court *pro se*, waived counsel, was found guilty of the offense charged, and was fined twenty-five dollars. On December 28, 1974, Maynard was again charged with violating § 262:27–c, subsequently found guilty, and when he refused to pay his two accumulated fines,[244] the state court sentenced him to a fifteen day jail term, which he served. Prior to his trial on his second offense, Maynard was charged for violating § 262:27–c a third time. The day of his trial on the second charge, Mr. Maynard was also convicted on the third charge, but this third conviction was "continued for sentence" so that he received no additional punishment. On March 4, 1975, both Mr. and Mrs. Maynard joined as plaintiffs in a federal action seeking declaratory and injunctive relief against future enforcement of §§ 262:27–c and 263:1, insofar as these provisions required displaying the embossed motto on their license plates.

On appeal, the United States Supreme Court held that both plaintiffs sustained standing under Article III of the United States Constitution to challenge §§ 262:27–c, 263:1 because they were *both* threatened with prosecution under those statutes despite the state's failure to prosecute Maxine Maynard in the past,[245] and despite George

238. *See, Younger*, 401 U.S. *supra*, at 46, 91 S.Ct. at 751.

239. *See, Younger*, 401 U.S. *supra*, at 49, 91 S.Ct. at 753.

240. The state litigation dealt with possessing obscene films. *See, Byrne*, 401 U.S. supra, at 218, 91 S.Ct. 777.

241. *See, Byrne*, 401 U.S. *supra*, at 220, 91 S.Ct. at 780 (emphasis added). *See also, Allee*, 416 U.S. *supra*, at 833, 835, 838–839, 94 S.Ct. 2191, where Chief Justice Burger, in a separate opinion, indicates that multiple prosecutions under the same statutes constitute extraordinary circumstances.

242. *See, Doran*, 422 U.S. *supra*, at 929, fn. 3, 95 S.Ct. 2561.

243. The Maynards claimed that displaying the motto contravened their religious faith. *See, Wooley*, 430 U.S. *supra*, at 707, 97 S.Ct. *supra*, at 1431, fn. 2.

244. Maynard refused to pay any of his fines. *Wooley*, 430 U.S. *supra*, at 708, 97 S.Ct. *supra*, at 1432.

245. *Compare*, Chief Justice Burger's position on standing in his separate opinion in *Allee*, 416 U.S. *supra*, at 827–832, 94 S.Ct. 2191. *See also, Wooley*, 430 U.S. *supra*, at 712, fn. 9, 97 S.Ct. *supra*, at 1434.

Maynard's failure to appeal his prior convictions to the New Hampshire appellate courts. Chief Justice Burger, writing for the majority, stated:

"In *Younger* the Court recognized that principles of judicial economy, as well as proper state-federal relations, preclude federal courts from exercising equitable jurisdiction to enjoin ongoing state prosecutions. 401 U.S., at 43–44 [91 S.Ct. 746, at 750]. However, when a genuine threat of prosecution exists, a litigant is entitled to resort to a federal forum to seek redress for an alleged deprivation of federal rights. See *Steffel v. Thompson*, [415] U.S. 452 [94 S.Ct. 1209, 39 L.Ed.2d 505]; *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930–931 [95 S.Ct. 2561, 2567–2568, 45 L.Ed.2d 648] (1975). *Younger* principles aside, a litigant is entitled to resort to a federal forum in seeking redress under 42 U.S.C. § 1983 for an alleged deprivation of federal rights. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609–610, n. 21 [95 S.Ct. 1200, 1210–1211, 43 L.Ed.2d 482] (1975). Mr. Maynard now finds himself placed 'between the Scylla of intentionally flouting state law and the Charybdis of foregoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in [another] criminal proceeding.' *Steffel v. Thompson, supra*, 415 U.S., at 462 [94 S.Ct. 1209, at 1210]. Mrs. Maynard, as joint owner of the family automobiles is no less likely than her husband to be subjected to state prosecution. Under these circumstances he cannot be denied consideration of a federal remedy.

"Appellants, however, point out that Maynard failed to seek review of his criminal convictions and cite *Huffman v. Pursue, Ltd., supra*, for the propositions that 'a necessary concomitant of *Younger* is that a party in appellee's posture must exhaust his state appellate remedies, before seeking relief in the District Court,' 420 U.S., at 608 [95 S.Ct. at 1210], and that '*Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies,' *id.*, at 609 [95 S.Ct. at 1211]. *Huffman*, however, is inapposite. There the appellee was seeking to prevent, by means of federal intervention, enforcement of a state court judgment declaring its theater a nuisance. We held that appellee's failure to exhaust its state appeals barred federal intervention under the principles of *Younger*: 'Federal post-trial intervention, in a fashion designed to annul the results of a state trial . . . deprives the State of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction.' 420 U.S., at 609 [95 S.Ct. 1200, at 1210] (emphasis added)."

"Here, however, the suit is in no way 'designed to annul the results of a state trial' since the relief sought is wholly prospective, to preclude further prosecution under a statute alleged to violate Maynard's constitutional rights. He has already sustained convictions and has served a sentence of imprisonment for his prior offenses. He does not seek to have his record expunged, nor to annul any collateral effects those convictions may have . . . ."[246]

The court did not rest its conclusion regarding the effect of the *Younger* doctrine on Mr. and Mrs. Maynard's challenge to the New Hampshire statute solely upon the theory that the federal plaintiffs were both threatened with a future judicial enforcement action, which was *not pending* for purposes of determining *Younger*'s application.[247] The *Wooley* court also determined that the particular threat directed at both "the Maynards,"[248] was a threat of a future

---

**246.** *See, Wooley*, 430 U.S. *supra*, at 705, 710, 97 S.Ct. *supra*, at 1433.

**247.** *See, Steffel*, 415 U.S. *supra*, at 455–456, fn. 2, 475, 94 S.Ct. 1209; *Doran*, 422 *supra*, at 930–931, 95 S.Ct. 2561.

**248.** *See, Wooley*, 430 U.S. *supra*, at 711, 97 S.Ct. *supra*, at 1433.

state judicial enforcement action, following on the heels of prior state enforcement actions.[249] The Supreme Court therefore concluded that the Maynards were exposed to a threat of *multiple* state prosecutions, which constitutes one of the recognized species of "extraordinary circumstances" sufficient to permit federal litigation of a constitutional issue despite the pendency of that same issue in a parallel state judicial enforcement action.

"In their complaint, the Maynards sought both declaratory and injunctive relief against the enforcement of the New Hampshire statute. We have recognized that although ' "[o]rdinarily . . . the practical effect of [injunctive and declaratory] relief will be virtually identical," ' *Doran v. Salem Inn, supra*, 422 U.S., at 931 [95 S.Ct. 2561, at 2567] quoting *Samuels v. Mackell*, 401 U.S. 66, 73 [91 S.Ct. 764, 768, 27 L.Ed.2d 688] (1971), a 'district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary.' *Doran, supra*, 422 U.S. at 931 [95 S.Ct. 2561, at 2567.] It is correct that generally a court will not '[enjoin] the enforcement of a criminal statute even though unconstitutional,' *Spielman Motor Co. v. Dodge*, 295 U.S. 89, 95 [55 S.Ct. 678, 680, 79 L.Ed. 1322] (1935), since '[s]uch a result seriously impairs the state's interest in enforcing its criminal laws, and implicates the concerns for federalism which lie at the heart of *Younger*,' *Doran, supra*, 422 U.S. at 931 [95 S.Ct. 256, at 2568.] But this is not an absolute policy and in some circumstances injunctive relief may be appropriate. 'To justify such interference there must be *exceptional circumstances* and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights.' *Spielman Motor Co., supra*, 295 U.S., at 95 [55 S.Ct. 678, at 680.]

"We have such a situation here for, as we have noted, *three successive prosecutions* were undertaken against Mr. Maynard in the span of five weeks. *This is quite different from a claim for federal equitable relief when a prosecution is threatened for the first time*. The *threat of repeated prosecutions in the future against both him and his wife*, and the effect of such a continuing threat on their ability to perform the ordinary tasks of daily life which require an automobile, is sufficient to justify injunctive relief . . . .. We are therefore unwilling to say that the District Court was limited to granting declaratory relief. Having determined that the District Court was not required to stay its hand as to either appellee we turn to the merits of the Maynard's claim." (emphasis added).[250]

During the April, 1976 term, Sovereign was indicted by authorities in Hamilton County, Ohio for violating the Ohio pandering obscenity and organized crime statutes. In March, 1977, the Montgomery County authorities instituted a second pending state judicial enforcement action against Sovereign when they presented physical and testimonial evidence to the Montgomery County Grand Jury. Sovereign argues that the Hamilton and Montgomery County proceedings confront it with two separate pending state judicial criminal actions[251] which constitute *multiple* enforcement proceedings, sufficient to establish "exceptional," or "extraordinary circumstances" under the *Younger, Byrne, Doran*, and *Wooley* decisions. Therefore Sovereign concludes that "extraordinary circumstances" permit

---

**249.** There was a threat of a fourth charge against Maynard. *See, Wooley*, 430 U.S. *supra*, at 711, 97 S.Ct. *supra*, at 1432, 1434.

**250.** *See, Wooley*, 430 U.S. *supra*, at 711–712, 97 S.Ct. *supra*, at 1433–1434. *Compare, Cline v. Frink Dairy Co.*, 274 U.S. 445, 449–453, 466, 47 S.Ct. 681, 71 L.Ed. 1146 (1927) (a case permitting the exercise of federal jurisdiction to

interfere with multiple *threatened* state prosecutions, and disallowing the exercise of federal jurisdiction to interfere with multiple *pending* state enforcement actions).

**251.** Both enforcement actions seek to enforce the same two Ohio statutes, but allege offenses located in different counties.

it to litigate its constitutional issues against the Montgomery authorities in federal court despite the pendency of the parallel Montgomery County judicial enforcement action. This court disagrees.

In *Wooley*, the federal plaintiffs were permitted to maintain their federal action because: (1) one of them had been previously prosecuted by the state authorities under a challenged state statute; (2) both plaintiffs were threatened with an additional prosecution in the *future*, which would constitute *multiple* prosecutions, and therefore triggered the "extraordinary circumstances" exception to *Younger*. However, the *Wooley* court stressed the significant point that the "*multiple*" enforcement action which triggered the *Younger* exception was *only threatened* at the time the federal action was filed.[252] Thus in *Wooley* the federal court's injunctive and declaratory power interfered with no pending state judicial enforcement proceeding. Sovereign's case stands in contrast with *Wooley*, because, as this court analyzed the record, Sovereign seeks to invoke federal judicial authority to intrude upon an already pending, second state judicial enforcement proceeding, in which the legitimate state interests are more weighty than the state interests attached to the bare threat of a future enforcement action. Therefore, Sovereign's case against the Montgomery County defendants does not fit the perimeters of *Wooley*.

Despite the important distinction between *Wooley* and Sovereign's case, language in *Younger, Byrne, Doran* and *Wooley* suggests that a federal plaintiff against whom multiple state enforcement actions are pending, is more likely to obtain the benefit of the "extraordinary circumstances" exception to the *Younger* abstention rule when the state compels the federal plaintiff to engage in more than one state proceeding. In applying the multiple state prosecution "extraordinary circumstances" exception to the *Younger* abstention rule, this court is not persuaded that a federal plaintiff, to whom the strict standards of *Younger* apply, may escape the *Younger* abstention result merely because *two* state enforcement actions are pending against him. The multiple pending state prosecution species of the "extraordinary circumstances" exception to the *Younger* abstention doctrine demands a more refined analysis, which is consistent with the need to balance the competing policy underlying the complex federal-state judicial comity doctrine. One reason for such care in the application of this particular exception to the *Younger* abstention rule is that if the state's interest in one, good faith, pending state enforcement action is usually substantial enough to trigger abstention, that interest is magnified, not diminished, when the state initiates two pending, good faith, state enforcement actions,[253] so long as both pending state actions afford the federal plaintiff an opportunity to fairly litigate its federal claims. Of course, a point is reached when the federal plaintiff is confronted with so many different, good faith, pending, state enforcement actions, that the sheer burden of litigating each state criminal action becomes overwhelming and the comity and federalism balance, which lies at the heart of any *Younger* abstention problem, shifts in favor of permitting the federal plaintiff to obtain a definitive ruling in one federal action on its federal claim.[254] This court reads the multiple-prosecution, abstention exception, language in *Younger, Byrne, Doran* and *Wooley*[255] as incorporat-

---

252. *See, Younger,* 401 U.S. *supra,* at 49, 91 S.Ct. 746; *Byrne,* 401 U.S. *supra,* at 220, 91 S.Ct. 777; *Doran,* 422 U.S. *supra,* at 929 fn. 3, 95 S.Ct. 2561; *Wooley,* 430 U.S. *supra,* at 710–712, 97 S.Ct. *supra,* at 1433–1434. *See,* text accompanying fn. 250, *supra.*

253. This court has found that Sovereign has not yet proved that the Montgomery County authorities acted in bad faith simply to harass Sovereign.

254. *See,* Justice Blackmun's concurring opinion in *Trainor,* 431 U.S. *supra,* at 448–450, 97 S.Ct. *supra,* at 1920–1921.

255. For citations, *see,* fn. 252, *supra.* Significantly, Montgomery County is conducting a second pending enforcement action against Sovereign, whereas in *Wooley* three enforcement actions had been initiated against the federal plaintiff.

ing such a balancing of interests approach. The court holds that the bare presence of two [256] pending state judicial enforcement actions against a federal plaintiff at the time his federal action attains the stage of substantial proceedings on the merits, and without any showing that either of the two pending state enforcement actions was initiated in bad faith, does *not* entitle the federal plaintiff to the benefit of the multiple-prosecution, "extraordinary circumstances" exception to the *Younger* abstention rule. Consequently, the court finds that the *Younger* doctrine applies to the Montgomery County branch of Sovereign's federal litigation, and that none of the exceptions to the *Younger* abstention rule apply to that branch of Sovereign's federal action. This court holds that it will abstain from ruling on Sovereign's declaratory judgment and preliminary injunctive claims against the following Montgomery County defendants: Lee Falke, E. R. Robinson and C. L. Dalrymple. The court therefore dismisses Sovereign's preliminary injunctive and declaratory claims against those defendants. However, the court retains jurisdiction of the damage claims asserted against defendants Robinson and Dalrymple, and Sovereign's claim for a permanent injunction against all three defendants, Falke, Robinson and Dalrymple, because none of these claims in Sovereign's complaint are currently before this court for determination.[257]

**256.** Under Part IV of today's opinion this court relieved Sovereign of the burden of Cleveland's threatened, *third*, enforcement action, which was not yet "pending" against Sovereign for *Younger* purposes. If that threatened enforcement action had matured to the stage of a "pending" prosecution, then Sovereign would be burdened with three separate criminal cases in which it would need to defend against a statute it viewed as unconstitutional. *Compare, Cline v. Frink Dairy*, 274 U.S. 445, 449–453, 466, 47 S.Ct. 681, 71 L.Ed. 1146 (1927).

**257.** Because of the disposition of the Montgomery County Branch of Sovereign's declaratory judgment and preliminary injunction claims, the court does not reach the issue of abstention

## IV.

## THIS COURT SHALL *NOT* ABSTAIN UNDER THE YOUNGER DOCTRINE FROM DECIDING SOVEREIGN'S CLAIMS AGAINST THE CUYAHOGA COUNTY DEFENDANTS [258]

### A. SOVEREIGN SUSTAINS STANDING TO CHALLENGE THE CUYAHOGA COUNTY AUTHORITIES' "ONGOING" THREAT TO ENFORCE OHIO REVISED CODE SECTIONS 2907.32, 2907.01, AND 2923.04.

In all cases in which a party seeks federal injunctive or declaratory relief challenging the constitutional validity of a state statute against the state law enforcement officers who in turn urge the federal court to abstain under *Younger*, the federal district court must first determine whether the federal defendants pose a concrete threat to enforce the challenged state statutes against the federal plaintiffs. A plaintiff in Sovereign's position sustains standing under Article III and 28 U.S.C. § 2201 to challenge the constitutional validity of the questioned state statute *only* if it is the target of a concrete threat of enforcement by the state officials who are defendants in the federal action. *See, Younger*, 401 U.S. *supra*, at 41–42, 91 S.Ct. 746; *Boyle*, 401 U.S. *supra*, at 79–81, 91 S.Ct. 758; *O'Shea*, 414 U.S. *supra*, at 493–499, 94 S.Ct. 669; *Rizzo*, 423 U.S. *supra*, at 371–373, 96 S.Ct. 598; *Steffel*, 415 U.S. *supra*, at 458–460, 94 S.Ct. 1209; *Doran*, 422 U.S. *supra*, at 924–925, 929–931, 95 S.Ct. 2561; *Wooley*, 430

under *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

**258.** The Cuyahoga County federal defendants are John T. Corrigan, Prosecuting Attorney for Cuyahoga County, Ohio, and the named Cleveland Police Officers Ray Warner, L. Thompson, John Crawford, Archie Catavolos, Kenneth White, William Poe, Richard Millett, John H. Devine, James Lynsky, Vincent G. Krawulski, Carl DeLau, Andrew S. Vanyo, James Kennelley, Robert J. Cermak, Henry Yisha, Gregory Kunz, B. Jones, Richard McIntosh, John McNamara, Edward C. Loucas, Samuel Hennie, Charles Berkey, Robert O'Brien; Officers Kaminski, Banyon, McGreer (Badge No. 1583), John Doe I, John Doe II, John Doe III.

U.S. *supra,* at 710–711, 97 S.Ct. *supra,* at 1433.[259]

This court determined that the Cuyahoga County defendants threaten to enforce Ohio Revised Code §§ 2907.32, 2923.01, and 2923.-04 against Sovereign for its activities in Cuyahoga County,[260] and that the Cuyahoga County threat of enforcement exists independent of the already pending Montgomery County enforcement proceedings. The Cuyahoga County defendants threaten a third,[261] independent enforcement action against Sovereign, because: (1) several Cleveland police officers testified to their department's continuing investigation and surveillance of Sovereign pertaining to violations of Ohio Revised Code §§ 2907.32, 2923.01, and 2923.04;[262] (2) the Cleveland police seized material which was outside the scope of the search warrant, unrelated to Sovereign's Montgomery County operations, and pertinent only to Sovereign's Cleveland operation;[263] (3) the Cleveland police seized evidence by the use of photographs, video and audio tape, and also seized a gun and holster, retaining the evidence without delivery to the Dayton authorities;[264] (4) the February 16, 1977 search episode was triggered by a warrant personally prepared by the Cuyahoga County prosecutor and directed in part to the Cleveland Police Department,[265] which fur-

nished the vast majority of the personnel who executed the warrant. Furthermore, the Cuyahoga County threat of prosecution under §§ 2907.32, 2923.01, and 2923.04 coexists with the Hamilton County indictment of Sovereign, and the Montgomery County Grand Jury proceedings which ripened into a second indictment of Sovereign under the same statutes. Also, the record reveals the entry of a judgment of conviction by one Ohio court against a publisher of sexually-oriented literature for violations of §§ 2907.32, 2923.01, and 2923.04. *See, State v. Hustler Magazine, and Larry Flynt,* Case No. B 76 1618 (Hamilton County, Ohio Common Pleas, February 8, 1977), wherein Hustler magazine was fined $11,000, and publisher Flynt was sentenced "to be imprisoned in the Ohio State Penitentiary for a minimum term of 7 years and a maximum term of 25 years," six months in jail, and fined $11,000 for violations of Ohio's pandering obscenity and organized crime statutes.[266]

In *Steffel v. Thompson,* 415 U.S. 452, 458–459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) the Supreme Court held that a person distributing leaflets who had been twice threatened by policemen with arrest under the challenged statute, and whose companion was *actually* arrested under the chal-

---

**259.** *See,* text accompanying fn. 105, *supra.*

**260.** *See,* Part II B, *supra,* in this Memorandum of Opinion.

**261.** Sovereign was indicted for violation of Ohio's pandering obscenity and organized crime statutes solely in Hamilton County during the April 1976 term of that county's grand jury. *See* text accompanying fn. 22, *supra.* This court determined that Montgomery County had initiated a second enforcement action based on these same statutes, against Sovereign which constituted a "pending proceeding" for purposes of *Younger's* application, prior to April 25, 1977, the date on which Sovereign's federal action attained substantial proceedings on the merits. *See,* Part III C(2), *supra.* Subsequently, the Montgomery County Grand Jury proceeding resulted in a second indictment of Sovereign for violation of Ohio's pandering obscenity and organized crime statutes. *See* text accompanying fn. 95, *supra.* Thus Cuyahoga County's threat to enforce these same statutes against Sovereign constitutes a threat to initi-

ate a *third* independent criminal action against Sovereign based on the same pandering obscenity and organized crime statutes.

**262.** *See,* fn. 30, *supra,* and accompanying text which demonstrates that Cleveland policemen testified: (1) that they are presently investigating Sovereign's activities for violations of Ohio's pandering obscenity and organized crime statutes; (2) they have placed Sovereign under surveillance and would "love to" dedicate more time to that activity; and (3) their investigation is "current and ongoing."

**263.** *See,* Part II B, *supra,* this Memorandum of Opinion.

**264.** *See,* fns. 44–46, 60–63, 73, 86, and accompanying text, *supra.*

**265.** *See,* fns. 35–37, *supra.*

**266.** A certified copy of this judgment entry is part of the record in Sovereign's case.

lenged statute, sustained standing under *Younger v. Harris*, 401 U.S. *supra*, at 41, 91 S.Ct. 746, because such a threat of prosecution cannot be characterized as "imaginary or speculative." In *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 924–925, 929–931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) the Supreme Court, citing *Steffel*, permitted Salem Inn, a tavern which allowed female employees to appear topless prior to enactment of an ordinance forbidding public exposure of breasts, to challenge the validity of the ordinance, which was simultaneously enforced in pending state criminal litigation against another tavern. *See, Doran, supra,* 928–931, 95 S.Ct. 2561. Thus *Doran* implicitly recognized that federal plaintiffs whose *business* activities clearly fall within the ambit of a state criminal law which is actively enforced against a similarly situated business, have standing under Article III and § 2201 to challenge the validity of the threatening state criminal laws under the First Amendment.[267]

 Therefore Sovereign, a distributor of sexually-oriented material,[268] is threatened sufficiently to sustain standing under Article III and § 2201 for a First Amendment challenge to the Ohio pandering obscenity and organized crime statutes, because: (1) the Cleveland authorities' testimony and conduct demonstrates their ongoing intention to enforce those provisions against Sovereign; (2) Sovereign itself has two separate pandering indictments against it for violation of those statutes; (3) those statutes have already resulted in the conviction of another publisher of sexually oriented literature, who was sentenced to 7 to 25 years in prison and fined over $20,000. The *tangible, unimaginary* character of the threat of a third prosecution under these statutes by Cuyahoga County is augmented by: the personal involvement of the Cuyahoga County Prosecutor in securing the warrant for the February 16, 1977 search of Sovereign's Cuyahoga County building; the Cleveland police officers' admission that they themselves are conducting a continuing investigation of Sovereign for violations of the Ohio pandering obscenity and organized crime statutes;[269] and the evidence which the Cleveland police seized, much of which clearly exceeded the Montgomery County orientation of the search warrant, and was logically pertinent *only* to Sover-

---

267. Both *Steffel, supra*, and *Doran, supra*, involved federal complaints based solely on the First Amendment. *See also, Wooley*, 430 U.S. *supra*, at 710–712, 97 S.Ct. *supra*, at 1433–1434 where Chief Justice Burger held that Mr. Maynard, who himself had been repeatedly prosecuted for obscuring the state's motto which was embossed on his family autos' license plates, sustained standing to challenge, under the First Amendment, the state statute pursuant to which he had been prosecuted. The only basis for the *Wooley* court's finding of a "threat" of future prosecutions of Mr. Maynard, was: (1) his unwillingness to comply with the statute; (2) the prior sequence of his prosecutions for its violation. Similarly, Sovereign is unwilling to comply with Ohio's pandering obscenity and organized crime statutes, and it is subject to two pending state prosecutions for violations of those statutes.

The Supreme Court also found that Mrs. Maynard, who had never *herself* been prosecuted for violation of the motto display statute was also threatened with future prosecution under that statute because: (1) she was a part owner of the auto on which the non-conforming license plate appeared; and (2) her husband had been repeatedly prosecuted for violating the statute. ("Mrs. Maynard, as joint owner of the family automobiles is no less likely than her husband to be subjected to state prosecution"). Based on these threats of future prosecution, the *Wooley* court held that *both* Mr. and Mrs. Maynard sustained standing to challenge the state's motto, license plate, display statute. Certainly if the concreteness of the threat of future prosecution of Mrs. Maynard was augmented by the repeated, prior prosecutions of another person, then this court may permissibly conclude that the concreteness of the threat of a future prosecution of Sovereign is augmented by the prior prosecution and conviction of another publisher of sexually oriented literature. *Compare* text accompanying fn. 243–250, *supra*.

Apparently the concreteness of the threat of future prosecution of the federal plaintiffs in *Steffel* and *Doran*, was also buttressed · by "pending" enforcement of the disputed state statutes or ordinances against others similarly situated to the federal plaintiffs in those two cases. *See, Steffel*, 415 U.S. at 455–456–459, 94 S.Ct. 1209; *Doran*, 422 U.S. at 924–925, 929–930, 95 S.Ct. 2561.

268. *See* text accompanying fn. 94, *supra*.

269. *See*, fn. 30, and accompanying text, *supra*.

eign's Cuyahoga County business operations and affiliations. The concrete character of the Cuyahoga County authorities' threat to initiate a third judicial enforcement proceeding involving the Ohio pandering obscenity and organized crime statutes against Sovereign is unlike any of the amorphous, speculative controversies which the Supreme Court held insufficient to furnish a federal plaintiff with Article III and § 2202 standing in a *Younger* setting. *Contrast, Younger*, 401 U.S. *supra*, at 41–42, 91 S.Ct. 746 (federal plaintiffs who were denied standing when they alleged only that they "felt *inhibited*" in advocating their political beliefs because of the challenged statute and the pending state court indictment of a federal co-plaintiff, where none of the federal plaintiffs engaged in a common, ongoing commercial activity that was threatened by the challenged statute);[270] *Boyle v. Landry*, 401 U.S. *supra*, at 79–81, 91 S.Ct. 758 (federal plaintiffs, none of whom had ever been prosecuted, charged, arrested, or threatened with arrest or prosecution under the challenged state statute, denied standing); *O'Shea*, 414 U.S. *supra*, at 493–499, 94 S.Ct. 669 (federal plaintiffs denied standing when they alleged only a general, discriminatory judicial enforcement of criminal laws, without alleging that any named federal plaintiffs had personally suffered injury from the discriminatory enforcement pattern, and without claiming that any state statute was unconstitutional);[271] *Rizzo v. Goode*, 423 U.S. *supra*, at 371–373, 96 S.Ct. 598 (federal plaintiffs denied standing where their federal claim rested upon feared future transgressions of one small unnamed minority of policemen, rather than threatened or actual conduct of the named defendants).

**B. AT THE TIME SOVEREIGN'S FEDERAL LITIGATION ATTAINED SUBSTANTIAL PROCEEDINGS ON THE MERITS, THE CUYAHOGA COUNTY DEFENDANTS' STATE ENFORCEMENT EFFORTS DID NOT OBTAIN A SUFFICIENTLY ADVANCED STAGE TO ENTITLE THEIR STATE ENFORCEMENT ACTIVITIES TO YOUNGER'S CLOAK OF PROTECTION.**

Substantial proceedings on the merits of Sovereign's federal action took place on April 25, 1977 and therefore this court must determine whether the Cuyahoga County defendants' independent enforcement action attained a sufficiently advanced stage by that date to entitle those defendants to *Younger's* protection from federal judicial interruption. On April 25, 1977 the independent Cuyahoga County enforcement action was still under the administrative control of the Cleveland Police Department, which was in the midst of an ongoing investigation of Sovereign, and which had recently seized important documentary evidence logically relevant solely to Sovereign's Cuyahoga County business operations.[272] The Cuyahoga County enforcement officials have not yet presented any evidence to the Cuyahoga County Grand Jury and those officials have not initiated proceedings before any Ohio judicial institution capable of affording Sovereign the opportunity to present its constitutional defenses to the threatened, but not yet pending, future Cuyahoga County crim-

---

**270.** On the surface the *Younger* court's approach to standing appears inconsistent with that of the *Doran* court. In *Doran*, Salem Inn was granted standing based on its bare allegation that it felt threatened with future prosecution under an ordinance which had resulted in a pending prosecution of a federal plaintiff who operated the same type of business, whereas in *Younger*, the federal plaintiffs who shared the beliefs of the one federal plaintiff who had been indicted were denied standing. Apparently *Doran* implicitly modifies the *Younger* standing rule by slightly broadening standing when one of several similarily situated federal plaintiffs has already been charged by the state courts.

**271.** Sovereign, contrary to the federal plaintiffs in *O'Shea*, 414 U.S. at 496, 94 S.Ct. 669, contends that specific Ohio statutes are unconstitutional. *See also*, this court's discussion of standing in Part III A of this Memorandum of Opinion, and text accompanying fn. 194.

**272.** *See*, fn. 30, and accompanying text.

inal enforcement action.[273] Thus the Cuyahoga County enforcement action did not advance past the stage in which the police, through their admitted intentions, and investigatory conduct, threatened a future prosecution of Sovereign for violating Ohio's pandering obscenity and organized crime statutes. Such police threats of prosecution, without further involvement of a state's justice system, are not sufficient to trigger *Younger*'s cloak of protection for the state law enforcement officers because the state's interest, in protecting such police activity from federal judicial intervention, is much "more attenuated" than the state's important interest in vindicating the authority of its judicial system. *See, Trainor*, 431 U.S. *supra*, at 448–449, 97 S.Ct. *supra*, at 1920–1921 (Blackmun, concurring); *Steffel*, 415 U.S. *supra*, at 462, 94 S.Ct. 1209; *Wooley*, 430 U.S. *supra*, at 712, 97 S.Ct. *supra*, at 1434.[274]

Furthermore, even if *Younger*'s stringent standards did apply to Sovereign's complaints against the Cuyahoga County federal defendants, this court would still not abstain under *Younger* because the Cuyahoga County enforcement action represents a *third* independent effort to prosecute Sov-

ereign under the Ohio pandering obscenity and organized crime statutes. The Supreme Court recognized an extraordinary circumstance exception to the *Younger* abstention rule in situations in which the state launches a barrage of multiple criminal prosecutions against a single state defendant. *See, Younger*, 401 U.S. *supra*, at 46, 49, 91 S.Ct. 746; *Byrne*, 401 U.S. *supra*, at 218, 220, 91 S.Ct. 777; *Allee*, 416 U.S. *supra*, at 833, 835, 838–839, 94 S.Ct. 219 (Burger, J., separate opinion); *Doran*, 422 U.S. *supra*, at 929, fn. 3, 95 S.Ct. 2561; *Wooley*, 97 S.Ct. *supra*, at 1433–1434; *Cline v. Frink Dairy*, 274 U.S. 445, 449–453, 466, 47 S.Ct. 681, 71 L.Ed. 1146 (1927). *See also*, fns. 238–242, 250, and accompanying text, *supra*, this Memorandum of Opinion.

*Cline v. Frink Dairy*, 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146 (1927), established the fundamental principle that federal district courts sustain jurisdiction to enjoin threatened *multiple* state prosecutions, under an unconstitutional state criminal statute, of a federal plaintiff by state officials who are defendants in the federal action. In *Cline*, the federal plaintiffs, Frink Dairy and other dairy producers brought an action

---

**273.** *Compare* this court's different disposition of *Sovereign's* Montgomery County claims, where this court found that Sovereign had a sufficient opportunity to present its constitutional defenses, if the grand jury issued an indictment. *See* text accompanying footnote 195, *supra*, and the discussion in Part III C (1) of this Memorandum of Opinion, *supra*, in particular the text accompanying footnotes 211–215.

**274.** *See also* this court's discussion of *Wooley* in the text of this Memorandum of Opinion, accompanying footnotes 243–250, *supra*. *Compare* this court's different view of the state's interest when the injunction sought by the federal plaintiff will disrupt the operation of a state grand jury. *See* text accompanying footnote 196, *supra*. *See also*, Part III C(2) of this Memorandum of Opinion, *supra*, which delineates a chain of Supreme Court decisions suggesting that grand juries sustain an unusually important state interest. *See also* the cases discussed in the text accompanying footnotes 210–215, *supra*. Those cases suggest that the state's interest in shielding state administrative officers from federal injunctive interference, when such officers concretely threaten enforcement of an unconstitutional

statute against an isolated individual, is a severely diminished state interest for purposes of analyzing *Younger*'s application. *See also*, fn. 202, *supra*.

Sovereign's complaint differs from the attempt of the federal plaintiffs in *Rizzo v. Goode*, 423 U.S. *supra*, at 380–381, 96 S.Ct. at 608 who unsuccessfully sought to induce a federal court to "supervise the function of the police department . . . ." Sovereign seeks only a limited declaratory judgment and preliminary injunction against the Cleveland Police and the Cuyahoga County Prosecutor, restraining them from initiating state criminal litigation against only Sovereign, based on Ohio's pandering obscenity and organized crime statutes. Sovereign seeks no protection from Cuyahoga County prosecution for *other* offenses, and the scope of the injunction restrains enforcement of the pandering obscenity statute by the Cuyahoga County authorities *only* against Sovereign. Thus the Cuyahoga County authorities are not enjoined from prosecuting individuals and entities other than Sovereign, its owners and its employees, for violations of the Ohio pandering obscenity and organized crime statutes by today's decision.

to challenge the validity of the Colorado criminal antitrust statute under the Fourteenth Amendment due process clause.[275] *Frink Dairy et al.* filed a complaint, which according to the *Cline* court, stated that:

". . . Foster Cline, the defendant, in his capacity as District Attorney of Denver City and County, has been, and still is, claiming that the plaintiffs and their competitors have been and now are acting in violation of the Anti-Trust law; that he has caused an information to be filed in the criminal division of the District Court of the City and County of Denver, in which the plaintiffs and the Beatrice Creamery Company, a Delaware corporation, are charged with conspiracy to violate the Anti-Trust Act; that he expects to press the case to trial; that, since the case was instituted, the grand jury has been in session and many witnesses summoned and questioned about the plaintiffs' milk business; that the defendant Cline has threatened, and unless restrained by the court will institute, further prosecutions, file further informations and attempt to procure indictments of the plaintiffs by the grand jury; and that Cline, *by this multiplicity of criminal suits* and prosecutions, as well as by the civil suits for forfeiture of the corporate plaintiffs' charters he has threatened to bring, has already inflicted serious loss to the businesses and properties of the plaintiffs, and they will be irreparably and immeasurably damaged thereby unless he is restrained." [276] (emphasis added).

The three-judge district court held the statute unconstitutional and granted a preliminary injunction against its enforcement. Cline, the Denver District Attorney, appealed to the United States Supreme Court, in which the threshhold issue was, "whether the practice and precedents in equity justified the granting of relief by injunction, where one criminal prosecution had been begun and many others . . . were threatened." [277] In *Cline* the Supreme Court affirmed the district court's grant of the injunction, insofar as it enjoined future *threatened* prosecutions by Cline. The court, in an opinion penned by Chief Justice Taft, held:

"The general rule is that a court of equity is without jurisdiction to restrain criminal proceedings to try the same right that is in issue before it; but an exception to this rule exists when the prevention of such prosecutions under alleged unconstitutional enactments is essential to the safeguarding of rights of property, and when the circumstances are exceptional and the danger of irreparable loss is both great and immediate.

"It is objected, however, that the injunction can not (sic) be supported under the authorities, insofar as it is directed against actual proceedings pending in the criminal court. One of the District Judges below dissented from this part of the decree. Of course the injunction is not only against actual prosecution but is also against a *multiplicity of future suits* and *the threatened proceedings* for forfeiture, by which the District Attorney proposes to end the businesses of all the plaintiffs, and the objection would only lead to a narrowing of the decree.

" . . . .

"We . . . agree with the view of the dissenting Judge that the injunction is too broad, insofar as it restrains proceedings actually pending, and that it must be accordingly modified.

"This brings us to the consideration of the constitutionality of the Anti-Trust Act." [278]

After holding the statute in question violative of the Fourteenth Amendment the Su-

---

275. *See, Cline*, 274 U.S. *supra*, at 450, 47 S.Ct. 681. The *Cline* opinion did not indicate that the federal plaintiffs alleged that the state prosecution was brought in bad faith.

276. *See, Cline*, 274 U.S. *supra*, at 451, 47 S.Ct. at 682.

277. *See, Cline*, 274 U.S. *supra*, at 451, 47 S.Ct. at 682.

278. *See, Cline*, 274 U.S. *supra*, at 452–453, 47 S.Ct. at 682 (emphasis added).

preme Court ordered, "The decree of the District Court to enjoin proceedings which the defendant threatens to bring under the Act against the [federal] plaintiffs [is] . . affirmed." [279]

■ In the recent case of *Wooley v. Maynard*, 430 U.S. 705, 710–712, 97 S.Ct. 1428, 1433–1434, 51 L.Ed.2d 752 (1977) the Supreme Court once again held that a threat of a future, *multiple* prosecution of Mr. Maynard constituted *"exceptional circumstances"* authorizing federal judicial inquiry into the merits of Maynard's claim that the state statutes under which he was *repeatedly* charged violated the First Amendment.[280] Similarly, Sovereign seeks federal injunctive examination of the merits of its claim that the Ohio pandering, obscenity and organized crime statutes violate the First Amendment. Just as the threat of repetitive future prosecutions in *Wooley* and *Cline* justified such an inquiry under the extraordinary circumstances exception to the *Younger* abstention rule, the Cuyahoga County authorities' threat of a *third repetitive* prosecution of Sovereign also justifies federal judicial scrutiny of the constitutional validity of the statutes on which the threatened Cuyahoga County

prosecution is based. Therefore, this court will *not* abstain under the *Younger* doctrine, from deciding the merits of Sovereign's preliminary injunction and declaratory judgment claims against the federal defendants from Cuyahoga County.[281]

C. HAVING DECIDED THAT YOUNGER ABSTENTION IS INAPPROPRIATE WITH RESPECT TO SOVEREIGN'S CLAIMS AGAINST THE FEDERAL DEFENDANTS FROM CUYAHOGA COUNTY, THIS COURT WILL NOT ABSTAIN FROM THE CUYAHOGA COUNTY PORTION OF THIS CASE UNDER THE PULLMAN ABSTENTION DOCTRINE.

■ In addition to arguing that this court should abstain under *Younger*, the Cuyahoga County defendants and the amicus curiae, argue that this court should abstain pursuant to the doctrine enunciated by the United States Supreme Court in *Railroad Commission of Texas .v. Pullman*, 312 U.S. 496, 500–502, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Although the comity policies underlying the *Pullman* and *Younger* abstention doctrines are interrelated,[282] each

---

**279.** *See, Cline*, 274 U.S. *supra*, at 466, 47 S.Ct. at 687. *Compare, Texas and Pacific Railroad Company v. Kuteman*, 54 F. 547, 549, 551–552 (5th Cir. 1892) (federal court sustains jurisdiction to issue injunction to restrain litigation in a state court of a multiplicity of threatened state court suits which have not begun).

**280.** *See* discussion of *Wooley* in text accompanying fns. 243–250, in this Memorandum of Opinion, *supra*. The *Wooley* court stressed that multiple state prosecutions constituted *"exceptional circumstances"* justifying federal intervention against *threatened future* state prosecutions. *See*, fn. 250, *supra*. *See also*, fns. 238–242, and accompanying text, *supra*, this Memorandum of Opinion.

**281.** This court's decision not to abstain with respect to the Cuyahoga County segment of Sovereign's case is consistent with the Sixth Circuit's recent abstention decisions, none of which involved a threat of future multiple prosecutions against the federal plaintiff in state court involving the federal question raised by the federal plaintiff's claim. *Contrast, Forest Hills Utility Company v. City of Heath, Ohio*, 539 F.2d 592, 595 (6th Cir. 1976); *Louisville Area Inter-Faith Committee for United Farm*

*Workers et al. v. Nottingham Liquors et al.*, 542 F.2d 652, 654–655 (6th Cir. 1976); *Piatt v. Louisville and Jefferson County Board of Education*, 556 F.2d 809, 810 (6th Cir. 1977); *Lamb Enterprises, Inc. v. Kiroff*, 549 F.2d 1052, 1055–1060, 1063 (6th Cir. 1977) (dealing with a "pending" state civil action and decided prior to *Wooley, supra*).

**282.** In *Juidice v. Vail*, 430 U.S. 327, 347–348, 97 S.Ct. 1211, 1223, 1224, 51 L.Ed.2d 376 (1977), Justice Stewart, in his separate opinion noted the interrelation of *Pullman* and *Younger* abstention doctrines when he wrote:

". . . [T]he Court rejects a routine application of [the Pullman] doctrine in favor of a novel extension of the *Younger-Huffman* line of 'abstention' cases. *Younger v. Harris*, 401 U.S. 37, [91 S.Ct. 746, 27 L.Ed.2d 669;] *Huffman v. Pursue, Ltd.*, 420 U.S. 592, [95 S.Ct. 1200, 43 L.Ed.2d 482.] That is a departure from prior cases, which have not reached the *Younger* question when grounds for *Pullman* abstention were clear. . . .

"*Both types of 'abstention,' of course, serve the common goal* of judicial restraint as a means of avoiding undue federal interference with state goals and functions. But

doctrine was crafted to implement those comity policies in different contexts. The *Younger* rule is triggered when a federal injunction or declaratory judgment action threatens interdiction of a state's justice system, usually by interference with a civil or criminal enforcement action "pending" in the state's justice system, to which action the state, exercising its sovereignty powers, is a party.[283] Additionally, *Younger* abstention principles apply to a federal action calculated to subjugate a substantial segment of a state's justice system to the pervasive regulation of a federal court's equity powers.[284]

In contrast with *Younger, Pullman* abstention applies when the outcome of federal litigation depends on a federal court's resolution of an unclear threshold question of state law that is "fairly subject"[285] to a state judicial construction. For example, in *Pullman, supra,* the Texas Railroad Commission issued a regulation which allegedly discriminated against the Pullman Company's all black cadre of porters, on the basis of race, and in favor of Pullman's all white cadre of conductors.

The Pullman Company, as well as the porters, initiated a *federal* injunctive action to restrain the implementation of the Texas Railroad Commission's regulation, claiming that the state's administrative action violated the due process and equal protection provisions of the Federal Constitution. The United States Supreme Court, noting that the administrative regulation appeared to discriminate against the black porters, observed that: (1) promulgation of such a discriminatory regulation appeared to exceed the Texas Railroad Commission's statutory authority; (2) the Texas courts had not yet resolved the ambiguous relationship between the Texas regulation and the Texas statute; (3) Texas judicial procedures furnished an "easy and ample means for determining the Commission's authority."[286] The *Pullman* court concluded that the federal district court, in the interests of comity, and because of the unresolved ambiguity with respect to the correct interpretation of the threshold question of Texas law, should abstain by retaining jurisdiction of the case, but staying all proceedings until the Texas courts received an opportunity to resolve the ambiguous Texas law issue.[287]

there is a significant difference in result between the two. Under *Pullman* abstention, the federal court may retain jurisdiction pending state court interpretation of an ambiguous statute, while under *Younger* it may not. The *Pullman* approach thus has the advantage of not altogether foreclosing access to federal courts to vindicate federal rights, while still avoiding needless friction in federal-state relations." (emphasis added).

283. *See,* discussion in Part III B, C, of this Memorandum of Opinion, *supra.*

284. *See,* discussion in Part III B, C, of this Memorandum of Opinion, *supra.*

285. *See, Zwickler v. Koota,* 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

286. *See, Pullman,* 312 U.S. *supra,* at 501, 61 S.Ct. at 645.

287. On the comity issue the *Pullman* court wrote at 500–501, 61 S.Ct. at 645:
"Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to

the enforcement of the criminal law . . ; or the administration of a specialized scheme for liquidating embarrassed business enterprises, . . .; or the final authority of a state court to interpret doubtful regulatory laws of the state, . . . . [The] cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion,' restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary. . . . This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers . . .

"Regard for these important considerations of policy in the administration of federal equity jurisdiction is decisive here. If there was no warrant in state law for the Commission's assumption of authority there is an end of the litigation; the constitutional issue does not arise. The law of Texas appears to furnish easy and ample means for determining the Commission's authority. Article 6453 of the Texas Civil Statutes gives a review of such an order to the state courts. Or, if there are difficulties in the way of this procedure of

Therefore, the elements which trigger a federal district court's self-assessment of its jurisdiction under the *Pullman* doctrine are:

(1) An unclear threshold question of state law which, if resolved in favor of federal plaintiff, aborts the need to decide the federal issues in the federal plaintiff's complaint;

(2) A state law question which can be readily resolved by state courts if the federal court temporarily stays its own proceedings.

 The Cuyahoga County federal defendants and the *amicus curiae* argue that Ohio's pandering, obscenity and organized crime statutes are, at worst, overbroad, and thus subject to a narrowing construction that could confine the statute's operation to a constitutionally permissible sphere. Cuyahoga County and the *amicus curiae* also point to the Larry Flynt conviction in Hamilton County [288] as presenting an opportunity for the state courts to gloss the challenged statutes with a construction that comports with constitutional standards. Thus, the Cuyahoga County authorities and the *amicus curiae* urge the court to abstain under *Pullman*, because the elements of *Pullman* abstention have been established. This court disagrees.

None of the United States Supreme Court's *Pullman* abstention decisions applied that doctrine to a case *which satisfied the extraordinary circumstances* exception to the *Younger* doctrine. Sovereign's claims against the Cuyahoga County defendants satisfy the multiple prosecution variant of the extraordinary circumstances exception to the *Younger* doctrine. *See*, fns. 281–285 and accompanying test of this Memorandum of Opinion, *supra*. This court will not apply *Pullman* to a case which overcomes the high barricades encasing federal jurisdiction under the *Younger* doctrine, merely because the statute, the application of which triggers an *extraordinary circumstance exception* to *Younger*, may be arguably unclear. Such an approach causes the anomalous result of federal abstention under *Pullman* in cases like *Dombrowski*, 380 U.S. 479, 482–483, 487–492, 498, 85 S.Ct. 1116, 14 L.Ed.2d 221, in which state officials violate the First Amendment by threatening bad faith prosecutions, based on unconstrued, arguably overbroad state statutes which could be constitutionally glossed by state courts, that are not participants in the bad faith state activity.[289] Both the *Pullman* and *Younger* abstention doctrines were similarly designed to implement the identical comity policy of balancing the differing interests of the federal judiciary and the states' justice systems,[290] and therefore the architects of the *Younger* abstention rule could not intend the *Pullman* rule to nullify *Younger's* recognition of the fundamental principle that certain extraordinary cases merit immediate federal attention.[291]

Furthermore, the United States Supreme Court, as well as several Circuit Courts of Appeal including the Sixth Circuit, have repeatedly demonstrated a marked reluctance to invoke the *Pullman* doctrine to oust a federal plaintiff who asserts a First

---

which we have not been apprised, the issue of state law may be settled by appropriate action on the part of the State to enforce obedience to the order . . . In the absence of any showing that these obvious methods for securing a definitive ruling in the state courts cannot be pursued with full protection of the constitutional claim, the district court should exercise its wise discretion by staying its hands."

**288.** *See, State of Ohio v. Hustler Magazine and Larry Flynt,* Case No. B 76 1618 (Hamilton County Ohio Common Pleas, February 8, 1977).

**289.** *See,* gloss placed on the *Dombrowski* holding in *Younger,* 401 U.S. *supra,* at 47–56, 91 S.Ct. 746.

**290.** *See, Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 481, 97 S.Ct. 1898, 1904, 52 L.Ed.2d 513 (1977), and *compare* with fn. 282, *supra*.

**291.** *See, Cline v. Frink Dairy Co.,* 274 U.S. 445, 449–451, 466, 47 S.Ct. 681, 71 L.Ed. 1146 (1927). *Compare, Doran,* 422 U.S. *supra,* at 933, 95 S.Ct. 2561, where the Supreme Court first rejected the application of *Younger* abstention to some of the federal plaintiffs and then affirmed the district court ruling that the ordinance involved was facially overbroad without even considering the applicability of *Pullman* abstention.

Amendment *pure expression* claim in a federal court. *See, Garvin v. Rosenau,* 455 F.2d 233, 234, fn. 114, at 238–239 (1972), in which the Sixth Circuit stated:

". . . [T]his statement on the *[Pullman]* abstention doctrine . . . is intended to emphasize that abstention is appropriate only in narrowly limited special circumstances. The mere fact that a constitutional decision conceivably could be avoided or that federal-state friction might arise does not automatically justify resort to the doctrine. The facts and circumstances of each case must be carefully examined in order to evaluate the policies to be served by abstention. Thus, resort to abstention is appropriate only if the narrowly limited countervailing interests are, on balance, more important to the federal constitutional system than a litigant's right to a federal forum.

" . . .

"Here we deal with alleged infringements upon First Amendment rights. . That the First Amendment is the essence of democratic government and that free speech is fundamental to our society need no elaboration. Historically, the guarantees of this amendment have been closely guarded by the federal courts." [292]

In *Jones v. Metzger,* 456 F.2d 854, 856 (6th Cir. 1972), and 323 F.Supp. 93, 98–99 (N.D. Ohio 1971) (prisoners alleging violation of their First Amendment rights, among others, federal court not required to abstain pursuant to *Pullman*) the Sixth Circuit stated, "Even if a viable option were availa-

**292.** *See also, Moreno v. Henckel,* 431 F.2d 1299, 1308–1309 (5th Cir. 1970) (Judge Wisdom); *Long Island Vietnam Moratorium Committee v. Cahn,* 437 F.2d 344, 346–350 (2d Cir. 1970) holding constitutionally, facially overbroad state flag desecration statute, which had not been construed by a state court, invalid. In rejecting the application of the *Pullman* doctrine, the *Vietnam Moratorium* court held at 347:

"We reject these contentions as did all three judges below. The principle of abstention does not involve the abdication of federal jurisdiction, but only the postponement of its exercise. *Harrison v. N.A.A.C.P., supra,* [360 U.S. 167], at 177, [79 S.Ct. 1025, 3 L.Ed.2d 1152]. However, in cases involving a challenge that the statute is on its face unconstitutional, *the* delay of state court proceedings might itself cause an impermissible chilling of the very constitutional rights which the plaintiff seeks to protect. *Zwickler v. Koota,* 389 U.S. 241, [88 S.Ct. 391, 19 L.Ed.2d 444]. *Dombrowski v. Pfister,* 380 U.S. 479, 483–485, [85 S.Ct. 1116, 14 L.Ed.2d 22] (1964). The Supreme Court has stated that 'due respect' must be afforded a civil rights plaintiff's choice of forum for the vindication of his First Amendment rights, *Zwickler v. Koota, supra,* 389 U.S. at 247–248, [88 S.Ct. 391]; and we stated in *Holmes v. New York City Housing Authority,* 398 F.2d 262, 266 (2d Cir. 1968), that '[w]here a district judge chooses to exercise his equitable discretion in favor of retaining [a civil rights action], it will be unusual indeed when an appellate court refuses to uphold his discretion.'

"In the circumstances of this case, abstention could cause irreparable harm to the plaintiffs and to others similarly situated and could thus effectively nullify First Amend-

ment rights. This danger is particularly grave since state proceedings often take many months before they are finished. Moreover, we were advised at oral argument that others are now being arrested frequently for various types of violations of § 136(a) similar to those in the instant case or are being threatened with arrest for such violations. For example, counsel for the plaintiffs advised us at argument that they represent over sixty persons who have been charged with displaying the emblem in question here, and that these prosecutions and District Attorney Cahn's threat have deterred many people from joining plaintiff organizations. Although Cahn has promised to refrain from prosecutions during the pendency of this litigation, his promise hardly affects prosecutions in parts of the state other than Nassau County. As Judge Moore observed in his opinion for the district court, 'our citizens are entitled not to be threatened with prosecution because of a particular interpretation given to a somewhat ambiguous statute by a prosecutor whose views on public issues may differ from others.' In view of these circumstances, there is no good reason why the federal courts should abstain in this § 1983 civil rights suit until the state courts have resolved the questions. *In the First Amendment area where many persons are constrained to withhold action until their rights are clarified, it is particularly desirable that judicial action be expeditious."* (emphasis added.

*See, also, Steffel v. Thompson,* 415 U.S. 452, 474–475, fns. 21–22, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (*Pullman* abstention inappropriate when statute challenged as invalid on its face).

ble to [the prisoners] under state law, it is well established . . . that when fundamental civil rights are at issue federal courts should hesitate to abstain [under *Pullman*]." *See also, McNeese v. Board of Education,* 373 U.S. 668, 670–672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *see, Hobbs v. Thompson,* 448 F.2d 456, 462–463 (5th Cir. 1971) (City firemen challenged a municipal charter provision and ordinance, alleging that it violated the First Amendment because it was both substantially overbroad and vague. The municipal provision allegedly chilled the firemen's electioneering and the court rejected an invitation to apply the *Pullman* abstention doctrine), wherein Fifth Circuit Judge Goldberg wrote:

"Courts have long recognized that abstention is particularly inappropriate in an overbreadth or vagueness case grounded upon the First Amendment. . . . [A]bstention merely postpones access to federal courts, the doctrine does contemplate considerable delay. . . . Delay, of course, is even more intolerable in an overbreadth case since the postponement of relief itself might 'effect the impermissible chilling of the very constitutional right * * * [the claimant] seeks to protect.' *Zwickler v. Koota, supra,* 389 U.S. at 252, [88 S.Ct. [391] at 397.] . . . While patience can sometimes be a jurisprudential virtue, courts have recognized that it must not be a frustrator or nullifier of First Amendment rights. . . .

"Cases such as *Baggett [Baggett v. Ballitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377] and *Zwickler* reflect the fact that in a facial attack the 'special circumstances' which have been held to justify abstention not only are 'at war' with the overbreadth doctrine but also are usually absent. Abstention, a product of the requirements of ripeness and standing, might be quite appropriate in the normal case to assure that the challenged state statute will actually be interpreted to reach the activities of the persons attacking its validity. But in an overbreadth case, where particular applications of a statute are not determinative and where conceptions of standing and ripeness are modified, such assurances are largely irrelevant. . . . Moreover, even if it be assumed that a state court could resolve the overbreadth problems, either by means of an 'acceptable limiting construction readily to be anticipated' or by voiding the statute on its face, abstention is nevertheless inappropriate. In such a situation the state courts would simply be deciding a federal constitutional issue within the framework of construing state law. A primary motive for abstaining—avoidance of constitutional issues—is not served. The issue is simply referred to another forum. The state courts, however, possess no special institutional competence to decide such issues. Since the federal courts are at least as adequate a forum, no real purpose would be served by denying litigant his choice of a federal forum." [293]

In *Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), the Supreme Court refused to apply *Pullman* abstention to a First Amendment vagueness and overbreadth challenge directed at a Washington state loyalty oath statute which had not been previously construed by state courts. The *Baggett* court expressly noted that *Pullman* abstention in a case involving a First Amendment attack on an

---

**293.** *Compare, Erznoznik v. City of Jacksonville,* 422 U.S. 205, 215–217, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1976) in which the Supreme Court gave significant weight to the chilling effect of a state obscenity statute which it invalidated as facially overbroad in a case where the *Pullman* and *Younger* abstention doctrines were not implicated because the court exercised its appellate jurisdiction under 28 U.S.C. § 1257(2). *Contrast, Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 59–61, fn.17, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), a case discussing the scope of the overbreadth doctrine and *ius tertii* standing, in a context clearly unrelated to the *Pullman* and *Younger* abstention questions presented by Sovereign's claims against the Cleveland authorities because the focus of the court's standing analysis is *who* will be permitted to litigate a particular issue in federal court, whereas the focus of abstention analysis is whether the federal court will hear the particular issue at all, regardless of who asserts it.

unconstrued state statute usually causes substantial adjudicatory delay, during which time "the vagueness of the statute deters constitutionally protected conduct, [and that] 'the free dissemination of ideas may be the loser.'"[294] *See, Baggett*, 377 U.S. *supra*, at 378–379, 84 S.Ct. at 1316, 1327. *See also, Keyishian v. Board of Regents*, 385 U.S. 589, 601, fn. 9, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

In *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), a federal defendant who had secured a state court reversal on purely state law grounds[295] of his New York conviction for distributing political handbills, initiated a federal declaratory and injunctive action challenging the New York handbilling statute as facially overbroad, and therefore violative of the First Amendment.[296] The three-judge federal district court abstained under the *Pullman* doctrine. The United States Supreme Court rejected the application of *Pullman*[297] to the First Amendment facial overbreadth challenge to the statute which no state court had glossed with a narrowing, constitutionally permissible, construction.

"In *McNeese v. Board of Education*, 373 U.S. 668, [83 S.Ct. 1433, 10 L.Ed.2d 622], we again emphasized that abstention cannot be ordered simply to give state courts the first opportunity to vindicate the federal claim. After examining the purposes of the Civil Rights Act, under which that action was brought, we concluded that '[w]e would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court.' 373 U.S., at 672, [83 S.Ct. [1433], at 1436.] For the 'recog-

nition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law.' *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 415–416, [84 S.Ct. 461, 465, 11 L.Ed.2d 440.]

"*These principles have particular significance when, as in this case, the attack upon the statute on its face is for repugnancy to the First Amendment.* In such case to force the plaintiff who had commenced a federal action to suffer the *delay of state court proceedings* might itself *effect the impermissible chilling* of the very constitutional right he seeks to protect." (emphasis added)[298]

In *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the United States Supreme Court again sternly rejected California's argument that the Supreme Court should apply *Pullman* abstention to a federal complaint which alleged that a California statute and related administrative regulations providing for censorship of prisoners' mail were facially invalid under the First Amendment.[299] The *Procunier* Court held:

"But we need not decide whether appellant's contention is controlled by the analysis in *Baggett*, for the short answer to their argument is that these regulations were neither challenged or invalidated solely on the ground of vagueness. Appellees also asserted, and the District Court found, that the rules relating to prisoner mail permitted censorship of constitutionally protected expression without adequate justification. In light of the successful First Amendment attack

---

294. *See, Baggett, supra*, at 378–379, 84 S.Ct. at 1327.

295. *See, Zwickler, supra*, at 243, fn. 2, 88 S.Ct. 391. The state appellate court held that the prosecution failed to show that the federal defendant distributed handbills in sufficient "quantity to justify conviction under the statute."

296. *See, Zwickler, supra*, at 244, 88 S.Ct. 391. The federal plaintiff sustained standing because

he claimed to be threatened with reprosecution in the future.

297. *See, Zwickler*, 389 U.S. *supra*, at 248, fn.10, 88 S.Ct. 391.

298. *See, Zwickler*, 389 U.S. *supra*, at 251–252, 88 S.Ct. at 397.

299. The state provisions had not been previously construed by any state court prior to the federal decision. *See, Procunier*, 416 U.S. *supra*, at 401, 94 S.Ct. 1800.

on these regulations, the District Court's conclusion that they were also unconstitutionally vague hardly 'constitutes a compelling reason for abstention.'

. . .

"Moreover, we are mindful of the high cost of abstention when the federal constitutional challenge concerns facial repugnance to the First Amendment. *Zwickler v. Koota,* 389 U.S. 241, 252, [88 S.Ct. 391, 397, 19 L.Ed.2d 444] (1967); *Baggett v. Bullitt,* 377 U.S. at 379, 84 S.Ct. 1316. We therefore proceed to the merits." [300]

Examination of all the cases in which the Supreme Court invoked the *Pullman* doctrine further illustrates the Court's repeated reluctance to apply *Pullman* to *pure expression* First Amendment litigation. Almost all of the cases in which the Supreme Court ordered abstention under *Pullman* involved either diversity jurisdiction [301] or federal questions unrelated to a claim that a state statute impinged on the protections extended to *pure expression* under the First Amendment. *See, Pullman, supra; Chicago v. Fieldcrest,* 316 U.S. 168, 170–173, 62 S.Ct. 986, 86 L.Ed. 1355 (1941) (abstention ordered where federal plaintiff initiated federal action seeking injunction against municipal ordinance requiring sale of milk in bottles, on theory that ordinance was unreasonable and therefore unconstitutional); *Spector Motor Service Inc. v. McLaughlin,* 323 U.S. 101, 102, 104–106, 65 S.Ct. 152, 89 L.Ed. 101 (1944) (abstention ordered in case challenging, on federal constitutional due process grounds, application of a state tax to the federal plaintiff); *A.F.L. v. Watson,* 327 U.S. 582, 585, 589, 596–599, 66 S.Ct. 761, 90 L.Ed. 873 (1945) (state's right to work law challenged as violative of the National Labor Relations Act and federal due process, and abstention ordered); [302] *Stainback v. Mohock Ke Lok Po,* 336 U.S. 368, 373, 383–384, fn.29, 69 S.Ct. 606, 93 L.Ed. 741 (1949) (abstention held applicable to federal attack, based on Fifth Amendment due process clause, on territorial statute which allegedly deprived proprietary schools and their teachers of their rights to property and to follow an occupation); *Shipman v. Du Pre,* 339 U.S. 321, 322, 70 S.Ct. 640, 94 L.Ed. 877 (1950), *see also,* 88 F.Supp. 482, 484 (E.D.S.C.1950) (Supreme Court ordered abstention under *Pullman* doctrine in case based on Fourteenth Amendment due process; Article III, Section 2; Article I, Section 8); *Meridian v. Southern Bell Telephone and Telegraph Co.,* 358 U.S. 639, 640–641, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959), *see also,* 154 F.Supp. 736, 737 (S.D.Miss.1957) (*Pullman* abstention ordered when federal plaintiff, a utility company, challenged a state statute as violative of Article I, Section 10 of the Federal Constitution); *Martin v. Creasy,* 360 U.S. 219, 223–225, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959) (*Pullman* abstention ordered in an injunctive action, based on the Fourteenth Amendment due process clause, to restrain a state highway program's exercise of the state's condemnation power); *Reetz v. Bozanich,* 397 U.S. 82, 84–87, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970) (*Pullman* abstention ordered in case urging a Fourteenth Amendment equal protection objection to an Alaska statute and regulations restricting eligibility for commercial salmon fishing licenses); *Askew v. Hargrave,* 401 U.S. 476, 478–479, 91 S.Ct. 856, 858, 28 L.Ed.2d 196 (1971) (*Pullman* abstention ordered where the federal plaintiff's Fourteenth Amendment equal protection claim implicates threshold state law claims involved in parallel action pending in state

---

**300.** *See, Procunier,* 416 U.S. *supra,* at 401–404, 94 S.Ct. at 1805.

**301.** *See,* 1A, pt. 2 Moore's Federal Practice ¶ 0.203[1] pp. 2104, 2131–2135, fn.10, for a catalogue of the diversity of *Pullman* abstention cases.

**302.** The federal plaintiffs in *Watson* made a First Amendment charge, alleging that the challenged statutes infringed their *associational* rights. The *Watson* court clearly understood that the plaintiff's NLRA claims would defuse that First Amendment issue. *See, Watson, supra,* at 598, 66 S.Ct. 761. Furthermore, because the First Amendment issue in the complaint raised *associational* rights, the *Watson* case is not an example of the application of *Pullman* to a *pure expression* First Amendment case. *See,* discussion in fn.303, *infra.*

court among parties different from the federal parties, when the decision in the state action might "obviate the necessity of determining the *Fourteenth Amendment question*" (emphasis added)); *Lake Carriers' Association v. MacMullan,* 406 U.S. 498, 502–503, 509–513, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972) (abstention under *Pullman* where federal plaintiff challenges ambiguous state watercraft pollution control statute as an undue burden on interstate and foreign commerce, violative of the uniform maritime law, the Fourteenth Amendment due process and equal protection clauses, the supremacy clause, and federal water pollution control statutes); *Harris County Commissioners Court v. Moore,* 420 U.S. 77, 80, 83–85, 89, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975) (*Pullman* applied to state judges' Fourteenth Amendment due process and equal protection claims pertaining to redistricting of judicial precincts); *Bellotti v. Baird,* 428 U.S. 132, 136, 147–152, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) (Fourteenth Amendment due process and equal protection clause objections to state abortion statute, subject to state's highest court's certification rule, results in *Pullman* abstention); *Carey v. Sugar,* 425 U.S. 73, 77–79, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976) (*Pullman* abstention ordered in case challenging, under the Fourteenth Amendment's due process clause, state's prejudgment attachment statute where state courts had demonstrated their inclination to impose a constitutionally permissible gloss on the questioned statute); *Burford v. Sun Oil Co.,* 319 U.S. 315, 317, 331–334, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (*Pullman* applied to Fourteenth Amendment due process claim).[303]

**303.** The court notes that the Supreme Court has ordered *Pullman* abstention in two cases, in addition to *Watson, see,* fn.302, *supra,* which raised First Amendment *associational* interests in challenge to a state statute which had not previously been authoritatively construed by any state court. *See, Albertson v. Millard,* 345 U.S. 242, 242–245, 73 S.Ct. 600, 97 L.Ed. 983 (1953) (statute dealing with registration of Communist front organizations, where the Supreme Court's *per curiam* opinion doesn't mention the First Amendment allegation, and plaintiffs filed their suit five days after effective date of statute). *Cf.,* the three-judge district court opinion, at 106 F.Supp. 635, 642–646 (E.D. Mich., 1952); *Government and Civic Employees Organizing Committee, CIO v. Windsor,* 353 U.S. 364, 365, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957). (State statute depriving state employees who join a union of their benefits as public employees had not been construed by state courts in light of the alleged constitutional deficiencies of the act and therefore district court should retain jurisdiction until such state court adjudication). *Compare, England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 420–423, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (substantially limiting the *Windsor* holding). Obviously the First Amendment right of association cases, *see, Watson, see,* fn.302, *supra, Albertson, supra,* and *Windsor, supra,* are not examples of *Pullman's* application to First Amendment *pure expression* cases. *Compare, Kucinich v. Forbes,* 432 F.Supp. 1101, 1110–1112, fn.10, 1115, fn.22 (N.D.Ohio 1977); *McNea v. Garey,* 434 F.Supp. 95, 105–106 (N.D. Ohio 1976).

In *Harrison v. N.A.A.C.P.,* 360 U.S. 167, 170–174, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959) the Supreme Court ordered *Pullman* abstention with respect to a First Amendment challenge to registration of those who offer financial assistance for the commencement or furthering of litigation. Thus the central thrust of the *Harrison* case was the due process question of access to the courts, as well as the First Amendment right to *associate* for purposes of carrying on litigation. Thus *Harrison* is not a case where *Pullman* was applied to a pure speech First Amendment case. Furthermore, *Pullman* abstention in *Harrison* was *expressly* conditioned on the state authorities' "assurances" not to enforce the challenged statutes until their validity is finally determined. *See Harrison,* 360 U.S. *supra,* at 178–179, 79 S.Ct. 1025. However, the Cuyahoga County authorities have furnished Sovereign with no such assurances, and this court has found that they threaten to enforce the challenged statutes, which are contemporaneously being enforced against Sovereign and others in Montgomery and Hamilton counties. When the state authorities furnish no assurances that they will not enforce a challenged state provision against a federal plaintiff, or when the legality of the challenged state provision is pending in the state's highest court, in a different action, then a district court need not abstain under *Pullman. See Gibson v. Berryhill,* 411 U.S. 564, 580–581, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). Sovereign, with two indictments already pending against it in the state courts, is similarly situated to the federal plaintiff in *Gibson, supra.* For a discussion of the normal inapplicability of *Pullman* abstention to federal civil rights litigation, *see, McNeese v. Board of Education,* 373 U.S. 668, 674, 83 S.Ct. 1433, 10 L.Ed.2d 622 (Douglas, J., dissenting); *Mayor of City of Philadelphia v. Educational Equality League, where*

Apart from the Supreme Court's reluctance to apply *Pullman* abstention to First Amendment, *pure speech* cases, it has carefully tailored the scope of *Pullman's* applicability.[304] In *Wisconsin v. Constantineau,* 400 U.S. 433, 437–439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) the Supreme Court held that a federal district court should not abstain under *Pullman* when a federal plaintiff launches a constitutional challenge against a clear, judicially unconstrued state statute merely because a state court might construe the state statute in a fashion that defuses the constitutional issue. In contrast to *Constantineau, supra,* the Supreme Court, in *Carey v. Sugar,* 425 U.S. 73, 77–79, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1975) applied *Pullman* to a federal constitutional challenge directed at a state prejudgment attachment statute that appeared to be clear on its face,[305] but was also subject to an identifiable trend in state judicial construction which showed that the state courts would probably remedy the statutes constitutional defect through expansive interpretation of the statutory language. The *Carey* approach to *Pullman* abstention does not apply to Sovereign's claims against the Cuyahoga County federal defendants because the Cuyahoga County Court of Appeals, Eighth Appellate District, has demonstrated a trend of judicial construction of Ohio's pandering obscenity statute which exacerbates, rather than ameliorates, the constitutional defects of the statutory scheme which the Cuyahoga County defendants threaten to enforce against Sovereign.

*See, State v. Burgun,* 49 Ohio App.2d 112, 123–124, 359 N.E.2d 1018, 1025–1026 (Cuyahoga County Ohio App.1976) [*Burgun* I]; *State v. Burgun* (Cuyahoga County App., August 18, 1977), Case No. 36078 [*Burgun* II].[306]

In contrast to the *Constantineau* and *Carey* situations, the Supreme Court recognizes that *Pullman* abstention is appropriate when a plaintiff attacks an ambiguous, unconstrued, state statute which is "fairly subject" to a state court construction because it will avoid or at least materially change the nature of the plaintiff's federal attack on the target statute. *See, United States v. Livingston,* 179 F.Supp. 9, 12–13 (E.D.S.C.1959), *aff'd, Livingston v. United States,* 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960), *quoted authoritatively* in *Zwickler v. Koota,* 389 U.S. *supra,* at 250–251, 88 S.Ct. 391. *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) is a paradigm example of *Pullman's* application to a federal challenge directed at an unconstrued state statute, which is "fairly subject" to a clarifying state judicial construction that could abort the federal litigation. *Compare, Steffel,* 415 U.S. *supra,* at 475, fn. 22, 94 S.Ct. 1209.

In *Bellotti, supra,* a federal plaintiff initiated a federal injunctive and declaratory judgment action under the Fourteenth Amendment due process and equal protection clauses, challenging the constitutionality of a Massachusetts abortion statute

the court, citing Douglas in *McNeese, supra,* and *Harrison, supra,* wrote, "Although we have no occasion to decide the issue here there is substantial authority for the proposition that abstention is not favored in an equal protection civil rights case brought as was this one under 42 U.S.C. § 1983 and 28 U.S.C. § 1343," 415 U.S., at 628, 94 S.Ct., at 1337. *See also,* Wechsler, "Federal Jurisdiction and the Revision of the Judicial Code, 13 *Law and Contemporary Problems,* 216, 230 (1948).

**304.** For a discussion of the Supreme Court's application of abstention to state administrative functions, apart from the *Pullman* and *Younger* doctrines, *see, Alabama Public Service Commission v. Southern Railway Company,* 341 U.S. 341, 349–350, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) and the discussion in 1A, Pt.

2 *Moore's Federal Practice* ¶ 0.203[2], pp. 2126–2130 (1977).

**305.** The district court determined the prejudgment attachment statute violative of due process because, according to its language, the attachment could be dissolved only by a post-judgment showing that the "attachment is unnecessary to the security of the plaintiff." *See, Carey,* 425 U.S. *supra,* at 77, 96 S.Ct. at 1209. The Supreme Court did not say that the statutory language itself was ambiguous, but focused its attention on the trend of the state court's application of the language. *See, Carey,* 425 U.S. *supra,* at 78, 96 S.Ct. 1208.

**306.** *See* discussion of *Burgun* II, *infra* at Part V C of this Opinion.

which on its face appeared to require parental consent before an unmarried female under eighteen years old could obtain an abortion. The federal action was filed one day prior to the effective date of the Massachusetts statute. *See, Bellotti, supra,* 428 U.S. at 136, 96 S.Ct. 2857. The majority of the three-judge district court panel held the statute unconstitutional and enjoined its enforcement. The dissenting district court judge concluded that the Massachusetts statute did not absolutely mandate parental consent, but rather furnished the state courts with the power to override the parent's refusal to lend consent, should those courts determine that the minor unmarried female was:

"mature enough to give an informed consent to the abortion and that she has been adequately informed about the nature of an abortion and its probable consequences to her . . . ."[307]

The Supreme Court in *Bellotti* ordered *Pullman* abstention, expressly relying on: (1) the absence of injury to the federal plaintiffs' rights due to the district court's orders restraining the enforcement of the statute from its effective date forward; (2) the federal defendants' and dissenting district court judges', arguments that the abortion consent statute was fairly subject to a narrower interpretation than the construction adopted by the district court majority, and that the narrower construction might render the statute valid under the Fourteenth Amendment; (3) Massachusetts Supreme Judicial Court Rule 3:21, which permits an issue of interpretation of Massachusetts law to be certified directly to the state's highest court for prompt, definitive

resolution with a minimum of delay in the state judicial system.[308]

The *Bellotti* variant of *Pullman* abstention is obviously inapplicable to Sovereign's claims against the Cuyahoga County defendants.[309] *First, Bellotti* involved a Fourteenth Amendment due process and equal protection challenge to a state statute which was fairly susceptible to a narrowing state court construction. In contrast, Sovereign's claims against the Cuyahoga County defendants, assert that Ohio's pandering obscenity and organized crime statutes infringe upon the core of First Amendment interest of protection for *pure expression,* and as discussed above, the Supreme Court, and the Circuit Courts of Appeal, including the Sixth Circuit, have expressed a marked reluctance to abstain, under *Pullman,* from deciding the merits of such *pure expression* claims.[310]

*Second,* in *Bellotti* the Supreme Court determined that the challenged state abortion consent statute was fairly subject to a constitutionally permissible construction. In contrast, this court has found, *infra,* the pandering obscenity statute which the Cuyahoga County defendants threaten to enforce against Sovereign is not fairly subject to a judicial construction which would narrow it to constitutional perimeters.[311] Further, Ohio courts have had numerous opportunities to gloss the statutes presently before the court and their predecessors, but have refused to do so. *See,* Memorandum of Opinion, Part V C, *infra.*

*Third,* Ohio, unlike Massachusetts in the *Bellotti* case, has no certification rule [312] which furnishes an opportunity to avoid the

---

**307.** *See, Bellotti,* 428 U.S. *supra,* at 142, 96 S.Ct. at 2863.

**308.** *See, Bellotti,* 428 U.S. *supra,* at 143–151, 96 S.Ct. 2857.

**309.** *Compare* the decision of the three-judge district court in *Bellotti* II, where the court was compelled to intrude on the operations of the state justice system by staying the effectiveness of the Massachusetts parental consent abortion statute *after* certification to the Massachusetts Supreme Judicial Court. The stay was ordered because the Massachusetts Supreme Judicial Court apparently did not gloss

the statute in a fashion which erased all of the substantial constitutional objections to it. *See, Baird v. Bellotti,* 428 F.Supp. 854, 855–857 (D.C.Mass.1977).

**310.** *See* discussion in fns.292–303 and the intervening text, *supra.*

**311.** *See,* p. 141 of Section V, *infra,* of this Memorandum of Opinion.

**312.** *Compare,* 1A, Pt. 2, *Moore's Federal Practice,* ' 0.203[5], p. 2142, fn.1.

heavy costs of delay, and the chilling effect on Sovereign's future Cuyahoga County operations inherent in the application of *Pullman* abstention to the Cuyahoga County segment of Sovereign's federal complaint. Even if Ohio's pandering obscenity statutes were subject to narrowing a construction by the Ohio courts, a view which this court does not share, the *amicus curiae* and the federal defendants offered this court no materials which demonstrate any inclination on the part of the Ohio courts to attempt to resolve the substantial overbreadth apparent on the face of the pandering obscenity statutes, despite the clear evidence that the state of Ohio actively enforces these statutes and imposes substantial sentences when it secures convictions for their violation. *See, State v. Hustler Magazine and Larry Flynt,* Case No. B76–1618 (Hamilton County County Ohio Common Pleas Court February 8, 1977); [313] *Burgun I,* 49 Ohio App.2d 112, 359 N.E.2d 1018; *Burgun II,* (Cuyahoga County Ohio Appeals, August 18, 1977) Case No. 36078; Sovereign's Hamilton County indictment; Sovereign's Montgomery County Indictment issued May 3, 1977. Furthermore, the Cuyahoga County defendants threat to instigate a third independent, and therefore *multiple,* criminal action against Sovereign, imposes such an overwhelming burden on Sovereign that it constitutes *"extraordinary circumstances"* sufficient to overcome the huge hurdles placed on access to the federal forum under *Younger's* principles. *See, Wooley,* 430 U.S. *supra,* at 710–712, 97 S.Ct. *supra,* at 1433–1434; *Cline,* 274 U.S. *supra,* at 450–453, 466, 47 S.Ct. 681. Significantly, in *Baggett v. Bullitt,* 377 U.S. 360, 378–380, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) the Supreme Court refused to abstain under *Pullman* when a First Amendment, *pure expression* attack was directed at a previously unconstrued state loyalty oath statute which would have caused multiple litigation in the state courts. The *Baggett* court wrote at 378, 84 S.Ct. at 1326:

"It is fictional to believe that anything less than extensive adjudications, under the impact of a variety of factual situations, would bring the oath within the bounds of permissible constitutional certainty. Abstention does not require this." [314]

If this court were now to abstain under *Pullman,* not only would the severe burden of defending multiple prosecutions be thrust back onto Sovereign's shoulders,[315] but that burden would be further augmented in light of the Cuyahoga County Court of Appeals documented hesitation to narrow these substantially overbroad statutes.[316] *Pullman* abstention as to the Cuyahoga County segment of this litigation would require Sovereign to exhaust all judicial remedies available in the separate criminal actions pending in Hamilton and Montgomery Counties, and also insure that Sovereign must conduct its daily future business in Cuyahoga County, under the imminent threat of a third prosecution pursuant to a substantially overbroad and vague statute. Furthermore, Sovereign would be unalterably condemned to litigate such a Cuyahoga County prosecution through three tiers of state courts all the way to Ohio Supreme Court in order to attain a forum which may consider removing the statute's restrictions on the pure expression which is protected under the First Amendment. Thus, abstention under *Pullman* would en-

---

**313.** Although the federal defendants relied on the *Flynt* conviction in arguing that this court should abstain, *see,* Tr. 11, they furnished no material to this court indicating that any state court in that case endeavored to narrow the pandering obscenity statute.

**314.** *See also, Keyishian v. Board of Regents of University of the State of New York,* 385 U.S. 589, 601, fn.9, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

**315.** *Younger,* 401 U.S. *supra,* at 46, 49–50, 91 S.Ct. 746; *Wooley,* 430 U.S. *supra,* at 711, 97 S.Ct. *supra,* at 1434; *Cline,* 274 U.S. *supra,* at 450–453, 466, 47 S.Ct. 681, were explicitly crafted to avoid federal judicial abstention when a federal plaintiff is confronted with the realistic prospect of defending *multiple* state criminal prosecutions under an unconstitutional state statute.

**316.** *See* discussion of *Burgun* I and II in Part V B, *supra,* of this Memorandum of Opinion.

gender a uniquely severe chilling effect on Sovereign's future Cuyahoga County operations in light of the Cuyahoga County Court of Appeals decision in *Burgun* II.

The severe penalty of imprisonment for up to twenty years which may be imposed under these statutes [317] further exacerbates the chilling effect on Sovereign's future operations caused by the extremely narrow opportunity available for Sovereign to promptly litigate the threshold First Amendment issues which threaten to result in a Cuyahoga County criminal prosecution.

This court's refusal to apply the *Younger* and *Pullman* abstention doctrines to Sovereign's claims against the Cuyahoga County defendants is consistent with the comity policy of adequately balancing important state interests against the interests of the federal judiciary. By reaching the merits of Sovereign's claims with respect to the Cuyahoga County authorities, this court does not interfere with any "pending" Ohio prosecution, and at the same time, this court performs the historic duty of the federal judiciary to vindicate every constitutional right [318] by issuing a preliminary injunction and declaratory judgment order protecting Sovereign alone, from the severe burden of maintaining the daily operations of its publication headquarters free from the threat of multiple future criminal prosecutions, under an unconstitutional statute, embodying a severe criminal sanction. This court accomplishes that important protection for Sovereign, at a minimal cost to the interests of the State of Ohio, which is left free to pursue its valid interests of determining the validity of its obscenity statutes in its own judicial institutions, and, if possible, imposing the appropriate sanction if Sovereign is guilty of distributing constitutionally unprotected, obscene materials.

317. *See* Justice Black's dissenting opinion in *Mishkin v. New York*, 383 U.S. 502, 517, 86 S.Ct. 958, 968, 16 L.Ed.2d 56 (1966) where he forecast the difficult problem raised by imposing disproportionately severe penalties for obscenity offenses:

"I would reverse these convictions. The three-year sentence imposed on Mishkin and the five-year sentence imposed on Ginzburg for expressing views about sex are minor in comparison with those more lengthy sentences that are inexorably bound to follow in state and federal courts as pressures and prejudices increase and grow more powerful, which of course they will. Nor is it a sufficient answer to these assuredly ever-increasing punishments to rely on this Court's power to strike down 'cruel and unusual punishments' under the Eighth Amendment. Distorting or stretching that Amendment by reading it as granting unreviewable power to this Court to perform the legislative function of fixing punishments for all state and national offenses offers a sadly inadequate solution to the multitudinous problems generated by what I consider to be the un-American policy of censoring the thoughts and opinions of people. The only practical answer to these concededly almost unanswerable problems is, I think, for this Court, to decline to act as a national board of censors over speech and press but instead to stick to its clearly authorized constitutional duty to adjudicate cases over things and conduct."

*See also, Universal Amusement Co. Inc. v. Vance*, 404 F.Supp. 33, 47–51 (S.D.Texas 1975) (district court invalidated combined application of obscenity statute in conjunction with a statute making it a crime to possess criminal instruments, where the criminal instruments statute carried a penalty of not more than ten years confinement), vacated solely that the three-judge district court may enter a fresh appealable order to the Court of Appeals, *see, Butler v. Dexter*, 425 U.S. 262, 267, fn.12, 96 S.Ct. 1527, 47 L.Ed.2d 774. Several federal courts, including the Sixth Circuit Court of Appeals recognize that prison sentences, within a statutory norm, may be struck down under the Eighth Amendment if they are disproportionately severe. *See, Downey v. Perini*, 518 F.2d 1288, 1290 (6th Cir. 1975), judgment vacated and case remanded for reconsideration only with respect to Ohio Revised Code § 2925.03, effective *after* the date of the Sixth Circuit opinion, at 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975); *Hart v. Coiner*, 483 F.2d 136, 139–143 (4th Cir. 1973), *cert. denied,* 415 U.S. 938, 983, 94 S.Ct. 1454, 39 L.Ed.2d 495 (1974); *United States v. Stein*, 544 F.2d 96, 103 (2nd Cir. 1976) (Judge Lumbard, concurring); *Davis v. Zahradnick*, 432 F.Supp. 444, 449–454 (D.C.Va.1977); *Carmona v. Ward*, 436 F.Supp. 1153, 1163 (S.D.N.Y.1977).

While Sovereign has made an argument in its brief based on the Eighth Amendment, the court will not now consider that argument because Sovereign nowhere included any Eighth Amendment allegations in its complaint. However, Sovereign may move to amend its complaint to include the Eighth Amendment allegations after the issuance of today's order if it so desires.

318. *See* discussion in fn.133, *supra.*

Today's decision, which by declaratory judgment holds only the pandering obscenity statute unconstitutional, is binding as *res judicata* between Sovereign and the Cuyahoga County defendants. Similarly, this court has restricted its preliminary injunction so as to preclude *only* the Cuyahoga County defendants from enforcing, in the future, the pandering obscenity statutes against Sovereign.[319] *See, Doran,* 422 U.S. *supra,* at 925, 926, 931, 95 S.Ct. 2561. Thus Hamilton County and Montgomery County are free to consider the application of those statutes to Sovereign. Those jurisdictions may determine, as has this court,[320] that the pandering obscenity statutes are irretrievably void for vagueness or overbreadth and therefore unenforceable. However, this court recognizes that those jurisdictions may, in good faith, differ with this court's determination that the statutes are irretrievably vague or overbroad and they may choose, in good faith, to attempt to perform the major surgery necessary to narrow them prior to trial, in conformance with First Amendment protections. If the Ohio courts are able to perform such a feat,[321] the State of Ohio's legitimate interests in punishing the spread of obscenity may be implemented.

Having rejected the application of the *Younger* and *Pullman* abstention doctrines to Sovereign's claims against the Cuyahoga County defendants, the court now confronts the merits of Sovereign's assertion that Ohio's pandering obscenity and organized crime statutes violate the First Amendment.

### V.

### THE CONSTITUTIONALITY OF OHIO REVISED CODE §§ 2907.01 and 2907.32

Sovereign News, the plaintiff, claims that the statutes under which it is threatened with prosecution in Cuyahoga County are unconstitutional. Specifically, the plaintiff claims the Ohio Statute governing the pandering of obscenity, Ohio Revised Code § 2907.32, and the related definitional section, Ohio Revised Code § 2907.01, are unconstitutionally overbroad and vague.

### A. OVERBREADTH

The First Amendment to the United States Constitution puts a broad and strong shield around the freedom of expression. *Marcus v. Search Warrants of Property, etc.,* 367 U.S. 717, 730, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); *Speiser v. Randall,* 357 U.S. 513, 520–521, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Controversial and onerous forms of expression are given protection from censorship to insure that legitimate expression is not stifled because of the fear of punishment. *See, e. g., Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976); *Cohen v. California,* 403 U.S. 15, 18–19, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *N.A.A.C.P. v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572; *Bridges v. California,* 314 U.S. 252, 270, 62 S.Ct. 190, 86 L.Ed. 192

---

**319.** Of course the relief shaped in today's order does not preclude Cuyahoga County from enforcing the pandering obscenity and organized crime statutes against individuals other than Sovereign and its owners and employees.

**320.** *See,* Section V, *infra,* of this Memorandum of Opinion.

**321.** As is discussed, *infra,* this court finds that there is no *reasonable* construction that can be placed on the Ohio definitional § 2907.01 that would make the statute constitutional. Because this decision is limited in effect to the parties before it, the court cannot bind Hamilton County or other Ohio counties. However, the court stresses that it finds § 2907.01 irrepa-

rably overbroad. *See,* p. 405, *infra,* this Memorandum of Opinion. This court's decision not to abstain with respect to Cuyahoga County, and the concomitant ruling that the pandering obscenity statutes are unconstitutional is consistent with this court's ruling that it will not enjoin Montgomery County from applying those facially unconstitutional statutes. The Supreme Court created an identical situation in *Doran,* 422 U.S. *supra,* at 929–933, 95 S.Ct. 2561, when it abstained as to one federal plaintiff, and allowed the other federal plaintiff to benefit from its ruling the ordinances in question unconstitutional. *See also, Douglas,* 319 U.S. *supra,* at 165–167, 63 S.Ct. 877.

(1941). Only with an ample breathing space between protected and non-protected expression will this country be able to maintain the open and robust debate and exchange of ideas that a democracy requires. *See, e. g., Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed. 659 (1976).

 Any statute or ordinance that may infringe on protected expression must be closely scrutinized. As the Supreme Court of the United States stated:

> "When we deal with the complex of strands in the web of freedoms which make up free speech, the operation and effect of the method by which speech is sought to be restrained must be subjected to close analysis and critical judgment in light of the particular circumstances to which it is applied." *Speiser v. Randall,* 357 U.S. 513, 520, 78 S.Ct. 1332, 1339, 2 L.Ed.2d 1460 (1958).

*See, e. g., Elrod v. Burns, supra,* 96 S.Ct. at 2684; *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

 The extent of the protection afforded expression varies with the form as well as the time and place during which it occurs. *Linmark Assoc. Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 1618–1619, 52 L.Ed.2d 155 (1977). If the expression takes the form of simply and unobtrusively communicating an idea, with the physical action element limited to the extent necessary to transmit the idea, then the expression is pure expression or speech and is entitled to the highest degree of protection. *See, e. g., Tinker v. Des Moines Independent Com. Sch. Dist.,* 393 U.S. 503, 505–506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). To restrict pure expression the state must show that: (1) A clear and present danger is presented to society by the pure expression,[322] *see, Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919); *City of Madison, etc. v. Wis. Emp. Rel. Com'n,* 429 U.S. 167, 173–176, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976); *Carroll v. President and Commissioners of Princess Anne County,* 393 U.S. 175, 180, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Dennis v. United States,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); (2) The individual's interest in having the pure expression allowed is outweighed by the danger presented to society by permitting the conduct; and (3) The government has used the narrowest restriction on pure expression consistent with the furtherance of the governmental interest involved. *See, Keyishian v. Board of Regents of U. of St. of N. Y.,* 385 U.S. 589, 602, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).[323]

---

**322.** As Justice Oliver Wendell Holmes stated:
> "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Schenck, supra,* 249 U.S. at 52, 39 S.Ct. at 249.

**323.** If the physical action element of the conduct becomes more than just an unobtrusive means to communicate an idea, then the conduct is *speech-plus* and is entitled to a lower degree of protection than *pure speech, see, e. g., United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). As the Supreme Court stated in *Cox v. Louisiana:*
> "We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. *See* the discussion and cases cited in No. 49, post, [379 U.S. [559] at p. 563, 85 S.Ct. [476]] at p. 480, [13 L.Ed.2d 487]. We reaffirm the statement of the Court in *Giboney v. Empire Storage & Ice Co., supra,* 336 U.S. [490], at 502, 69 S.Ct. [684], at 691, 93 L.Ed. 834, that 'it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language either spoken, written, or printed.' " *Cox v. Louisiana,* 379 U.S. 536, 555–556, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965).

To restrict speech-plus the state must show that: (1) a substantial interest of society will be effected by the speech-plus conduct. *See, e. g., United States v. O'Brien, supra,* 391 U.S. at

The printed media, books, pictures and motion pictures are all forms of pure expression which are entitled to the highest degree of protection, i. e., the state must meet the three-pronged clear and present danger test before it may constitutionally restrict them.[324] *See, e. g., Near v. Minnesota,* 283 U.S. 697, 707–723, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 502, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); *cf., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557–558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

▆▆▆▆ The high degree of protection afforded all forms of pure expression does not, with a narrow [325] exception, end when the subject matter of the expression deals with human sexuality, and therefore such material may not be normally restricted or censored. *See, e. g., Roth v. United States,* 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *Marcus v. Search Warrants of Property, etc.,* 367 U.S. 717, 730, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). The "narrow" exception occurs when the contents of what would otherwise be protected expression deals with human sexuality in a manner which is "obscene" under standards established by the United States Supreme Court,[326] then the dissemination or produc-

376–377, 88 S.Ct. 1673; (2) the individual's interest in allowing the speech-plus conduct is insufficient in comparison with the detrimental effect the conduct will have on society; and (3) the government has used the narrowest restriction on pure speech consistent with the furtherance of the governmental interest involved. *See, e. g., Keyishian v. Board of Regents of U. of St. of N. Y.,* 385 U.S. 589, 602, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). An example of speech-plus in the obscenity area would be nude go-go dancers. While there is an expression element to this activity, see, *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932–933, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), the action element is dominant and therefore the degree of protection afforded is reduced. *See, e. g., Miller v. California,* 413 U.S. 15, 26, n.8, 93 S.Ct. 2607, 37 L.Ed.2d 419; *California v. La Rue,* 409 U.S. 109, 116–118, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *Kew v. Senter,* 416 F.Supp. 1101, 1104 (N.D.Texas, 1976); *see also,* Emerson, *The System of Freedom of Expression,* p. 495, Vintage, 1970. The expression-action distinction, with the state being required to show a degree of interest depending on the extent of the action, is applicable to the depiction or description of sexual conduct. *See, Huffman v. United States,* 152 U.S.App.D.C. 238, 470 F.2d 386 (1971) and discussion, *infra.*

324. All media which are used as a means to communicate ideas unobtrusively are forms of expression and are given the highest degree of protection. The message conveyed has not, in the past, determined the degree of protection. As the Supreme Court stated:

"The line between the informing and the entertaining is too elusive for the protection of that basic right [a free press]. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine." *Winters v. New York,* 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

The exception to the rule, as discussed above, is when the contents of the expression constitutes a clear and present danger to society, or as discussed below, when the material is obscene.

325. As the Supreme Court stated:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942); *See, Gooding v. Wilson,* 405 U.S. 518, 520–523, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

326. The court finds that dealing with obscenity in the context of a clear and present danger test allows for a more logical and flexible handling of different fact patterns. This court believes that exposure of juveniles and non-consenting adults to certain forms of sexual depictions may constitute a clear and present danger to society. *See, Miller v. California,* 413 U.S. 15, 19, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); The Report of the Commission on Obscenity and Pornography, pp. 56–62 (1970). However, that same material does not pose such a threat to consenting adults, where there is no likelihood of further dissemination. *See, Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). Additionally, as further information is obtained about the effect of an exposure to sexual depiction, or as the standards of permissiveness change, the clear and present danger test is more readily adaptable. *But see,* Emerson, *The System of Freedom of Expression,* pp. 494, Vintage (1970). The court notes that the Supreme Court has found "obscene" material to be outside the protection of the First Amendment without resort to the clear and present danger test. *See, Ginsberg v. State of New York,* 390 U.S. 629, 641, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

tion of such material may be punished. *See, e. g., Ward v. Illinois,* 431 U.S. 767, 97 S.Ct. 2085, 2087, 52 L.Ed.2d 738 (1977); *Miller v. California,* 413 U.S. 15, 21, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 54, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *United States v. 12 200-ft Reels of Super 8 mm Film,* 413 U.S. 123, 126, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *United States v. Thirty-Seven (37) Photographs,* 402 U.S. 363, 376, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *United States v. Reidel,* 402 U.S. 351, 354, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971); *Kois v. Wisconsin,* 408 U.S. 229, 230, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972); *Jacobellis v. Ohio,* 378 U.S. 184, 188, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); *Roth v. United States,* 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). However, the line between protected expression and obscene material which is subject to restriction must be drawn so as not to unduly infringe protected rights. *See, e. g., Speiser v. Randall,* 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); *Cantwell v. Connecticut,* 310 U.S. 296, 304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Interstate Circuit Inc. v. City of Dallas,* 390 U.S. 676, 684–685, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968).

The sole question in this portion of the opinion is whether Ohio Revised Code §§ 2907.01 and 2907.32 prohibit, *inter alia,* the sale or dissemination of non-obscene material. If these sections do prohibit the sale or dissemination of non-obscene material, then the Ohio obscenity statutes are overbroad [327] on their face because they restrict free expression without a showing that the expression constitutes a clear and present danger to society. To determine if the statutes are overbroad, this court must compare what the United States Supreme Court has found to be obscene and subject to restriction, with the type of material restricted by §§ 2907.01 and 2907.32.

## A(1) "OBSCENE MATERIAL" AS DEFINED BY THE UNITED STATES SUPREME COURT

In 1973 the United States Supreme Court handed down a series of decisions which established a three-part test for determining whether any given material is obscene. The test reads as follows:

"(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value." *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973) (citations omitted).

The court in *Miller* went on to state, "We acknowledge, however, the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene material must be carefully limited. As a result, we now confine the permissible scope of such regulations to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed." *Miller v. California, supra,* 413 U.S. at 23–24, 93 S.Ct. at 2615. (citations omitted)

The *Miller* court gave two examples of the type of sexual material that a state could constitutionally regulate: [328]

"(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

---

**327.** A statute is "overbroad if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972); *see, e. g., Lewis v. New Orleans,* 415 U.S. 130, 132–133, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *Gooding v. Wilson,* 405 U.S. 518, 520–523, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

**328.** The examples given in *Miller* of the sexual conduct, the depiction or description of which can be restricted, were not meant to be exhaustive. *See, Ward v. Illinois,* 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738; *Hamling v. United States,* 418 U.S. 87, 114, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Miller v. California, supra,* 413 U.S. at 25, 93 S.Ct. at 2615.

In reviewing the type of sexual material which can be prohibited by a state statute, the Supreme Court stated in *Miller*:

"Under the holdings announced today, no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct specifically defined by the regulating state law, as written or construed." *Miller v. California, supra,* 413 U.S. at 27, 93 S.Ct. at 2616.

▮▮▮▮▮ Examining the *Miller* opinion with regard to its significance to the case before this court, four important holdings stand out. *First,* only material that depicts or describes sexual conduct can be regulated because it is obscene. *Miller, Id.* at 24, 93 S.Ct. 2607. Material containing violence, brutality or cruelty cannot be considered obscene unless it also contains depictions or descriptions of sexual conduct. Material limited to forms of violence is therefore given the highest degree of protection, *i. e.,* it may not be restricted unless it is shown to constitute a clear and present danger to society. *Secondly,* when sexual material appeals to the prurient interest *and* depicts in a patently offensive way sexual conduct specified in a state statute *and* the work lacks serious literary, artistic, political or scientific value, then it can be found to be obscene. *Miller, Id.* at 24, 93 S.Ct. 2607. The three part *Miller* test is *conjunctive.* The state must establish that all elements of the test are met before restricting material on the grounds that it is obscene.[329] *Third,* only hard core sexual conduct may be restricted. *Miller, Id.* at 27, 93 S.Ct. 2607. Examples of hard core sexual conduct, as announced in *Miller,* are the description or depiction of the ultimate sex acts, excretory function or lewd exhibition of the genitals.[330] *Miller, Id.* at 25, 93 S.Ct. 2607. *Fourth,* statutes proscribing the depiction or description of sexual conduct must *specifically* define the sexual conduct which may not be described or depicted.[331] *Miller, Id.* at 27, 93 S.Ct. 2607.

In a number of opinions handed down subsequent to 1973 the Supreme Court has sought to clarify the *Miller* test.

## A(2) "HARDCORE" [332]

As noted above, *Miller* held that only the depiction or description of "hardcore" sexu-

---

**329.** If the court in *Miller* had meant to make the test disjunctive it would have used the conjunction "or" instead of the conjunction "and." *Cf. Attwood v. Purcell,* 402 F.Supp. 231, 235 (D.Arizona, 1975).

**330.** Part B of the *Miller* test states, "whether the work depicts or describes in a patently offensive way, sexual conduct specifically defined by the applicable state law." *Miller, Id.* at 24, 93 S.Ct. at 2615. The "patently offensive" requirement must be measured by a jury using contemporary community standards. However, if what a jury finds is patently offensive does not amount to a "hard core" depiction or description, as the term is described by the Supreme Court, then a jury's decision will not be allowed to stand. *See, e. g., Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974); *Hamling v. United States,* 418 U.S. 87, 119, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Smith v. United States,* 431 U.S. 291, 97 S.Ct. 1756, 1763–1764, 52 L.Ed.2d 324. In this way the Supreme Court has "constitutionalized" the lower limit of the "patently offensive" requirement, *i. e.,* as shown by *Jenkins,*

the mere depiction or description of nudity is not patently offensive as a matter of constitutional law and cannot be proscribed despite the fact that a jury may find it patently offensive.

**331.** The specificity requirement is taken from Part B of the *Miller* test. The degree of specificity must be sufficient to meet constitutional standards.

**332.** Justice Stewart, borrowing from the Solicitor General's brief, defined hard core pornography as follows:

"* * * Such materials include photographs, both still and motion picture, with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character. They also include strips of drawings in comic-book format grossly depicting similar activities in an exaggerated fashion. There are, in addition, pamphlets and booklets, sometimes with photographic illustrations, verbally describ-

al conduct may be punished as being obscene. *Miller, Id.* at 27, 93 S.Ct. 2607. In *Jenkins v. Georgia* (*Jenkins*), 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) the Supreme Court provided an example of sexual conduct which was not hardcore and therefore could not be restricted. In *Jenkins* the appellant had been convicted by a jury of violating Georgia's obscenity law for distributing the motion picture, "Carnal Knowledge." The Supreme Court reversed the conviction, finding that the film could not, as a matter of law, be found obscene because there were no descriptions or depictions of sexual conduct which was "hardcore." As the court stated:

"While the subject matter of the picture is, in a broader sense, sex, and there are scenes in which sexual conduct including 'ultimate sexual acts' is to be understood to be taking place, the camera does not focus on the bodies of the actors at such times. There is no exhibition whatever of actors' genitals, lewd or otherwise, during these scenes. There are occasional scenes of nudity, but nudity alone is

not enough to make material legally obscene under the *Miller* standards.

"Appellant's showing of the film 'Carnal Knowledge' is simply not the 'public portrayal of hard core sexual conduct for its own sake, and for the ensuing commercial gain' which we said was punishable in *Miller*. We hold that the film could not, as a matter of constitutional law, be found to depict sexual conduct in a patently offensive way, and that it is therefore not outside the protection of the First and Fourteenth Amendments because it is obscene." *Jenkins v. Georgia, supra*, 418 U.S. at 161, 94 S.Ct. at 2755. (citations omitted).

Similarly in *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) the Supreme Court reaffirmed its ruling that mere nudity cannot be found to be obscene, even as to juveniles. *Erznoznik, Id.* at 213, 95 S.Ct. 2268.

▮ The court concludes from *Jenkins* and *Erznoznik* that depictions or descriptions of simple nudity [333] are not "hard core" sexual conduct and cannot be restricted.[334]

ing such activities in a bizarre manner with no attempt whatsoever to afford portrayals of character or situation and with no pretense to literary value. All of this material * * * cannot conceivably be characterized as embodying communication of ideas or artistic values inviolate under the First Amendment. * * *" *Ginzburg v. United States*, 383 U.S. 463, 499, n. 3, 86 S.Ct. 942, 957, 16 L.Ed.2d 31 (1966).

**333.** "Simple" nudity as defined by this court is nudity without an action element. *See* discussion, p. 397, *infra*.

**334.** Further clarification of the sort of depictions or descriptions that the Supreme Court does not consider to be hard core pornography can be gleaned from the pre-*Miller* cases of *Jacobellis v. Ohio*, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1969) and *Redrup v. New York*, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967). In *Jacobellis* the court found that, as a matter of constitutional law, a film called "The Lovers" which had in it "an explicit love scene" was not obscene. *Jacobellis, Id.*, 378 U.S. at 196, 84 S.Ct. 1676. In *Redrup* the court, in a *per curiam* opinion, reversed three convictions under New York, Kentucky, and Arkansas obscenity laws. The material involved paperback books and "girlie" magazines such as Gent, Swank, Bachelor, Modern

Man, Cavalcade, Gentleman, Ace, and Sir. The court found, as a matter of constitutional law that the material involved was not obscene. The usefulness of *Jacobellis* and *Redrup* is limited by the lack of specific description of the material involved, and the fact that a different test than the *Miller* test was employed by some of the judges. *See, A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts*, 383 U.S. 413, 418, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). Of greater assistance are the summary reversals by the Supreme Court of obscenity convictions and the way they have been interpreted. In *Central Magazine Sales, Ltd. v. United States*, 389 U.S. 50, 88 S.Ct. 235, 19 L.Ed.2d 49 the Supreme Court reversed the 4th Circuit Court of Appeals' affirmance of a forfeiture and destruction decree entered into by a district court judge. The contents of one of the magazines that the Supreme Court in *Central Magazine* held, by its reversal, could not constitutionally be obscene, was described by the 4th Circuit as follows:

"*Exclusive* is a collection of photographs of young women. In most of them, long stockings and garter belts are employed to frame the pubic area and to focus attention upon it. A suggestion of masochism is sought by the use in many of the pictures of chains binding

Finally, in *Ward v. Illinois*, 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977) the Supreme Court found the material described below to be hard core pornography.

"'Lust Campus' by Andrew Shaw is a story of sexual adventures on a college campus 'where even members of the faculty taught sin and evil.' The book describes homosexuals 'necking' on a public beach; mutual masturbation; self-fondling; a circle of persons engaged in oral-genital contact; rape; intercourse; lesbian intercourse; cunnilingus and flagellation; flagellation with barbed wire; an abortion with red-hot barbed wire; masturbation with a mirror reflection, and a transvestite episode.

"'Passion Bride' by John Dexter described curricular and extracurricular sexual episodes that take place during a honeymoon on the French Riviera. The book describes masturbation; intercourse; a party between an old man and three prostitutes; attempted intercourse in a bath; lesbian foreplay; flagellation; rape ending in the death of the female from a broken back and intercourse ending in the broken back of the male participant.

"'Crossroads of Lust' by Andrew Shaw describes the sexual adventures of various persons in a small town. There are numerous descriptions of intercourse; lesbian intercourse; oral-genital contact; and rape. A woman stabs a man in the course of intercourse, completing the act after he is dead. There are also three voyeurism scenes, two of which involve watching lesbian love play. The third is characterized by sadism and masochism." *Ward v. Illinois, supra*, 97 S.Ct. at 2089, n. 3.

■ Synthesizing past judicial decisions, this court finds that the line drawn between hard core pornography which is subject to

---

the model's wrists and ankles. Some of the seated models, squarely facing the camera, have their knees and legs widespread in order to reveal the genital area in its entirety. In one of the pictures, all of these things are combined: The model clad only in a framing black garter belt and black stockings is chained to a chair upon which she is seated, facing the camera, with one knee elevated and both spread wide." *United States v. Central Magazine Sales, Ltd.*, 373 F.2d 633, 634 (4th Cir. 1967).

Based on the reversal in this and in other cases, *see, Bloss v. Dykema*, 398 U.S. 278, 90 S.Ct. 1727, 26 L.Ed.2d 230 (1970); *I. M. Amusement v. Ohio*, 389 U.S. 573, 88 S.Ct. 690, 19 L.Ed.2d 776 (1968), the First Circuit was led to state: "We are obliged to conclude that no photograph of the female anatomy, no matter how posed if no sexual activity is being engaged in, or however lacking in social value, can be held obscene." *Hunt v. Keriakos*, 428 F.2d 606, 608 (1970), *cert. denied* 400 U.S. 929, 91 S.Ct. 185, 27 L.Ed.2d 189 (1970).

The continued validity of these decisions is questionable in light of *Miller*. On the other hand, in *Mishkin v. New York*, the Supreme Court agreed with the New York court that material "depicting various deviant sexual practices, such as flagellation, fetishism and lesbianism" was "hard core" pornography. *Mishkin v. New York*, 383 U.S. 502, 508, 86 S.Ct. 958, 963, 16 L.Ed.2d 56 (1966).

However, in *Huffman v. United States*, 163 U.S.App.D.C. 417, 502 F.2d 419 (1974) the Circuit Court of Appeals for the District of Columbia repeated its pre-*Miller* finding that the following was not "hardcore" pornography.

"While detail is distasteful in such matters it can hardly be avoided. And so we note that in Government Exhibit 2, the magazine that Officer Milam purchased, the ladies are nude except for stockings, are in a series of small photographs shown on rear and front cover, with their bodies in close embrace, and the promise of these photographs is extended inside with such photographs as these: one lady either kissing or about to kiss the pubic area of the other; the ladies embracing while one's breast snuggles into the other's body, sometimes front, sometimes rear, their lips about to kiss either while one's breast rests on the other's stomach, or, another time, while the ladies are kneeling, one stomach against another, one's hand caressing the other's buttock." *Huffman v. United States*, 152 U.S.App.D.C. 238, 253, 470 F.2d 386, 401–402 (1971) (quoted in part).

The court in *Huffman* did note that the procedural aspects of the case made moot any consideration of whether the exhibition of genitals contained in the *Huffman* material was lewd. *Huffman v. United States*, 163 U.S.App.D.C. 417, 421, n. 14, 502 F.2d 419, 423, n. 14 (1974); *see also, United States v. Womack*, 166 U.S. App.D.C. 35, 50–51, 509 F.2d 368, 383–384 (1974). *See also, Amato v. Divine*, 496 F.2d 441 (7th Cir. 1974), *remanded*, 419 U.S. 1014, 95 S.Ct. 487, 42 L.Ed.2d 288; on remand 558 F.2d 364 [finding certain men's magazines non-obscene as a matter of law].

restriction, and the depictions and descriptions of sexual conduct which may not be restricted, depends on the amount of physical activity which is connected with the sexual depiction or description. If the human subject of the depiction or description is engaged in sexual action,[335] whether by himself or herself, or with another,[336] then the material is "hard core" sexual conduct, as the Supreme Court used the term, and it may be banned.[337] When, however, the description or depiction is of sexual conduct without a significant action element, i. e., the sexual conduct is of a passive nature,[338] then the description or depiction is not "hard core" and it may not be banned or restricted.[339]

## A(3) SPECIFICITY

The Miller decision required that a statute restricting the depiction or description of sexual conduct must define specifically the nature of the depictions or descriptions

that are barred. Examples of a sufficiently specific statute were given by the court.[340]

The specificity requirement has been reaffirmed by the Supreme Court in two recent decisions. See, Hamling v. United States, 418 U.S. 87, 114, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); Ward v. Illinois, 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977). In Hamling the court made it clear that the two specific examples given in Miller were not exhaustive. Hamling v. United States, supra, 418 U.S. at 114, 94 S.Ct. 2887. In Ward the court discussed the implications of a state obscenity statute not being sufficiently specific: [341]

"Fourth, even assuming that the Illinois statute had been construed to overcome the vagueness challenge in this case and even assuming that the materials at issue here are not protected under Miller, there remains the claim that Illinois has failed to conform to the Miller requirement that a state obscenity law, as written or authoritatively construed, must

**335.** Some examples of sexual action are masturbation, intercourse, cunnilingus, fellatio, and flagellation.

**336.** It is more likely to be "sexual action" when two or more people are the subject of the depiction. However, scenes of masturbation have a sufficient action element to make them "sexual action."

**337.** A finding that the material is hard core as a matter of constitutional law, does not, of course, mean it is obscene and may be banned. The material must be shown to meet all three parts of the Miller test.

**338.** An example of sexual conduct in which there is no action element is a description or depiction of a nude male or female in a state of repose. The fact that a nude human is engaged in action, like walking, running or dancing, does not make the depiction or description hard core. It is only when the depiction or description is of sexual action that it becomes hard core and subject to restriction.

**339.** The action/non-action distinction was thoroughly set out in Huffman v. United States, 152 U.S.App.D.C. 238, 470 F.2d 386 (1971). This court notes that the action/non-action test, with changing degrees of protection based on whether action is present, is consistent with other areas of First Amendment analysis. Further, because the sexual action, sexual non-action distinction is more easily discerned, it re-

duces the chilling effect caused by the exclusion from the protection of the First Amendment of obscene material. Cf., United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Also the adoption of the clear and present danger test for non-action sexual material, with the substantial interest test being employed for material containing sexual "action," would make First Amendment analysis more consistent. See, discussion, supra, p. 391, and fn. 323.

**340.** The examples were: (a) patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated; (b) patently offensive representation or depictions of masturbation, excretory functions, and lewd exhibitions of the genitals.

**341.** The statute in Ward involved Ill.Rev.Stat. C. 38, § 11–20(a)(1) which forbids the sale of obscene matter. Section 11–20(b) defines "obscene" as follows:

"A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, that is, a shameful or morbid interest in nudity, sex or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. A thing is obscene even though the obscenity is latent, as in the case of undeveloped photographs." Ward v. Ill., supra, 97 S.Ct. at 2088.

state specifically the kinds of sexual conduct the description or representation of which the State intends to proscribe by its obscenity law. If Illinois has not complied with this requirement, its statute is arguably overbroad, unconstitutional on its face, and an invalid predicate for Ward's conviction." *Ward v. Ill., supra,* 97 S.Ct. at 2090.

The court, in finding the Illinois statute constitutional, stated:

"As we see it, Illinois has not failed to comply with *Miller,* and its statute is not overbroad. . . . As we understand the Illinois Supreme Court, however, the statute is not vulnerable in this respect. That court expressly incorporated into the statute part (b) of the guidelines . . . ." *Ward, Id.* at 2090.

### B. THE OHIO STATUTE

Having determined the type of depictions or descriptions which may constitutionally be restricted as "obscene," the court must now determine if Ohio's definition of what is "obscene," contained in Ohio R.C. § 2907.-01, comports with, or is at variance to, that standard.

Ohio Revised Code § 2907.32 reads as follows:

"Pandering obscenity.

"(A) No person, with knowledge of the character of the material or performance involved, shall do any of the following:

"(1) Create, reproduce, or publish any obscene material, when the offender knows that such material is to be used for commercial exploitation or will be publicly disseminated or displayed, or when he is reckless in that regard;

"(2) Exhibit or advertise for sale or dissemination, or sell or publicly disseminate or display any obscene material;

"(3) Create, direct, or produce an obscene performance, when the offender knows that it is to be used for commercial exploitation or will be publicly presented, or when he is reckless in that regard;

"(4) Advertise an obscene performance for presentation, or present or participate in presenting an obscene performance, when such performance is presented publicly, or when admission is charged;

"(5) Possess or control any obscene material with purpose to violate division (A)(2) or (4) of this section.

"(B) It is an affirmative defense to a charge under this section, that the material or performance involved was disseminated or presented for a bona fide medical, scientific, educational, religious, governmental, judicial, or other proper purpose, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian, clergyman, prosecutor, judge, or other person having a proper interest in such material or performance.

"(C) Whoever violates this section is guilty of pandering obscenity, a misdemeanor of the first degree. If the offender has previously been convicted of a violation of this section or of section 2907.31 of the Revised Code, then pandering obscenity is a felony of the fourth degree.[342]

Ohio Revised Code § 2907.01 reads:

"Definitions.

"As used in sections 2907.01 to 2907.37 of the Revised Code:

"(A) 'Sexual conduct' means vaginal intercourse between a male and female, and anal intercourse, fellatio, and cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

"(B) 'Sexual conduct' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

"(C) 'Sexual activity' means sexual conduct or sexual contact, or both.

"(D) 'Prostitute' means a male or female who promiscuously engage in sexual

---

**342.** Section 2907.32 was enacted by the state legislature as part of House Bill 511. The bill was signed by the governor in 1972 and was effective on January 1, 1974.

activity for hire, regardless of whether the hire is paid to the prostitute or to another.

"(E) Any material or performance is 'harmful to juveniles,' if it is offensive to prevailing standards in the adult community with respect to what is suitable for juveniles, and if any of the following apply:

"(1) It tends to appeal to the prurient interest of juveniles;

"(2) It contains a display, description, or representation of sexual activity, masturbation, sexual excitement, or nudity;

"(3) It contains a display, description, or representation of bestiality or extreme or bizarre violence, cruelty, or brutality;

"(4) It contains a display, description, or representation of human bodily functions of elimination;

"(5) It makes repeated use of foul language;

"(6) It contains a display, description, or representation in lurid detail of the violent physical torture, dismemberment, destruction, or death of a human being.

"(7) It contains a display, description or representation of criminal activity that tends to glorify or glamorize the activity, and that, with respect to juveniles, has a dominant tendency to corrupt.

"(F) When considered as a whole, and judged with reference to ordinary adults or, if it is designed for sexual deviates or other specially susceptible group, judged with reference to that group, any material or performance is 'obscene' if any of the following apply:

"(1) Its dominant appeal is to prurient interest;

"(2) Its dominant tendency is to arouse lust by displaying or depicting sexual activity, masturbation, sexual excitement, or nudity in a way that tends to represent human beings as mere objects of sexual appetite;

"(3) Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;

"(4) Its dominant tendency is to appeal to scatological interest by displaying or depicting human bodily functions of elimination in a way that inspires disgust or revulsion in persons with ordinary sensibilities, without serving any genuine scientific, educational, sociological, moral, or artistic purpose;

"(5) It contains a series of displays or descriptions of sexual activity, masturbation, sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily for its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral, or artistic purpose.

"(G) 'Sexual excitement' means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

"(H) 'Nudity' means the showing, representation, or depiction of human male or female genitals, pubic area, or buttocks with less than a full, opaque covering, or a female breast with less than a full, opaque covering of any portion thereof below the top of the nipple, or of covered male genitals in a discernibly turgid state.

"(I) 'Juvenile' means an unmarried person under the age of eighteen.

"(J) 'Material' means any book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture film, phonographic record, or tape, or other tangible thing capable of arousing interest through sight, sound, or touch.

"(K) 'Performance' means any motion picture, preview, trailer, play, show, skit, dance, or other exhibition performed before an audience.

"(L) 'Spouse' means a person married to an offender at the time of an alleged offense, except that such person shall not be considered the spouse when any of the following apply:

"(1) When the parties have entered into a written separation agreement authorized by section 3103.06 of the Revised Code;

"(2) During the pendency of an action between the parties for annulment, divorce, dissolution of marriage, or alimony;

"(3) In the case of an action for alimony, after the effective date of the judgment for alimony." [343]

The court finds that in four separate instances § 2907.01 defines "obscenity" in a manner that restricts constitutionally protected expression.

█ *First*: Section 2907.01(F)(1)(2)(3)(4) and (5) fail to incorporate the three-part *Miller* test. The *Miller* test is a conjunctive three-part test, *all* parts of which must be satisfied before the material may be found obscene. *See,* discussion on p. 394, *supra.* However, under Ohio Revised Code § 2907.01 material may be found obscene without the state being required to prove each of the three parts of *Miller.*[344] An example of this is § 2907.01(F)(1) which defines as "obscene," material whose ". . . dominant appeal is to prurient interest." Under Subsection (F)(1), the *Miller* requirements that (b) the material be "patently offensive" and (c) that , "taken as a whole, it lacks serious literary, artistic, political or scientific value," need not be proven by the state before material can be found obscene. It is evident, therefore, that material which is not patently offensive, and which has, for example serious literary value, may, under Ohio Revised Code § 2907.01(F)(1), be found to be obscene. The Court concludes that Ohio R.C. § 2907.01 restricts material which is not 'obscene', making the statute overbroad.

█ *Second*: Section 2907.01(F)(3) unconstitutionally restricts the display or depiction of extreme or bizarre violence, cruelty or brutality. It is an express holding of *Miller* that only material depicting or describing sexual conduct may be barred as being obscene. *See, Miller v. California, supra,* 413 U.S. at 24, 93 S.Ct. 2607. Therefore, the restrictions placed on the description or depiction of extreme violence unconstitutionally restrains free expression, and the statute is therefore overbroad.

█ *Third*: Sections 2907.01(F)(1)(2)(3) and (5) unconstitutionally restrict the display and description [345] of non-active sexual conduct. For example, simple nudity, such as the showing of a female breast or a male buttocks, may be considered obscene under § 2907.01(F). A sexual depiction of that kind is not hardcore pornography, and cannot be restricted as being obscene. *See,* p. 397, *supra.* Therefore the court finds § 2907.01(F)(1)(2)(3) and (5) are overbroad in that they restrict non-hardcore sexual conduct.

█ *Fourth*: Section 2907.01(F)(1) does not define with the requisite specificity the sexual acts the description or depiction of which is restricted. Subsection (F)(1) declares that any material whose "dominant appeal is to prurient interest" is obscene. The subsection is unconstitutionally overbroad because it does not list the types of sexual conduct to be restricted,[346] and therefore may be applied to the depiction of sexual conduct not subject to restriction.

---

**343.** Section 2907.01, as reproduced above, became effective August 27, 1975.

**344.** The court finds the Ohio definition of obscenity to be disjunctive, as is demonstrated by the concluding phrase of Subsection (F), ". . . any material or performance is 'obscene' if *any* of the following apply:" Ohio Revised Code § 2907.01(F) (emphasis added).

**345.** It is important to note that this opinion does not mean that live public nudity may not be restricted. *See, Roth v. United States,* 354

U.S. 476, 512, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (Douglas, J., dissenting). *But see, Doran,* 422 U.S. *supra,* 932–933, 95 S.Ct. 2561.

**346.** An obscenity statute which only limits hard core sexual conduct may still be overbroad because it does not list the types of conduct specifically. *See, Ward v. Illinois, supra,* 97 S.Ct. at 2090–2091. There is some doubt, however, as to whether such a statute is "substantially" overbroad. *See, Ward, Id.* at 2091.

## C. OHIO COURTS' INTERPRETATION OF § 2907.01

The court's finding that Ohio Revised Code §§ 2907.01 and 2907.32 [347] are overbroad on their face does not end the analysis. The defendants argue correctly that if §§ 2907.01 and 2907.32 have been construed by an authoritative Ohio court to be limited in their reach to constitutional parameters, then the statutes are constitutional.[348] See, e. g., Miller v. California, supra, 413 U.S. at 27, 93 S.Ct. 2607 (1973); United States v. 12 200-ft Reels of Super 8mm Film, 413 U.S. 123, 130, n. 7, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); Hamling v. United States, 418 U.S. 87, 107, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

The main thrust of the defendants'[349] argument is based on the case of State v. Burgun (1976) (Burgun I ), 49 Ohio App.2d 112, 359 N.E.2d 1018. In Burgun I,[350] the Cuyahoga County Court of Appeals of Ohio, Eighth District, was faced with a claim, inter alia, that Ohio Revised Code § 2907.-01(F) was overbroad, because it did not comport with the requirements of Miller. In rejecting the overbreadth argument the Burgun I court stated:

"Arguably R.C. 2907.01(F) does not on its face incorporate all of the elements of the Miller test. In instructing the jury, however, the trial judge narrowed the statutory definition of obscenity by restricting it to apply only to that material that was obscene under the tests laid down in Miller. A state statute which does not meet the standards of Miller may still be valid if the Miller tests are incorporated into the statutory definition

of obscenity by judicial construction. If R.C. 2907.01(F) is overbroad, it was properly narrowed by the trial judge to comport with the standards laid down in Miller v. California, supra, and the appellant was not prejudiced." State v. Burgun, supra, 49 Ohio App.2d at 123–124, 359 N.E.2d at 1025.

It is unclear, based on the above-quoted language, whether the Eighth District Court of Appeals [351] of Ohio gave § 2907.-01(F) an authoritative construction limiting the statute by the Miller tests, or whether the appellate court had simply found that because the trial court had instructed the jury consistent with Miller, the defendant had not been prejudiced by any alleged overbreadth. However, in a subsequent case, State v. Burgun (August 18, 1977), Slip Op. No. 36078 (Burgun II ), the Eighth District Court of Appeals makes it evident that § 2907.01 has not been interpreted to contain the Miller test, but regardless of this fact, it is not overbroad or vague.

In Burgun II the Ohio Court of Appeals approved a jury instruction which used the statutory definition contained in Ohio Revised Code § 2907.01(F) to define "obscenity" for the jury. Therefore, a fortiori, the court in Burgun II found § 2907.01(F) to comport with constitutional requirements without the need for a narrowing construction and without the incorporation of the Miller test. As the court stated:

"In State v. Burgun, supra, we stated that it was arguable that R.C. 2907.01(f) was overbroad because the statute did not incorporate, on its face, all the ele-

---

**347.** Ohio Revised Code § 2907.32 is overbroad on its face because it uses the overbroad definition of obscenity provided in § 2907.01.

**348.** A federal court may not place a narrowing interpretation on a state statute. See, e. g., Gooding v. Wilson, 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); Hynes v. Mayor and Council of Borough of Oradell, 425 U.S. 610, 96 S.Ct. 1755, 1761–1762, 48 L.Ed.2d 243 (1976); United States v. Thirty-Seven Photographs, 402 U.S. 363, 364, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); United States v. 12 200-ft Reels of Super 8 mm Film, 413 U.S. 123, 130, n. 7, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973).

**349.** See, Brief in Opposition to Motion for Preliminary and Declaratory Relief of Defendant Cleveland Police Officers.

**350.** The Burgun I opinion was authored by Judge Corrigan. Judge Corrigan concurred in the Burgun II opinion.

**351.** The Cuyahoga Court of Appeals can give authoritative interpretations to state statutes if, as in this case, the state Supreme Court has not passed on the issue. See, West v. American Tel. & Tel., 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1974).

ments of the *Miller* test. However, we went on to say that, under the specific factual circumstances of that case, the appellant could not complain that she was prejudiced because the trial judge narrowed the statutory definition of obscenity by instructing the jury that the only material which could be considered obscene would be that which complied with the *Miller* test. We, therefore, were able to say that '[i]f R.C. 2907.01(F) is overbroad, it was properly narrowed by the trial judge to comport with the standards laid down in *Miller v. California, supra,* and the appellant was not prejudiced.'

"But, *State v. Burgun, supra,* went an important step further when the court declared, in overruling the same assignment of error as presented herein:

"Prior to the revision of the Criminal Code in 1974, Ohio's definition of obscenity was found at R.C. 2905.34. R.C. 2905.34 was similar to Ohio's present definition of obscenity with the exception that the present definition is more precise in defining what constitutes obscenity. In construing R.C. 2905.34 the Ohio Supreme Court held that the statute was constitutionally sound and that it complied with *Miller v. California* (1973), 413 U.S. 15 [93 S.Ct. 2607, 37 L.Ed.2d 419]. *State ex rel. Sensenbrenner v. Book Store* (1973), 35 Ohio St.2d 220 [301 N.E.2d 695]; *see also Hollington v. Ricco* (C.A.Cuyahoga Cty. 1973), 40 Ohio App.2d 57 [318 N.E.2d 442]. These cases support the conclusion that R.C. 2907.01(F), which is more precise and definite than R.C. 2905.34, is likewise not overbroad or vague. Id. [49 Ohio App. 2d], p. 124 [359 N.E.2d 1018].

"We reaffirm that conclusion here and hold that it is equally applicable to a case where, as here, the trial judge instructed the jury that, for purposes of the pandering obscenity statute, R.C. 2907.32(A)(4), *they need only consider the statutory definition of obscenity, R.C. 2907.01(F), in determining whether or not the material is obscene.*" *Burgun II, supra,* Slip Op. at pp. 6–7. (emphasis added).

In passing on the second assignment of error the *Burgun* II court went on to state:

" '2. THE COURT ERRED IN REFUSING TO CHARGE THE JURY ON THE DEFINITION OF OBSCENITY AS PRESCRIBED IN *MILLER v. CALIFORNIA,* 413 U.S. 15 [93 S.Ct. 2607, 37 L.Ed.2d 419] (1973).'

"In the instant case, the trial judge charged the jury that it could find the defendant guilty of pandering obscenity under R.C. 2907.32 if the film were 'obscene' under the statutory definition of obscenity as given in R.C. 2907.01(F).

"While the appellant does not abandon his contention that the Ohio definition of obscenity, does not, in the first instance, comport with the requirements of *Miller v. California, supra,* he also argues that the jury was misled and prejudiced by the refusal of the trial judge to charge the jury, as requested, that it could find the material 'obscene' under the Ohio statutory definition *only* if the material met the three element test comprising the First Amendment constitutional standard of obscenity set forth in *Miller v. California, supra.* The appellant therefore contends that the trier of facts was deprived of 'all matters of law necessary for the information of the jury in giving its verdict.' R.C. 2945.11.

"Since it has been admitted that the jury charge was in conformity with the statutory language of R.C. 2907.01(F), and since we have found under the first assignment of error that R.C. 2907.01(F) is constitutionally sound, neither vague nor overbroad, and comports with the specificity requirements of *Miller v. California, supra,* and since the Ohio Supreme Court has held that R.C. 2905.34, the predecessor definitional section of obscenity to R.C. 2907.01(F), comports with the *Miller* standards, *State ex rel. Keating v. Vixen* (1973), 35 Ohio St.2d 215, 219 [301 N.E.2d 880], we hold that the defendant was not prejudiced by a jury charge which defined obscenity in the language of R.C. 2907.01(F), nor was the defendant prejudiced by the refusal of the trial judge to supply the jury with an adden-

dum charge under *Miller*. We find, therefore, that it is not constitutionally necessary to superimpose a *Miller* charge onto a proper jury instruction under R.C. 2907.01(F).

"Accordingly, we overrule appellant's assignment of error 2." *See, Burgun II, supra,* Slip Op. at pp. 7–8.

The finding of the *Burgun II* court that § 2907.01 is constitutional without a limiting gloss is consistent with the Ohio Supreme Court's decision in *State ex rel. Keating v. Vixen* (1973), 35 Ohio St.2d 215, 301 N.E.2d 880 and *State ex rel. Sensenbrenner v. Adult Book Store* (1973), 35 Ohio St.2d 220, 301 N.E.2d 695. *Vixen* and *Sensenbrenner* found the Ohio definition of "obscene" contained in § 2905.34 [superseded January 1, 1974 by § 2907.01], the language of which is very similar to § 2907.01, to be constitutional without the need for a limiting interpretation.[352]

Because this court has found § 2907.01 to be overbroad on its face, and that it has not been narrowed to constitutionally permitted parameters by an authoritative state court interpretation,[353] the court finds Ohio Revised Code §§ 2901.01 and 2907.32 to be overbroad.

## D. "SUBSTANTIAL OVERBREADTH" AND "READILY SUBJECT TO A NARROWING CONSTRUCTION"

 Finally, though the court concludes that Ohio Revised Code §§ 2907.01 and 2907.32 are overbroad on their face, this court must still decide whether the statutes should be declared unconstitutional. Declaring a state statute facially unconstitutional because of overbreadth "is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). *See, e. g., Bigelow v. Virginia*, 421 U.S. 809, 817, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

As the Supreme Court stated in *Erznoznik v. Jacksonville* :

**352.** Prior to the revision of the criminal code in 1973 R.C. § 2905.34 contained the Ohio definition of "obscenity." The definition contained in R.C. § 2905.34 is very similar to the definition contained in R.C. § 2907.01 and therefore the past interpretation by the Ohio Supreme Court of § 2905.34 should indicate how that court would view § 2907.01. In this regard there are two significant decisions. First, in *State ex rel. Keating v. Vixen* (1973), 35 Ohio St.2d 215, 301 N.E.2d 880, the Supreme Court of Ohio found that § 2905.34 comported with the standards established in *Miller*. The court stated,

"This court is of the opinion that the statutes applied in this cause initially by the court comport with the standards enunciated in *Miller*. Therefore, we adhere to our holding that the motion picture [from] Vixen 'does depict numerous acts of purported sexual intercourse . . . for a commercial purpose.' in violation of R.C. 2905.34 and 2905.35, and that its 'exhibition may be enjoined as provided in R.C. § 3767.02 et seq.'" *Vixen, supra,* 35 Ohio St.2d at 219, 301 N.E.2d at 882.

Then in *State ex rel. Sensenbrenner v. Adult Book Store,* 35 Ohio St.2d 220, 301 N.E.2d 695 (1973), the Ohio Supreme Court stated that the statute, on its face, may be used to determine if material is obscene. *See, Sensenbrenner, supra,* 35 Ohio St.2d at 221, 301 N.E.2d 695. *See also, Hollington v. Ricco,* 40 Ohio App.2d 57,

63, fn. 5, 318 N.E.2d 442 (8th Dist.App.1973). The language of *Vixen* and *Sensenbrenner* makes it evident that the Ohio Supreme Court found that § 2905.34 met the constitutional requirements of *Miller,* without reading the *Miller* test into § 2905.34. This interpretation of *Vixen* and *Sensenbrenner* is confirmed by *Burgun II* which cites *Sensenbrenner* and then holds that a jury instruction defining obscenity by reading § 2907.01 alone, and without any reference to the *Miller* test, is constitutionally proper. This court finds that Ohio courts have consistently found § 2907.01 [2905.34] to be constitutional without a restricting gloss. *See, e. g., Vixen, supra,* 35 Ohio St.2d 215, 301 N.E.2d 880; *Sensenbrenner, supra,* 35 Ohio St.2d 220, 301 N.E.2d 695; *Hollington v. Ricco, supra,* 40 Ohio App.2d 57, 318 N.E.2d 442; *Burgun I, supra,* 49 Ohio App.2d 112, 359 N.E.2d 1018; *Burgun II, supra.* The court notes that the decisions by the Ohio Supreme Court in *Vixen* and *Sensenbrenner* required the appellate court in *Hollington* to find as it did.

**353.** In the other unreported opinions the Eighth District Court of Appeals, Cuyahoga County, held that a jury charge on *Miller* by a Common Pleas Court Judge precluded the defendant from arguing facial overbreadth. *See, State v. Turoso* (July 14, 1977, No. 36368) p. 8; *State v. Bayless* (July 21, 1977, No. 36264) p. 9.

"This Court has long recognized that a demonstrably overbroad statute or ordinance may deter the legitimate exercise of First Amendment rights. Nonetheless, when considering a facial challenge it is necessary to proceed with caution and restraint, as invalidation may result in unnecessary interference with a state regulatory program. In accommodating these competing interests the Court has held that a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts . . . and its deterrent effect on legitimate expression is both real and substantial." *Erznoznik v. Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975) (citations omitted).

*See also, Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310 (1976).

■ Applying the principles of *Erznoznik* [354] the court must determine (1) whether § 2907.01 is "substantially" overbroad and (2) whether the statutes could "readily" be "narrowed" by a state court.

The court finds the overbreadth of the Ohio definitional section 2907.01 real and substantial. Protected expression is re-stricted by § 2907.01 and, though the form of expression may not be appealing, it may not be censored under the Supreme Court's interpretation of the First Amendment. Significantly, the overbreadth is not simply technical. In four different instances Ohio Revised Code § 2907.01 goes beyond the suppression of just obscene material. *See* p. 400, *supra.* The degree of the impact on First Amendment rights is substantial because of the extent of the overbreadth. Further, the chilling effect of Ohio's obscenity statute is multiplied by the large number of persons caught in the statute's web [355] as well as the severe penalties that may be meted out for violations of the obscenity laws. *See,* Ohio Revised Code § 2923.04; *Ohio v. Flynt,* No. B 76 1618 (Hamilton Cty., Ohio C.P., February 8, 1977) (order entering judgment). The possibility of heavy criminal penalties combined with high numbers of persons subject to these penalties would make even a technical impingement on the First Amendment rights a substantial overbreadth.

On the question of whether an Ohio court can put an authoritative gloss on § 2907.01 thereby making it constitutional, the court finds that this cannot be done "readily." [356]

**354.** The Supreme Court, though reluctant to declare a statute unconstitutionally overbroad on its face, has in numerous cases employed this device to protect First Amendment rights from being impinged.

"It matters not that the words appellee used might have been constitutionally prohibited under a narrowly and precisely drawn statute. At least when statutes regulate or proscribe speech and when 'no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution,' the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity,'. . . . This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson,* 405 U.S. 518, 520–521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972) (citations omitted).

*See, e. g., Lewis v. New Orleans,* 415 U.S. 130, 133–134, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *Coates v. Cincinnati,* 402 U.S. 611, 619–620, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (White, J., dissenting); *United States v. Raines,* 362 U.S. 17, 21–22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

In *Erznoznik* itself the Supreme Court found the statute under consideration facially overbroad. *See, Erznoznik v. Jacksonville, supra,* 422 U.S. at 217, 95 S.Ct. 2268. *See also, Doran,* 422 U.S. *supra,* at 933, 95 S.Ct. 2561.

**355.** The Ohio obscenity laws have been applied against cashiers, projectionists and other employees of commercial establishments selling material that depicts or describes sexual conduct. *See, State v. Burgun, supra,* 49 Ohio App.2d 114–115, 359 N.E.2d 1018; *State v. Bayless, supra* (No. 36264); *State v. Turoso, supra* (No. 36368). *See also,* Ohio Revised Code § 2907.35.

**356.** In *Erznoznik, supra,* the court stated the standard for substantial overbreadth as being whether a state statute is "readily subject to

Section 2907.01 does not lend itself to a narrowing construction. The statute is so substantially overbroad that only radical surgery could save it. *See, Attwood v. Purcell,* 402 F.Supp. 231, 234 (D.Ariz.1975). For example, the statute defines the depiction of violence as "obscene." *See,* Ohio Revised Code § 2907.01(F)(3). No reasonable judicial interpretation of this section can save it from unconstitutionally impinging on free expression. Another example is that the depiction of simple nudity is defined as obscene. *See,* Ohio Revised Code § 2907.01(F)(5) and (H). No gloss that would sufficiently narrow this section is reasonably available. Finally, each section of Ohio Revised Code § 2907.01(F) lacks one or two parts of the three part *Miller* test. To restructure Ohio Revised Code § 2907.-01(F) into a conjunctive statute in order to satisfy the *Miller* test, when it is a disjunctive statute on its face, would require strained reasoning by an Ohio court. This court cannot presume Ohio courts will not interpret § 2907.01 reasonably. The court concludes that § 2907.01 is not "readily subject" to narrowing by state court interpretation. *See, e. g., Allied Artists Pictures Corp. v. Alford,* 410 F.Supp. 1348, 1356–1357 (W.D.Tenn.1976); *Attwood v. Purcell,* 402 F.Supp. 231, 234 (D.Ariz.1975); *Stroud v. Indiana,* Ind., 300 N.E.2d 100 (1973).

Additionally, even if § 2907.01 was readily susceptible to being narrowed by a state court interpretation, the court nevertheless would find the statute unconstitutionally overbroad. Ohio courts have had a number of opportunities to narrow the state statutes, but have failed to do so. *See, e. g.,*

narrowing construction by the state [court]." *Erznoznik v. Jacksonville, supra,* 422 U.S. at 216, 95 S.Ct. at 2276. The court therefore applies the "readily" standard of *Erznoznik.*

**357.** The Supreme Court in *Grayned* set forth the reasons that vague laws are unconstitutional:

"Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second,

*Burgun I and II, supra.* Ohio courts have found § 2907.01 facially constitutional. The Supreme Court in *Erznoznik* recognized that the refusal of state courts to place a narrowing construction on a state statute militates against avoidance by a federal court of a First Amendment overbreadth question. *See, Erznoznik v. Jacksonville, supra,* 422 U.S. at 216, 95 S.Ct. 2268. Further, the effect of this court issuing a declaratory judgment that § 2907.01 is unconstitutional, is limited. *See, Doran v. Salem Inn,* 422 U.S. 922, 930–931, 95 S.Ct. 2561, 45 L.Ed.2d 48 (1975); *Steffel v. Thompson,* 415 U.S. 452, 467–473, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Such a declaration precludes solely the prosecution of the plaintiff by Cuyahoga County for any offense which uses Ohio Revised Code § 2907.01(F) to define obscenity. Therefore, in light of the substantial restriction placed on protected expression by § 2907.01, and the mitigating factors mentioned above, this court declines to avoid the First Amendment overbreadth issue even if § 2907.01 is readily subject to a narrowing construction.

The court declares that Ohio Revised Code §§ 2907.01 and 2907.32 are unconstitutionally overbroad on their face.

## E. VAGUENESS

The Supreme Court has stated, "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972).[357] *See, e.*

if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked.' " *Grayned v. City of Rockford,*

*g., Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975); *Smith v. Goguen,* 415 U.S. 566, 572–573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). Further, statutes which impinge on the area of freedom of expression must have a " . . . greater degree of specificity than in other contexts," *Goguen, supra,* 415 U.S. at 573, 94 S.Ct. at 1247, so as to insure that citizens will not be "chilled" from exercising their constitutional right to free expression.[358] *See, e. g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Stromberg v. California,* 283 U.S. 359, 369–370, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Edwards v. South Carolina,* 372 U.S. 229, 238, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

▮▮▮ Because of the need for greater clarity when a statute restricts conduct closely associated with expression, the Su-

preme Court has established special standards for determining vagueness.[359] In *Miller v. California,* the Supreme Court required that statutes restricting "obscene" material "specifically define" the forms of sexual conduct restricted. *Miller v. California, supra,* 413 U.S. at 27, 93 S.Ct. 2607. Applying this standard[360] to Ohio Revised Code § 2907.01(F) the court finds that the statute fails to specify the types of sexual conduct that are banned.[361]

The court therefore declares Ohio Revised Code § 2907.01(F) unconstitutionally vague.

## VI.

### CONSTITUTIONALITY OF OHIO REVISED CODE § 2923.04

▮▮▮ Sovereign News, the plaintiff, claims that Ohio Revised Code § 2923.04,[362]

408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972).

**358.** As the Supreme Court stated,
" . . . stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." *Smith v. California,* 361 U.S. 147, 151, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959); *Haynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976).

**359.** The standard normally used in determining if a statute is vague, is whether " . . . men of common intelligence must necessarily guess at its meaning." *See, e. g., Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

**360.** In all other ways the court finds § 2907.01 to be sufficiently precise. Statutes of a more vague nature than § 2907.01(F) have been approved by the Supreme Court. As that court stated,
"Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. ' * * * [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices * * *.' These words, ap-

plied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark '* * * boundaries sufficiently distinct for judges and juries fairly to administer the law * * *. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense * * *.' " *Roth v. United States, supra,* 354 U.S. at 491–492, 77 S.Ct. at 1312.
The statute approved in *Roth v. United States, supra,* 354 U.S. at 479, n.1, 77 S.Ct. at 1306 read in part:
"Every obscene, lewd, lascivious or filthy book, pamphlet, picture, paper, letter, writing, print or other publication of an indecent character;"
It must be noted, however, that at the time of *Roth* there was no "specificity" requirement for obscenity statutes.

**361.** In *Ward v. Illinois,* 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977), the Illinois obscenity statute did not contain specific examples. However, in *Ward,* the Illinois court had previously found the specific form of depiction that Ward was charged with, as being covered by the statute, so that Ward was on notice. That is not the case here.

**362.** Ohio Revised Code § 2923.04 reads:
"(A) No person, with purpose to establish or maintain a criminal syndicate or to facilitate any of its activities, shall do any of the following:
"(1) Organize or participate in organizing a criminal syndicate or any of its activities;

commonly referred to as the organized crime statute, read in conjunction with Ohio's obscenity statutes, is unconstitutionally overbroad and vague.[363]

## A. OVERBREADTH

As previously stated, declaring a state criminal statute unconstitutional because of overbreadth is a grave step which often has a widespread effect on the state's legitimate police power functions and consequently will only be taken when the state statute is (1) clearly overbroad; (2) not reasonably subject to a corrective state court interpretation; and (3) substantially impinges on constitutionally protected rights. *See, e. g., Erznoznik v. Jacksonville, supra,* 422 U.S. at 216, 95 S.Ct. 2268; *Young v. American Mini Theatres Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310 (1976); *Bigelow v. Virginia, supra,* 421 U.S. at 817, 95 S.Ct. 2222; *Broadrick v. Oklahoma, supra,* 413 U.S. at 613, 93 S.Ct. 2908. In this case Sovereign News claims that Ohio R.C. § 2923.04 is overbroad in that when read in conjunction with §§ 2907.01 and 2907.32 it subjects to severe criminal penalties all members of publishing houses which publish, *inter alia,* material which may be considered obscene in Ohio. The plaintiff contends that the extensive web of § 2923.04 unconstitutionally restricts free expression because of the fear of punishment those engaged in publishing will have if they approach the line between obscene and non-obscene material. This court is sympathetic to the plaintiff's argument. However, the court has today declared sections 2907.01 and 2907.32 unconstitutional, and therefore section 2923.04 no longer even arguably "substantially impinges on [the] constitutionally protected right" of free speech.[364] The court therefore declines to decide whether § 2923.04 is unconstitutionally overbroad.

## B. VAGUENESS

The court likewise declines to pass on the question of the alleged vagueness of

"(2) Provide material aid to a criminal syndicate or any of its activities, whether such aid is in the form of money or other property, or credit;

"(3) Manage, supervise, or direct any of the activities of a criminal syndicate, at any level of responsibility;

"(4) Furnish legal, accounting, or other managerial services to a criminal syndicate;

"(5) Commit, or conspire or attempt to commit, or act as an accomplice in the commission of, any offense of a type in which a criminal syndicate engages on a continuing basis;

"(6) Commit, or conspire or attempt to commit, or act as an accomplice in the commission of, any offense of violence;

"(7) Commit, or conspire or attempt to commit, or act as an accomplice in the commission of bribery in violation of section 2921.02 of the Revised Code.

"(B) Whoever violates this section is guilty of engaging in organized crime, a felony of the first degree.

"(C) As used in this section, 'criminal syndicate' means five or more persons collaborating to promote or engage in any of the following on a continuing basis:

"(1) Extortion or coercion in violation of section 2905.11 or 2905.12 of the Revised Code;

"(2) Compelling or promoting prostitution, or procuring in violation of section 2907.21, 2907.22, or 2907.23 of the Revised Code;

"(3) Any theft offense as defined in section 2915.01 of the Revised Code;

"(4) Any gambling offense as defined in section 2915.01 of the Revised Code;

"(5) Illegal trafficking in drugs of abuse, in intoxicating or spirituous liquor, or in deadly weapons or dangerous ordnance as defined in section 2923.11 of the Revised Code;

"(6) Lending at usurious interest, and enforcing repayment by illegal means;

"(7) Any offense for the purpose of gain.

"(D) A criminal syndicate retains its character as such even though one or more of its members does not know the identity of one or more other members, and *even though its* membership changes from time to time.

**363.** Sovereign News in its brief claims that § 2923.04 is unconstitutional because it effects a cruel and unusual punishment. This issue was not raised in the plaintiff's complaint and is therefore not presently cognizable by this court. *See,* fn. 317, *supra.*

**364.** Clearly §§ 2907.01 and 2907.32 may not be used in conjunction with § 2923.04 against Sovereign News in Cuyahoga County because they are unconstitutional.

§ 2923.04.[365] The court has today declared §§ 2907.01 and 2907.32 unconstitutional. They may not be used against Sovereign News, and it was only the use of §§ 2907.01 and 2907.32, in conjunction with § 2923.04 that the plaintiff could sustain a sufficiently concrete threat of prosecution under § 2923.04 to have Article III standing. *See, Bigelow v. Virginia, supra,* 421 U.S. at 816–817, 95 S.Ct. at 2230; *Young v. American Mini Theatres Inc., supra,* 96 S.Ct. at 2447, fn. 17. Further it is a settled principle of law that a court will not reach constitutional questions when it is not necessary. *See, e. g., Burton v. United States,* 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1904); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936). In this case it is no longer necessary to reach the constitutionality of § 2923.04.[366]

## VII.

## CONCLUSION

The court abstains, under the doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), from deciding Sovereign's declaratory judgment and preliminary injunction claims against the Montgomery County defendants, Lee Falke, E. R. Robinson, and C. L. Dalrymple, and therefore the court dismisses those claims against those defendants.

The court will *not* abstain, under either the *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) or *Railroad Comm. of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) abstention doctrines, from deciding Sovereign's declaratory judgment and preliminary injunction claims against the Cleveland police officer defendants and Cuyahoga County Prosecutor John T. Corrigan.

The court issues a declaratory judgment for Sovereign, and against the Cleveland police officer defendants and John T. Corrigan, holding Ohio's pandering obscenity statutes, Ohio Revised Code §§ 2907.32 and 2907.01(F), unconstitutionally overbroad and vague, and therefore violative of the First Amendment. The court, finding that Sovereign established a probability of success on the merits of its First Amendment claims against the Cuyahoga County defendants, issues a preliminary injunction against the Cleveland police officer defendants and John T. Corrigan, restraining those defendants from enforcing Ohio Revised Code §§ 2907.32 and 2907.01(F), either alone or in conjunction with other Ohio statutes, only against Sovereign, its owners, or its employees.[367] *See, Doran v. Salem Inn,* 422 U.S. 922, 931–933, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

The court declines to rule now on the merits of Sovereign's declaratory judgment and preliminary injunction claims against the Cuyahoga County officials regarding the asserted constitutional infirmities of Ohio's organized crime statute, Ohio Revised Code § 2923.04. For similar reasons the court does not now reach the merits of Sovereign's solely Fourth Amendment claims against the Cuyahoga County defendants.

IT IS SO ORDERED.

---

**365.** The court finds the same arguments adopted here to be applicable to § VIA of this opinion, the overbreadth of § 2923.04.

**366.** The court notes further that there are significant comity interests which require that this court allow state courts to first interpret § 2923.04. *See Erznoznik v. Jacksonville, supra,* 422 U.S. at 216, 95 S.Ct. 2268.

**367.** The court will not order the return of seized items which were employed in the Montgomery County investigation of Sovereign. The court will deal with the question of the appropriate disposition of the materials seized from Sovereign's premises which were never employed in the Montgomery County investigation after the appeal, if any, of today's decision.